IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

STATE OF NEW MEXICO, *et al.*,           )
                                          )
                    Plaintiffs,           )   Case Nos.   CIV 99-1118 BSJ/KBM
                                          )               CIV 99-1254 BSJ/ACT
vs.                                       )               (Consolidated)
                                          )
GENERAL ELECTRIC COMPANY,                 )
*et al.*,                                 )
                                          )
                    Defendants.           )

## MEMORANDUM OPINION & ORDER

**I.    FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**II.   BRIEF STATEMENT OF THE CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . . . 12

**III.  PROCEDURAL CONTEXT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

**IV.   ISSUES ADDRESSED AT THE PRETRIAL CONFERENCE** . . . . . . . . . . . 21

      **A.    The State's Interest in Groundwater** . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      **B.    The State's Interest in the Middle Rio Grande Basin Aquifer** . . . . . . 26

      **C.    The Alleged Injury to the State's Interest** . . . . . . . . . . . . . . . . . . . . . . 31

    **1.  The Loss of Drinking Water Services** . . . . . . . . . . . . . . . . . . . . . . . . 31

        **a.  The NMWQCC Regulations** . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

        **b.  The NMWQCC Regulations and Use of Groundwater** . . . . 35

        **c.  New Mexico Drinking Water Regulations** . . . . . . . . . . . . . . 37

        **d.  Reconciling the EIB & NMWQCC Regulations** . . . . . . . . . 38

        **e.  NMAC § 20.7.10.1 & Loss of Drinking Water Services** . . . . 41

    **2.  Plaintiffs' Theory of Injury Revisited** . . . . . . . . . . . . . . . . . . . . . . . 41

**V.  THE PLAINTIFFS' THEORY OF DAMAGES** . . . . . . . . . . . . . . . . . . . . . 44

  **A.  Loss of "Extractive Services" & Loss**

**of Value of *in situ* Groundwater** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    **1.  Alleged Loss of "Extractive Services"** . . . . . . . . . . . . . . . . . . . . . 46

    **2.  Alleged Loss of Value of *in situ* Groundwater** . . . . . . . . . . . . . . 51

    **3.  Different Labels, Same Injury** . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

  **B.  Loss of Drinking Water Services vs.**

**Total Loss of All Beneficial Uses** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

  **C.  "Temporary" vs. "Permanent" Injury** . . . . . . . . . . . . . . . . . . . . . . . 55

  **D.  Summary** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

**VI.  THE SCOPE AND LIMITS OF PLAINTIFFS' STATE LAW CLAIMS** . . . . 64

**A.**     **The State's Affected Interests** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

**B.**     **Plaintiffs' Current Pleadings** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

**C.**     **Extrinsic Limitations on the Available Remedies** . . . . . . . . . . . . . . . . 69

     **1. CERCLA & Plaintiffs' State Law Claims** . . . . . . . . . . . . . . . . . . . 69

        **a. The CERCLA Savings Clauses** . . . . . . . . . . . . . . . . . . . . . . . 69

        **b. Conflict Preemption** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

     **2. The Hydrocarbon Remediation Agreements** . . . . . . . . . . . . . . . . . 75

     **3. *Schwartzman*, Settlement and Release of the State's Claims** . . . . . 78

     **4. Avoidable Consequences & Plaintiffs'**

     **Duty to Mitigate Damages** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

**D.**     **Intrinsic Limitations on the Available Remedies** . . . . . . . . . . . . . . . . 82

     **1. Common Law Trespass** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

        **a. *Schwartzman* and Physical Invasion**

        **of a Possessory Interest** . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

        **b. Common-Law Trespass & the State's**

        **Interests in Public Water** . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

        **c. Trespass, Public Nuisance & Injury to Public Rights** . . . . . 88

        **d. Plaintiffs' Claims re: Injury to the Aquifer** . . . . . . . . . . . . 89

     **2. Common Law Public Nuisance** . . . . . . . . . . . . . . . . . . . . . . . . . 89

        **a. Remedies for Common Law Public Nuisance** . . . . . . . . . . . 91

b.  Nuisance Damages & the "Special Injury" Requirement . . 95

3.  Statutory Public Nuisance (N.M. Stat. Ann. § 30-8-2

(Repl. 1994)) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

a.  Availability of Damages for Statutory Public Nuisance . . 101

b.  Statutory Public Nuisance, NMED &

the Doctrine of Primary Jurisdiction . . . . . . . . . . . . . . . . . . 104

4.  Common Law Negligence . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

a.  Essential Elements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 106

b.  The Duty Issue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 107

c.  Breach of the Duty of Care . . . . . . . . . . . . . . . . . . . . . . . 110

d.  Causation in Fact & Proximate Cause . . . . . . . . . . . . . . . 111

e.  Injury in Fact & Damages . . . . . . . . . . . . . . . . . . . . . . . . 114

5.  Summary re: Instrinsic Limitations . . . . . . . . . . . . . . . . . . . . 117

E.  The Measure of Damages Under New Mexico Law . . . . . . . . . . . . . 118

1.  Diminution of Value & Loss of Use . . . . . . . . . . . . . . . . . . . . . 118

2.  Cost of Restoration as a Measure of Damages . . . . . . . . . . . . . . 119

3.  Plaintiffs' "Loss of Use" Damages Theory . . . . . . . . . . . . . . . . . 122

a.  Loss of Use Damages & Replacement Cost . . . . . . . . . . . . 122

b.  Proof of "Loss of Use"/Replacement Cost Damages . . . . 124

c.  Alternative Measures & the "License to Pollute" . . . . . . . 125

**4. Cost of Restoration vs. Replacement Cost** . . . . . . . . . . . . . . . . . . . 126

**5. Injury and Remedy in Hazardous Waste Cases** . . . . . . . . . . . . . 127

**6. The State as Public Trustee/*Parens Patriae*** . . . . . . . . . . . . . . . . 129

**7. Cost of Restoration & the Constraints on Plaintiffs' Claims** . . . . 131

**F.     The Measure of Damages in This Case** . . . . . . . . . . . . . . . . . . . . . . 132


**VII.     SCOPE OF THE TRIAL ON INJURY AND DAMAGES** . . . . . . . . . . . . . 136

**A.     Summary Judgment & Genuine Issues for Trial** . . . . . . . . . . . . . . 137

**B.     Genuine Issues Remaining for Trial** . . . . . . . . . . . . . . . . . . . . . . . . 139


**VIII.   RULINGS ON PENDING MOTIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141


**XI.     FINAL PRETRIAL CONFERENCE** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 145

## I.      FACTUAL BACKGROUND

Albuquerque's South Valley is located about 2.5 miles south of downtown

Albuquerque, west of the Albuquerque International Airport around the intersections of

Woodward Avenue with Broadway Avenue and Edmunds Street.  The South Valley area

has been the site of manufacturing operations since at least 1948, when the Eidal

Manufacturing Company operated a welding plant on Broadway Avenue.  In 1951, the

Atomic Energy Commission, through American Car and Foundry ("ACF Industries"),

took over the property, constructed plant facilities and engaged in machining of metal

parts, plating, welding and other activities related to the manufacture of nuclear weapons

components. This continued until 1967, when the United States Air Force (USAF)

assumed control over the property and converted the facility into an aircraft engine parts

manufacturing plant, known as U.S. Air Force Plant 83 ("Plant 83."), operated by General

Electric Company under a series of facilities contracts and leases.  In 1984, Plant 83 was

sold to General Electric Aircraft Engines (GEAE) and remains in operation today as an

aircraft engine parts manufacturing facility.  Other industrial facilities have been located

in South Valley as well, including petroleum product pipeline and bulk distribution

facilities operated by Chevron, Texaco and others, and an industrial chemical distribution

facility on Edmunds Street owned and operated by Univar.

In 1979, chemical analysis of samples collected from one of the City of

Albuquerque's municipal water supply wells, the San Jose 6 Well ("SJ-6"),[1] located near the intersection of Woodward and Broadway Avenues in the South Valley, detected the presence of hazardous substances consisting of "volatile organic compounds" ("VOCs," mainly halogenated solvents) and petroleum hydrocarbons.  Samples then taken from two other municipal supply wells, the San Jose 3 ("SJ-3") and Miles No. 1 Wells, were also found to be contaminated.  In 1981, after further investigation and monitoring by the Environmental Improvement Division of the New Mexico Health and Environment Department,  the San Jose 3 and San Jose 6 Wells were decommissioned due to the low-level VOC contamination problem.

The contamination and subsequent shut-down of SJ-6 had a significant impact upon the production of the San Jose Well Field, raising concerns among Albuquerque city officials that fire-protection water supplies in particular would be inadequate to serve the needs of the South Valley area, particularly during very dry years.

In light of these concerns, the New Mexico Environmental Improvement Division declared in June 1982 that the South Valley site was the State's number one priority for environmental cleanup, and brought the groundwater contamination problem to the attention of the United States Environmental Protection Agency (EPA).  Beginning in July 1982, the EPA proposed to list South Valley among the hazardous waste sites across the nation that needed remedial action.

---

[1]The City of Albuquerque's water supply infrastructure includes approximately 100 wells in 25 different well fields, including the San Jose Well Field in the South Valley.

On August 9, 1983, the Director of the Environmental Improvement Division formally requested that EPA initiate remedial investigations and feasibility studies associated with the South Valley site, including the resolution of immediate water supply problems resulting from the shut-down of the contaminated SJ-6 well. On September 8, 1983, the EPA published a final rule listing the one-square-mile area of land surrounding the SJ-3 and SJ-6 wells on its National Priorities List pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), Pub. L. 96-510, 94 Stat. 2767, *codified at* 42 U.S.C. §§ 9601 *et seq.* (2000), designating it as the South Valley NPL Site. *See* 48 Fed. Reg. 40,658 (September 8, 1983). The agency began the Remedial Investigation/Feasibility Study process at the South Valley Site, calling upon the Air Force and other potentially responsible parties at South Valley to conduct much of the investigative work.

The EPA established as many as six "Operable Units" (OU) for remediation activities at the South Valley Site:

OU1:  Replacement of the water supply wells at SJ-3 and SJ-6

OU2:  Plug and monitor wells at SJ-3 and SJ-6

OU3:  Groundwater remediation at the Univar Edmunds Street facility

OU4:  Soil Remediation at the Univar Edmunds Street facility

OU5:  Soil and shallow groundwater remediation at Plant 83/General Electric facility

OU6:  Deep aquifer ground water remediation at Plant 83/General Electric facility.

(EPA Site Status Summary: South Valley New Mexico (NMD980745558), at 4-5 (rev. October 7, 2003), *available at* http://www.epa.gov/earth1r6/6sf/pdffiles/southval.pdf .) Remedial work soon commenced, beginning with Operable Unit #1: the replacement of SJ-3 and SJ-6 was accomplished by the installation of a new replacement city water supply well, the Burton #4 Well, in April of 1987.  (*Id.* at 4.)[2]

Second phase remedial investigations were conducted at the Univar Edmunds Street Operable Units (#3 & #4) and the Plant 83/General Electric Operable Units (#5 & #6).  The investigation of the Univar Edmunds Street units led to the issuance of a Record of Decision on June 28, 1988,[3] followed by the drafting and execution of a consent decree effective June 1, 1990, requiring the implementation of a groundwater extraction and treatment system.  Installation of the system commenced in September of 1990; the system became operational in April 1992.  (*Id.* at 3, 4.)

Following public hearings and discussions with the State of New Mexico, the EPA issued its Record of Decision (ROD) concerning the Plant 83/General Electric Operable Units on September 30, 1988.[4]  Pursuant to the ROD, EPA issued a Unilateral

---

[2]In its 1985 Record of Decision, the EPA reported that as to the replacement well, "THE STATE OF NEW MEXICO REQUESTED THIS MEASURE AND HAS BEEN CONSULTED AND AGREES WITH THE APPROVED REMEDY."  (United States Environmental Protection Agency, Record of Decision: South Valley OU 1 (March 22, 1985), *available at* http://www.epa.gov/superfund/sites/rods/fulltext/r0685006.pdf .)

[3](*See* United States Environmental Protection Agency, Record of Decision: South Valley OU 3 (June 28, 1988) ("Univar ROD"), *available at* http://www.epa.gov/superfund/sites/rods/fulltext/r0688037.pdf .)

[4](*See* United States Environmental Protection Agency, Record of Decision: Former Air Force Plant 83/General Electric, South Valley Superfund Site (September 1988), Attachment 18 to Federal Defendants' Motion for Summary Judgment as to CERCLA Natural Resource Damages, filed July 10, 2002 (dkt. no. 587) ("Plant 83 ROD").)

Administrative Order to General Electric Company ("GE") for performance of design and construction of a remediation system to treat the contaminated groundwater. GE responded in August 1989, agreeing to comply with the Order and perform the work. GE performed the Remedial Design/Remedial Action (RD/RA), implementing the extraction and treatment remedies called for by the Plant 83 ROD, pumping, treating and reinjecting both shallow aquifer and deep aquifer water beginning in May 1994 and April 1996, respectively. (*Id.* at 3, 5.)[5]

Having the opportunity to review and comment on the EPA's proposed remedial scheme, the State of New Mexico, through the Environmental Improvement Division of the New Mexico Health and Environment Department, responded that "EID concurs with the remedy outlined in the draft Record of Decision for the GE/USAF Operable Unit . . . While this remedy alone does not address all potential threats to public health at the San Jose site it is an important part of the overall strategy to do so." (Plant 83 ROD, Attachment One (September 30, 1988).)

The New Mexico Environment Department (NMED) also undertook its own investigation of groundwater contamination due to hydrocarbons discharged from various petroleum facilities at South Valley. The NMED Ground Water Quality Bureau then negotiated Hydrocarbon Remediation Agreements (HRAs) with Chevron, ATA Pipeline,

---

[5]The cost of the remedial activity has been shared among GE, the Air Force and the United States Department of Energy (for the AEC): nine percent of the cost was allocated to General Electric, 43.2 percent was allocated to the Department of Energy, and 47.8 percent was allocated to the Air Force, based on the relative duration of land ownership.

and Texaco in 1994, requiring the companies to treat the contaminated soil and

groundwater underlying the South Valley Site using soil vapor extraction, free product

recovery, and dissolved phase groundwater recovery systems.

Groundwater remediation in the South Valley Operable Units continues today,

with the EPA recently observing that

> the groundwater remedial systems at the South Valley Superfund Site have
> been very effective in recovering and treating over 2.3 billion gallons of
> water since the remedial systems went on-line.  Almost the entire amount of
> this large volume of water has been returned to the aquifer from which it
> was extracted, allowing the groundwater to be returned back to its
> beneficial use.

(EPA Site Status Summary: South Valley New Mexico (NMD980745558), at 6 (rev.

October 7, 2003), *available at* http://www.epa.gov/earth1r6/6sf/pdffiles/southval.pdf .)

## II.    BRIEF STATEMENT OF THE CLAIMS

Plaintiffs the State of New Mexico and the State of New Mexico *ex rel.* Patricia A. Madrid assert the State's ownership of all waters in the State of New Mexico, including all groundwater underlying the South Valley Site.  Plaintiffs assert that pursuant to the New Mexico Constitution and laws, the State holds that groundwater in trust for the purpose of making it available for appropriation by users who will put it to a beneficial use.[6]  Plaintiffs also assert *parens patriae* standing to protect the State's sovereign interests together with interests which all of New Mexico's citizens hold in common in protecting public waters against pollution.[7]

Originally, the plaintiffs pleaded damages claims under CERCLA as well as several state law tort theories, all arising from the persistent chemical contamination of portions of the groundwater underlying the South Valley Site allegedly resulting from the conduct of the named defendants.[8]  Plaintiffs voluntarily dismissed all damages claims arising under CERCLA in November of 2002, and now assert only New Mexico statutory

---

[6]*See, e.g.*, Proposed Joint Pre-Trial Order, received July 29, 2003, at LI-105 ("the State has a paramount interest in protecting her citizens' interest in the rights and services which flow from the corpus of her ownership.  In this case, that interest is the ability to appropriate and beneficially use *in situ* groundwater."); *id.* ("The State has standing to pursue this case based on the public trust doctrine and its role as sovereign." (citing *State ex rel. New Mexico Water Quality Control Comm'n v. Molybdenum Corp. of America*, 89 N.M. 552, 554, 555 P.2d 375, 377 (Ct. App. 1976) (state has "authority to enforce its own regulations apart from any statutory authority"))).

[7]*See id.* at LI-106 ("The State has a sovereign interest in its water resources and is the proper party to pursue the claims of its citizens in its role as *parens patriae*." (citing *Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464 (10th Cir. 1993)).

[8]Plaintiffs have not sought relief in this action against *all* potentially responsible parties at South Valley, omitting, *e.g.*, the Univar Edmunds Street facility.

and common-law claims.

Plaintiffs allege that the chemical contamination at South Valley has rendered a significant volume of that groundwater—as much as 289,500 acre-feet [9]—unavailable for appropriation to its highest and best use, *viz.*, as drinking water for human consumption, and has thus injured the State's interest as owner and trustee in making the water available for appropriation.  Claiming a permanent loss, Plaintiffs seek an award of monetary damages to compensate the State of New Mexico for the value of the volume of contaminated groundwater thus rendered unavailable for appropriation, and damages for loss of use of that portion of the Middle Rio Grande Basin aquifer underlying the South Valley Site where the contaminated water may be found.  Plaintiffs' counsel submit that the proper measure of damages for this injury is the market value, with future losses adjusted to present value, of the volume of water affected by the contamination, together with the replacement cost of the storage capacity of the aquifer, which counsel also asserts to be permanently lost.

The Defendants respond that the claims now asserted by the Plaintiffs constitute an impermissible challenge to the ongoing remediation activities at South Valley because any such challenge is barred by § 113(h) of CERCLA, 42 U.S.C. § 9613(h) (2000), which

---

[9] (*See, e.g.*, Transcript of Hearing, dated December 10, 2003 (a.m.), at 2736:2-6 (testimony of Stephen B. Johnson).)  Under New Mexico law, "the standard of measurement of the volume of water shall be the acre-foot, being the amount of water upon an acre covered one foot deep, equivalent to forty-three thousand five hundred and sixty cubic feet."  N.M. Stat. Ann. § 72-5-19 (Repl. 1997).

An acre-foot of water equals 325,872.36 U.S. gallons.

provides that no federal court "shall have jurisdiction . . . to review any challenges to . . . remedial action" under CERCLA, at least prior to the completion of the remediation.  *See, e.g., United States v. State of Colorado*, 990 F.2d 1565, 1576 (10th Cir. 1993) ("to the extent a state seeks to challenge a CERCLA response action, the plain language of § 9613(h) would limit a federal court's jurisdiction to review such a challenge"), *cert. denied*, 510 U.S. 1092 (1994).  Moreover, because the State of New Mexico has concurred with the EPA's decisions concerning remedial action, or has itself approved remedial action pursuant to the Hydrocarbon Remediation Agreements, the Defendants assert that Plaintiffs are estopped from attacking the adequacy of the existing remediation.  *Cf. Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1429 (10th Cir. 1996) (equitable estoppel defined).

The Defendants further contend that the Plaintiffs' state law claims are pre-empted by federal law because "'under the circumstances of this particular case,'" the New Mexico tort remedies "'stand as an obstacle to the accomplishment of the full purposes and objectives of Congress'" in enacting CERCLA, *Geier v. American Honda Motor Co.*, 529 U.S. 861, 873 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)), particularly as implemented through the on-going remedial action overseen by the EPA. *See, e.g.*, *United States v. City and County of Denver*, 100 F.3d 1509, 1512 (10th Cir. 1996).

Besides preemption, the Defendants also argue that the Plaintiffs' state law claims

-14-

are barred by *res judicata* as a result of Plaintiffs' voluntary dismissal of their CERCLA

claims in November 2002 because the CERCLA claims involved the same parties; they

arise out of the same transaction or series of transactions; and their dismissal operates as a

final judgment on the merits of those claims.  *See, e.g.*, *Satsky v. Paramount*

*Communications*, 7 F.3d 1464, 1467-70 (10th Cir. 1993); *Clark v. Haas Group, Inc.*, 953

F.2d 1235, 1237, 1238-39 (10th Cir. 1992) (the doctrine of *res judicata* prohibits a party

from asserting in a second lawsuit any matter that might have been asserted in the first

lawsuit"; "even though one group of facts may give rise to different claims for relief upon

different theories of recovery, there remains but a single cause of action").

　　　　To the extent that Plaintiffs have pleaded any legally viable theory of liability, the

Defendants further respond that the State of New Mexico has suffered no compensable

injury because no volume of groundwater has been lost to appropriation from the Middle

Rio Grande Basin aquifer due to the contamination, including the groundwater beneath

the South Valley Site.  First, Defendants submit, the Middle Rio Grande Basin

groundwater has already been fully appropriated, and none remains available for new

appropriation whether it is contaminated or not.[10]  Moreover, the contamination has not

prevented *existing* water rights holders—primarily the City of Albuquerque—from

---

[10]Defendants point to the position taken on this subject by the State of New Mexico in the *Silvery Minnow* litigation.  *See Rio Grande Silvery Minnow v. Martinez*, Civil No. 99-1320-JP (D.N.M.), *prelim. ruling aff'd on interlocutory appeal sub nom. Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109 (10th Cir. 2003), *panel opinion vacated and appeal dismissed as moot*, 355 F.3d 1215 (10th Cir. 2004); (Proposed Joint Pre-Trial Order, received July 29, 2003, at LI-23).  *See also Middle Rio Grande Conservancy Dist. v. Babbitt*, 206 F. Supp.2d 1156, 1179 (D.N.M. 2000) (agency ignored "the most basic reality of the Rio Grande: it is a fully appropriated river system.").

exercising their rights to extract groundwater and apply it to beneficial uses.[11]  At most, the city was required to move a point of diversion away from the San Jose 6 Well.  While "remediation is ongoing, the Middle Rio Grande Basin continues to provide all of the services it provided prior to the contamination: it receives recharge, stores water, and provides safe yield."[12]  Finally, Defendants assert, all of the groundwater underlying the South Valley Site could be used to satisfy existing rights because either it currently meets drinking water standards or could be rendered potable through existing treatment methods.  "Accordingly," Defendants argue, "there is a complete failure of proof on the essential element of injury."[13]

## III.    PROCEDURAL CONTEXT

After three years of pleadings, amended pleadings, and extensive discovery and motion practice, this action was calendared for a Final Pretrial Conference beginning September 30 through October 4, 2002.[14]  In the initial five days of the Conference, court

---

[11](*See, e.g.*,  Motion and Memorandum for Partial Summary Judgment Seeking Dismissal of Plaintiffs' Alleged Lost Services Claims Under CERCLA and Lost Use Claims at Common Law, filed July 10, 2002 (dkt. no. 612), at 2 (Albuquerque "has not sustained any loss, deprivation, or diminution of its water rights as a result of the alleged contamination in the South Valley area, and . . . the City has continuously satisfied all past and current demands for water services through the unimpaired use of its water rights.").)

[12](Defendant ACF Industries, Inc.'s Supplemental Brief in Support of Summary Judgment, filed December 29, 2003 (dkt. no. 1041), at 5.)  *Cf.* ACF Industries, Inc.'s Motion for Partial Summary Judgment Limiting Damages to Those for Any Loss of Drinking Water Services and Brief in Support of the Motion, filed July 10, 2002 (dkt. no. 598), at 2 ("the State's damages are limited to any damages associated with the interim loss of use of the aquifer.").)

[13](Supplemental Memorandum in Support of Defendant General Electric Company's Motion for Summary Judgment on Plaintiffs' Damages Claims, filed December 29, 2003 (dkt. no. 1039), at 4.)

[14]The prior procedural history of this action has already been detailed elsewhere and will not be

(continued...)

and counsel considered "the formulation and simplification of the issues, including the elimination of frivolous claims or defenses," Fed. R. Civ. P. 16(c)(1), as well as the resolution of any remaining discovery disputes.  (*See* Minute Entry, dated September 30-October 4, 2002 (dkt. no. 900), *passim*.)  The parties' Proposed Joint Pre-Trial Order, received September 23, 2002, provided the working text for that effort; pending dispositive motions were also considered in the context of the Pretrial Conference, as this court had previously stated they would be.  (*Id.*)

As the Pretrial Conference progressed, the court made several rulings on substantive issues, denying summary judgment motions by Chevron Pipeline, Chevron USA, and Texaco entities raising the CERCLA statute of limitations (dkt. nos. 523, 582, 583), granting a motion by the Chevron/Texaco Defendants for summary judgment on plaintiffs' lost tax revenues claim (dkt. no. 584), granting in part a motion by General Electric attacking plaintiffs' "disamenity" damages theory (dkt. no. 631), and granting motions by ACF Industries and General Electric for summary judgment on Plaintiffs' punitive damages claims (dkt. nos. 597, 631).  (*Id.* )  The court reserved on other motions, and made a preliminary determination concerning plaintiffs' damages theories. (*See* Transcript of Hearing, dated October 3, 2002, at 736:22-737:2, 737:10-12, 738:3-5.)

When the Pretrial Conference resumed on November 18, 2002, court and counsel addressed a number of motions dealing with trial, including motions *in limine* seeking to

---

[14](...continued)
repeated here.  (*See* Order Denying Renewed Motion for Remand, filed March 27, 2003 (dkt. no. 987), at 3-19.)

exclude testimony by various expert witnesses.  (*See* Minute Entry, dated November 18-

20, 2002 (dkt. no. 919), *passim*.)  On November 20, based upon a stipulation by counsel

for all parties, this court entered an order dismissing Plaintiffs' CERCLA claims and the

federal defendants from the action, all with prejudice.  (Stipulation and Order of

Dismissal, filed November 20, 2002 (dkt. no. 909).)[15]

The Pretrial Conference continued on January 16, 2003, with the court inquiring of

counsel as to what remained.  The court heard and considered the Plaintiffs' motion to

amend their complaint, filed November 14, 2002 (dkt. no. 887), and denied the same.

(*See* Minute Entry, dated January 16-17, 2003 (dkt. no. 971), at 3.)[16]  The court also heard

Plaintiffs' motion for reconsideration of the court's earlier ruling concerning punitive

damages,[17] which was taken under advisement.  (*Id.*)  Further argument was heard on the

---

[15]Plaintiffs also filed a renewed motion for remand of their remaining claims to state court, which was heard on January 16, 2003, considered and denied by this court.  (*See* Order Denying Renewed Motion for Remand, filed March 27, 2003 (dkt. no. 987), at 3-19.)  That ruling became the subject of a petition for interlocutory appeal, which in turn was denied by the court of appeals.  (*See* Order, filed May 13, 2003, *State of New Mexico vs. General Electric, et al.*, Case No. 03-0500 (10th Cir.) (Mem.).)  A subsequent motion for reconsideration was also denied. (*See* Order, filed July 1, 2003, *State of New Mexico vs. General Electric, et al.*, Case No. 03-0500 (10th Cir.) (Mem.).)

[16]Consequently, Plaintiffs' pleaded claims in this action currently consist of those *non*-CERCLA claims alleged in the State of New Mexico's Complaint in the Consolidated Case, filed July 31, 2001 (dkt. no. 367), as modified to the extent that claims against Chevron Pipeline are also deemed to be repleaded against defendant Chevron U.S.A. (*See* Plaintiffs' Motion for Leave to File Amended Complaint, filed September 19, 2002 (dkt. no. 800); Order, filed September 30, 2002 (dkt. no. 863) (granting motion); Transcript of Hearing, dated August 8, 2003, at 2378:4-2379:23; Stipulation and Order Re: Chevron U.S.A., Inc., filed March 16, 2004 (dkt. no. 1065).)

[17](*See* Motion for Reconsideration on Plaintiffs' Claims for Punitive Damages, filed December 23, 2002, *nunc pro tunc* to November 27, 2002 (dkt. no. 924).)

Defendants' various motions for summary judgment on Plaintiffs' damages claims.[18]  (*Id.*

at 5.)

The Pretrial Conference continued on February 4, 2003, resuming the colloquy

concerning the Plaintiffs' damages theories and the nature of the State's interest in the

groundwater in question; court and counsel addressed the question of the applicable legal

standards defining the Plaintiffs' claimed injury, and the court heard and considered

several motions concerning expert testimony and motions in limine concerning specific

evidence questions.  (*See* Minute Entry, dated February 4-6, 2003 (dkt. no. 985), at 1-5.)

Bifurcation of trial was also discussed.  (*Id.* at 5-7.)  On February 6, the court made a

bench ruling concerning the legal standards defining Plaintiffs' claimed injury, denying a

request by Plaintiffs for certification of the question to the state courts.  (*Id.* at 7-11.)  A

jury trial on damages issues was provisionally set for April, 2003,[19] and the Pretrial

Conference was continued until March.

Other procedural matters arose, delaying the continued Pretrial Conference in this

---

[18](*See* ACF Industries, Inc.'s Motion for Partial Summary Judgment Limiting Damages to Those for
Any Loss of Drinking Water Services and Brief in Support of the Motion, filed July 10, 2002 (dkt. no. 598));
Defendant General Electric Company's Motion and Supporting Memorandum for Summary Judgment on
Plaintiffs' Damages Claims, filed July 10, 2002 (dkt. no. 631).)
    One summary judgment motion on damages by the ATA Defendants (no longer parties), ACF Industries
and Chevron USA was not heard, but nonetheless remains pending before the court, at least to the extent it was
not rendered moot by Plaintiffs' dismissal of all of their CERCLA claims. (*See* Motion and Memorandum for
Partial Summary Judgment Seeking Dismissal of Plaintiffs' Alleged Lost Services Claims Under CERCLA and
Lost Use Claims at Common Law, filed July 10, 2002 (dkt. no. 612).)

[19]The provisional trial date was stricken by Order of the court on March 27, 2003, in deference to
Plaintiffs' attempts to obtain interlocutory review by the court of appeals. (*See* Order, filed March 26, 2003 (dkt.
no. 986).)

case until August of 2003.  The conference resumed session on August 6, returning once

again to the questions of Plaintiffs' damages claims and the issues that genuinely remain

to be resolved at trial.  (*See* Minute Entry, dated August 6-8, 2003 (dkt. no. 1014), at 2-

3.)[20] The court also heard and considered Plaintiffs' motion to substitute an expert witness

and defendant GE's motion for an evidentiary hearing concerning certain expert

witnesses.  (*Id.* at 4.)  Court and counsel reviewed the parties' proposed witness lists in

some detail, received the parties' exhibits as listed on the proposed exhibit lists, subject to

particular motions to strike, and granted GE's motion for an evidentiary hearing

concerning expert witnesses under Fed. R. Evid. 702.[21]  (*Id.* at 5-6.)  On August 8, the

court set new dates for submission of revised witness and exhibit lists, calendared the

Rule 702 evidentiary hearing for December 9, 2003, and deferred on setting a new trial

date.  (*Id.* at 7-8.)[22]  By subsequent Order, trial was provisionally set to begin February 9,

2004.  (*See* Order, filed September 2, 2003 (dkt. no. 1015), at 4.)

From December 9 through December 12, 2003, and continuing through January 7

and 8, 2004, the court heard testimony from the experts listed by counsel for the Rule 702

---

[20]Counsel for the parties had prepared and submitted a revised Proposed Joint Pre-Trial Order, received by the court on July 29, 2003.

[21]*See Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221-29 (10th Cir. 2003).

[22]The court also expressed its intent to draft a revised Final Pretrial Order governing the first (damages) phase of the trial.  (*See* Transcript of Hearing, dated August 8, 2003, at 2372:21-2373:4 (The Court).)

hearing,[23] heard argument by counsel concerning experts and damages theories (as well as several recently filed motions), and took many of those matters under advisement.[24]  (*See* Minute Entry, dated December 9-12, 2003 (dkt. no. 1059), at 2-6; Minute Entry, dated January 7-8, 2004 (dkt. no. 1066); Transcript of Hearing, dated January 7, 2004, *passim*; Transcript of Hearing, dated January 8, 2004, *passim*.)  The court vacated the provisional February 9, 2004 trial date, resetting the Final Pretrial Conference for that date, but on further consideration, vacated the February 9 setting altogether, deferring the calendaring of the Final Pretrial Conference and the first phase of trial pending further order of the court.  (*See* Transcript of Hearing, dated January 8, 2004, at 4150:7-21 (The Court); Order, filed January 29, 2004 (dkt. no. 1063).)

## IV.   ISSUES ADDRESSED AT THE PRETRIAL CONFERENCE

Since commencing this action in October of 1999, the Plaintiffs have been creative in the number and kind of theories of liability they have pleaded and argued in this action. The Defendants in turn have proven resourceful in responding to the Plaintiffs' claims, propounding an array of legal theories and factual assertions.  By the time of the most recent hearing in January, the pleadings, motions and other papers filed in this action

---

[23]The court heard from Dennis E. Williams, David S. Brookshire, Stephen B. Johnson, Steven P. Larson, Jerold Grisak, Matthew Davis, Emlen Hall,  John A. Connor, John Billiard, Phillip Soice, Dennis Cooper, Theodore Tomasi, Donald E. Myers, John W. Hawley, William H. DesVousges.

[24]Plaintiffs' Motion to Strike and Limit the Expert Opinions Offered by Matthew Davis, filed December 29, 2003 (dkt. no. 1042), and Motion to Exclude Newly Formed Opinions of Dennis [John] Connor, filed December 31, 2003 (dkt. no. 1048), were heard, considered and denied, as were GE's Motion to Strike Jury Demand, filed October 6, 2003 (dkt. no. 1027), and Motion for Judgment on the Pleadings on Plaintiffs' State Law Action (No. CIV 99-1254) on Grounds of Res Judicata, filed October 10, 2003 (dkt. no. 1028).

exceeded *thirty-seven shelf feet* of files in the Clerk's Office, and more filings have since been received.  Together the parties have raised a multitude of issues requiring distillation and refinement in the context of the Pretrial Conference.

We began our continuing discussion of this case by considering a few fundamental questions, and we have returned to those questions again and again:

(1)     What is the nature of the State's interest in the groundwater underlying the South Valley Site?

(2)     How has that interest been injured, and as measured by what standard?

(3)     What is the appropriate measure of damages to compensate that injury?

**A.     The State's Interest in Groundwater**

According to Plaintiffs, "all ground waters . . . belong to the public and are natural resources 'belonging to,' 'managed by,' 'held in trust by,' and 'controlled by' the State of New Mexico.  (State of New Mexico's Complaint in the Consolidated Case, filed July 31, 2001 (dkt. no. 367) ("Consolidated Complaint"), at 5 ¶ 13.)  Plaintiffs' counsel asserts that the State of New Mexico is the absolute owner of the groundwater, subject only to the rights of others under New Mexico law to seek to appropriate the water for a beneficial use, and to do so through an administrative process managed by the State Engineer.

To define the legal interest of the State, we look first to the New Mexico Constitution: Art. XVI, Sec. 2 provides that unappropriated water in the State of New

Mexico belongs to the public: "The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, is hereby declared to belong to the public and to be subject to appropriation for beneficial use, in accordance with the laws of the state. Priority of appropriation shall give the better right."

The legislature echoes this language in *New Mexico Statutes Ann*. § 72-1-1 (Repl. 1997): "All natural waters flowing in streams and watercourses, whether such be perennial, or torrential, within the limits of the state of New Mexico, belong to the public and are subject to appropriation for beneficial use. . . ."  In 1931, the Legislature explicitly extended this rule to much of New Mexico's groundwater: "The water of underground streams, channels, artesian basins, reservoirs or lakes, having readily ascertainable boundaries, are hereby declared to be public waters and to belong to the public and to be subject to appropriation for beneficial use."  N. M. Stat. Ann. § 72-12-1 (Cum. Supp. 2002).[25]  As the New Mexico Supreme Court has explained:

> All water within the state, whether above or beneath the surface of the ground belongs to the state, which authorizes its use, and there is no ownership in the corpus of the water but the use thereof may be acquired and the basis of such acquisition is beneficial use. . . . The state as owner of

---

[25]This statute and its predecessor, 1927 N.M. Laws ch. 182, § 1, are understood to be declaratory of then-existing law.  *See Pecos Valley Artesian Conserv. Dist. Peters*, 50 N.M. 165, 182, 173 P.2d 490, 501 (1945); *Yeo v. Tweedy*, 34 N.M. 611, 286 P. 970, 972 (1929).  Another provision of the statute declares that "all underground waters of the State of New Mexico are hereby declared to be public waters and to belong to the public of the State of New Mexico and to be subject to appropriation for beneficial use," N.M. Stat. Ann. § 72-12-18 (Repl. 1997), but does so for the purpose of provisions governing the use of such water outside of the State of New Mexico. *See* N.M. Stat. Ann. §§ 72-12B-1, 72-12B-2 (Repl. 1997); *State ex rel. Reynolds v. Mendenhall*, 68 N.M. 467, 469-70, 362 P.2d 998, 1000 (1961). The State Engineer's authority to regulate appropriation of groundwater for in-state use remains limited to basins "declared by the state engineer to have reasonably ascertainable boundaries."  N.M. Stat. Ann. § 72-12-20 (Repl. 1997).

the water has the right to prescribe how it may be used."

*State ex rel. Erickson v. McLean*, 62 N.M. 264, 308 P.2d 983, 987 (1957) (citations

omitted).

"Beneficial use is the basis, the measure and the limit to the right to the use of the

waters" owned by the State, including its groundwater.  N.M. Stat. Ann. § 72-1-2 (Repl.

1997).[26]

> Generally, individuals seeking to appropriate water . . . are required
> to seek a permit from the state engineer. *Id.* Since 1931, the state engineer
> has declared individual groundwater basins throughout most of the state and
> has regulated appropriation of their waters. *See* NMSA 1978, §§ 72-12-18;
> *see generally* Charles T. DuMars, *New Mexico Water Law: An Overview
> and Discussion of Current Issues,* 22 Nat. Resources J. 1045 (1982).

*Elephant Butte Irr. Dist. v. Regents of New Mexico State University*, 115 N.M. 229, 232-

33, 849 P.2d 372, 375-76 (Ct. App. 1993).  *See also* N.M. Stat. Ann. § 72-12-2 (Cum.

Supp. 2002) (procedure for application for use of underground water).

The State serves as the watermaster, the gatekeeper, the overseer of the process of

appropriation for beneficial use.  As counsel suggests, it acts as the trustee: it owns the

resource, but holds it not for itself, but for the use and benefit of the public.  The

---

[26]    New Mexico, like most Western states, follows the prior appropriation
doctrine. N.M. Const. art. XVI, §§ 2 (Repl.Pamp.1992); *see also* NMSA
1978, §§ 72-1-1 (Repl.1985). This doctrine may be characterized as a "first in
time, first in right" system, under which "[b]eneficial use [is] the basis, the
measure and the limit of the right to the use of water." N.M. Const. art. XVI,
§§ 3 (Repl.Pamp.1992); *see also* NMSA 1978, §§ 72-1-2 (Repl.1985). . . .

*Elephant Butte Irr. Dist. v. Regents of New Mexico State University*, 115 N.M. 229, 232, 849 P.2d 372, 375 (Ct.
App. 1993).  In turn, "beneficial use" is defined as "the use of such water as may be necessary for some useful
and beneficial purpose in connection with the land from which it is taken."  *State ex rel. Erickson v. McLean*,
308 P.2d at 988.

commodity it "owns," it cannot sell, lease or give away; it can only make it available for use by others.[27]  *See Jicarilla Apache Tribe v. United States*, 657 F.2d 1126, 1133 (10th Cir. 1981) ("The state controls the use of water because it does not part with ownership; it only allows a usufructuary right to water.").[28]  If the State wishes to obtain a right to appropriate water to a beneficial use, like everyone else it must make application to the State Engineer:

> Any person, association or corporation, public or private, *the State of New Mexico*, or the United States of America . . . hereafter intending to acquire the right to the beneficial use of any waters, shall, before

---

[27]Plaintiffs point to *State ex rel. State Game Commission v. Red River Valley Co.*, 51 N.M. 207, 182 P.2d 421 (1945), as support for their assertion that "the State/public can sell its water, lease its water, and give it away since it is the owner of that water and never parts with that ownership."  (Plaintiff's Further Response to General Electric Company's Supplemental Brief in Support of its Motion for Summary Judgment on Plaintiff's Damage Claims," filed December 29, 2003 (dkt. no. 1043), at 10.)  However, the *Red River Valley Co.* case involved the question of whether the State Game Commission could open for recreational use a body of unappropriated public water stored in a reservoir on private property.  The court concluded that the waters of Conchas Dam Reservoir, being waters impounded from two natural streams, are "public waters" subject to jurisdiction of the State Game Commission; the landowner had no right of recreation or fishery distinct from the right of general public; and that public waters of state, by legislative authority, have been dedicated to use of public for fishing and recreation.

[28]The Defendants respond that the State does not actually "own" the public waters in the traditional sense:

> As the U.S. Supreme Court stated in *Toomer v. Witsell*, 334 U.S. 385, 402, 68 S. Ct. 1156, 1165, 92 L. Ed. 1460,1474 (1946), so-called state "ownership" of natural resources "is now generally regarded as but a fiction expressive in legal shorthand" of a State's [sovereign] power to regulate the use of its resources.  *See also Mountain States Legal Foundation v. Hodel*, 799 F.2d 1423, 1426 (10th Cir. 1986); *City of El Paso v. Reynolds*, 563 F. Supp. 379, 388 (D.N.M. 1983).  As a result, the State as a sovereign does not "own" natural resources in the same way it owns "lands and buildings so as to support a civil action for damages." *Commonwealth v. Agway, Inc.*, 210 Pa. Super. 150, 232 A.2d 69, 71 (Pa. Super. 1967) (finding that state had insufficient property interest to bring an action for trespass for injury to natural resources as a result of water contamination); *see also State of North Dakota v. Dickinson Cheese Co.*, 200 N.W.2d 59, 61 (N.D. 1972) (same).

(Reply Memorandum in Support of Defendants' Motion to Dismiss and for Judgment on the Pleadings on the State Law Claims for Trespass, Nuisance and Unjust Enrichment, filed October 4, 2001 (dkt. no. 402), at 4-5.)

commencing any construction for such purposes, make an application to the state engineer for a permit to appropriate . . . .

N.M. Stat. Ann. § 72-5-1 (Repl. 1997) (emphasis added).

In this case, the Plaintiffs allege an injury to the State's interest as trustee, and not as an owner or holder of water rights, or as a beneficial user of water.[29]  Plaintiffs are not here as appropriators or users of water; nor are they here on behalf of other water rights holders or water users.  The entity that once diverted groundwater from South Valley wells to beneficial use—the City of Albuquerque—is not here.  The city's right to appropriate groundwater has been satisfied by changing the point of diversion to another well (the Burton #4 Well) that pumps groundwater from the same aquifer, and the city asserts no claim for damages in this action.

## B.     The State's Interest in the Middle Rio Grande Basin Aquifer

The Plaintiffs also claim an injury to the aquifer underlying the South Valley Site, separate and apart from the alleged injury to the groundwater located there: "Experts . . . agree that the aquifer, as a storage medium, is a natural resource that has economic value and can be injured through contamination by various hazardous substances."[30]

In contrast to the state's water resources, however, the New Mexico Constitution

---

[29]While Plaintiffs appear to assert some interest in the *storage* of groundwater for future diversion by the City of Albuquerque for various beneficial uses, storage for the sake of storage alone is not a beneficial use under New Mexico law, particularly where future use "is nothing more than speculative with respect to the beneficial uses."  *Jicarilla Apache Tribe v. United States*, 657 F.2d at 1135; *see id.* at 1133-1136.

[30](Plaintiff's Further Response to General Electric Company's Supplemental Brief in Support of its Motion for Summary Judgment on Plaintiffs' Damages Claims," filed December 29, 2003 (dkt. no. 1043), at 3.)

and statutes do not speak of permanent State ownership or trusteeship of *all* of the soils, clay, sand, gravel, rocks and minerals within the state—the geological constituents of which any aquifer is comprised.  Indeed, there appears to be very little beyond the New Mexico Enabling Act's requirement that "no sale or other disposal [of state land or its natural productions] shall be made for a consideration less than the [appraised true] value." Act of June 20, 1910, ch. 310, § 10, 36 Stat. 557, 564.  The New Mexico Supreme Court has observed that "[t]he State has a nondelegable duty to hold as trustee state lands and their products—as well as the proceeds from the sale of state lands and their products—for the development of state schools and other public institutions.  *See* N.M. Const. art. XXIV, § 1." *Bogle Farms, Inc. v. Baca*, 122 N.M. 422, 429, 925 P.2d 1184, 1191 (1996).  However this trust duty extends to lands—particularly school trust lands—owned by the State that may ultimately be sold and conveyed to others.

Whether the State has retained an ownership or trust interest in the minerals, including sand and gravel, underlying parcels of state land that have been sold and conveyed to others is a fact-specific determination under New Mexico law, and is not determined by a blanket state property law rule.  *Id.*, 122 N.M. at 433, 925 P.2d at 1194 ("whether sand and gravel are 'minerals' as that term is used in general mineral reservations is to be answered on a case-by-case basis by examining the intent of the parties").  Similarly, sand, gravel and other geological constituents of an aquifer may or may not have been reserved to the United States in lands otherwise patented in fee simple

to landowners in New Mexico.  *See, e.g.*, *Watt v. Western Nuclear, Inc.*, 462 U.S. 32

(1983) (gravel is a "mineral" reserved to the United States in lands patented under the

Stock-Raising Homestead Act); *but cf. Andrus v. Charlestone Stone Products Co., Inc.*,

436 U.S. 604 (1978) ("common varieties" of sand and gravel excluded from "valuable

minerals" under federal mining statute).

  In the extensive briefing on their damages claims, Plaintiffs cite no statutory or

case authority that directly supports their assertion that the State of New Mexico *owns* the

Middle Rio Grande Basin aquifer as a "natural resource" in the same sense that it "owns"

the public's water.  Nor have Plaintiffs cited to any cases in which damages have actually

been awarded for injury to the aquifer itself.[31]  Prior reported cases from other

jurisdictions do not appear to distinguish between pollution of an aquifer and the

contamination of the groundwater found in the aquifer, and the injury has been measured

in terms of lost use of groundwater.  *See, e.g.*, *Miller v. Cudahy Co.*, 858 F.2d 1449,

1456-57(10th Cir. 1988); *Artesian Water Company v. New Castle County*, 851 F.2d 643,

650 (3d Cir. 1988).  Similarly, unless the State claims some proprietary interest in the

land or the aquifer's subsurface geologic materials as a landowner or title holder, then it

would seem that chemical contamination of those geologic materials impacts the State's

---

[31]Plaintiffs rely on *State of Utah v. Kennecott Corp.*, 801 F. Supp. 553 (D. Utah 1992), as recognizing
the storage value of the aquifer as a value distinct from the loss of use of the groundwater found there, but no
damages were actually awarded in that case; instead, the court rejected a proposed consent decree under
CERCLA on the ground, among others, that the State's own assessment of damages under the "loss of use"
method failed "to take into account damages such as loss of the aquifer apart from market value of the quantity
of water the State determined to be contaminated . . . ."  *Id.* at 566-67.

interest in groundwater only when it results in further groundwater contamination.

Current landowners may have a claim under CERCLA and state tort law for soil pollution as against the parties responsible for that contamination, *e.g.*, *Nielsen v. Sioux Tools, Inc.*, 870 F.Supp. 435 (D. Conn. 1994), but whether the State of New Mexico is a current landowner at South Valley has not been pleaded or proven in this case.

Plaintiffs' Consolidated Complaint makes no reference to the tract book in pleading the State's interest in the aquifer beneath the South Valley Site.  In Defendant ACF Industries, Inc.'s Motion for Summary Judgment on Plaintiffs' Nuisance Claims and Brief in Support of the Motion, filed July 10, 2002 (dkt. no. 606), the statement of "Undisputed Material Facts" avers that "[t]he Site and lands adjacent to the Site are under private ownership and the State owns no land within the geographic proximity of the Site," and that "[t]he State has no possessory interest in the soil near the Site or in any soil alleged to have been contaminated by ACF."  (*Id.* at at 2 ¶2.)  Likewise,  Chevron/Texaco set forth as undisputed the averments that "[t]he Site and lands adjacent to the Site are under private ownership and Plaintiffs own no land within the geographic proximity of the Site," and that "Plaintiffs have no possessory interest in . . . any soil alleged to have been contaminated by Chevron, Texaco," and others.  ([Chevron/Texaco] Motion and Memorandum of Points and Authorities in Support of Motion for Summary Judgment on Public Nuisance Claims, filed July 10, 2002 (dkt. no. 646), at 3 ¶2.)[32]

---

[32]In Chevron/Texaco's Motion and Memorandum in Support of Motion for Summary Judgment on
(continued...)

Plaintiffs' Response to the Petroleum Pipeline Defendants' Motion for Summary Judgment on Public Nuisance Claims, filed September 3, 2002 (dkt. no. 735), argues that "[o]wnership of the surface property is not relevant to the State's claims for nuisance; the State possess[es], owns and holds in trust the water on and beneath the surface.  It possess[es] the State's natural resources.  Such possessory interest is a matter of law, not an issue of fact."  Plaintiffs' Response to ACF Industries' Motion for Summary Judgment on Public Nuisance Claims, filed August 30, 2002 (dkt. no. 721),  does not controvert ACF's assertions concerning ownership at all.

Absent proof of some possessory ownership interest in *land* at the South Valley Site—title to the surface or subsurface estate, a reservation of minerals, or the like—the State has no legally cognizable interest in the aquifer beneath the South Valley Site. Plaintiffs thus have no legal footing for their damages claim based upon injury to the aquifer itself.[33]

---

[32](...continued)

Claim for Trespass, filed July 10, 2002 (dkt. no. 629), at 4 ¶ 1, the Defendants assert that "Plaintiffs admit that '[a]s stated in the State's previous response, the State is not claiming to have title to the surface land, rather, the State's claim is to the subsurface water . . . .'" (quoting Surreply to Defendants' Reply Memorandum in Support of Defendants' Motion to Dismiss and for Judgment on the Pleadings on the State Law Claims for Trespass, Nuisance and Unjust Enrichment, filed November 26, 2001 (dkt. no. 422), at 4).  Plaintiffs responded that "the State of New Mexico does possess and 'own' the unappropriated subsurface water in the State."  (The State of New Mexico's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment on Claim for Trespass, filed August 30, 2002 (dkt. no. 720), at 3.)

[33]Toxic contamination of the geological materials comprising the aquifer may create a public nuisance that the State has the power to abate, but as "an unreasonable interference with a right common to the general public," that would be an injury to the same legal interest, *viz.*, the right to appropriate and use the public's water, for which Plaintiffs already seek a remedy.  *Cf. Miller v. Cudahy Co.*, 858 F.2d at 1456-57.

### C.   The Alleged Injury to the State's Interest

Plaintiffs assert that the groundwater underlying the South Valley Site, and a portion of the larger aquifer in which it is found, have been injured through contamination by a list of organic chemicals, and that the ongoing remediation activities conducted pursuant to CERCLA and the State's own Hydrocarbon Remediation Agreements will neither restore the contaminated groundwater to its pristine, pre-contaminated "baseline" condition, nor restore it to a condition suitable for use as drinking water: "The STATE OF NEW MEXICO has been prevented from allowing its citizens the benefit of this natural resource.  Further, even after said remediation, the natural resource will remain in an impaired state, unusable and/or nonpotable, and unfit for human consumption." (Consolidated Complaint at 14 ¶ 44.)

### 1.  The Loss of Drinking Water Services

Given Plaintiffs' assertion of the loss of use of groundwater for drinking water purposes as their claimed injury to the State's interests in this case, the court's inquiry at pretrial was simply this: *under New Mexico law, what is the proper legal standard to apply in determining whether drinking water services have been lost?*

### a.  The NMWQCC Regulations

Plaintiffs point to New Mexico Water Quality Control Commission (NMWQCC) regulations found in Title 20, Chapter 6, Part 2 of the New Mexico Administrative Code, NMAC §§ 20.6.2.3101 *et seq.* and 20.6.2.4101 *et seq.*, as being applicable to the question

of use.  NMAC § 20.6.2.3101 *et seq.* governs "discharges onto or below the surface of the ground," with the goal of protecting the quality of New Mexico groundwater for future use while still allowing discharge of contaminants and "degradation of the ground water up to the limit of" the levels set by that Part's ground water standards in NMAC § 20.6.2.3103.   NMAC § 20.6.2.3101(A), (B).[34]  Both the New Mexico Water Quality Act[35] and these NMWQCC regulations promulgated under the Act seek to protect the quality of New Mexico's surface and groundwater primarily through the administration of a system of discharge permits.  *See* N.M. Stat. Ann. § 74-6-5 (discharge permits); § 74-6-5.1 (disclosure statements by permit applicants); § 74-6-10 (enforcement & compliance orders); §§ 74-6-10.1, 74-6-10.2 (civil & criminal penalties).  Like its federal counterpart,

---

[34]     **20.6.2.3101  PURPOSE:**

A.  The purpose of Sections 20.6.2.3000 through 20.6.2.3114 NMAC *controlling discharges onto or below the surface of the ground* is to protect all ground water of the state of New Mexico which has an existing concentration of 10,000 mg/l or less TDS, for present and potential future use as domestic and agricultural water supply, and to protect those segments of surface waters which are gaining because of ground water inflow, for uses designated in the New Mexico Water Quality Standards. Sections 20.6.2.3000 through 20.6.2.3114 NMAC are written so that in general:

(1)  if the existing concentration of any water contaminant in ground water is in conformance with the standard of 20.6.2.3103 NMAC, degradation of the ground water up to the limit of the standard will be allowed; and

(2)  if the existing concentration of any water contaminant in ground water exceeds the standard of Section 20.6.2.3103 NMAC, no degradation of the ground water beyond the existing concentration will be allowed.

B. Ground water standards are numbers that represent the pH range and maximum concentrations of water contaminants in the ground water which still allow for the present and future use of ground water resources. [Emphasis added.]

[35]N.M. Stat. Ann. §§ 74-6-1 *et seq.* (Repl. 2000).

the New Mexico Water Quality Act seeks to maintain and improve water quality by addressing water pollution at its *source*: those who discharge contaminants into the State's waters.  The NMWQCC regulations issued pursuant to that Act serve to detail the discharge permit process.  *See* NMAC § 20.6.2.3104 (permit requirement);[36] NMAC §§ 20.6.2.3103-20.6.2.3113 (permit procedure); NMAC § 20.6.2.3114 (schedule of fees for discharge permits).

Where a serious contamination problem already exists, the abatement process contemplated by the Water Quality Act and detailed in the NMWQCC regulations seeks to remediate the problem, placing much of the burden of restoring water quality upon the "responsible persons," who must formulate and carry out an NMED-approved abatement plan.  NMAC § 20.6.2.4103 (abatement standards & requirements); §§ 20.6.2.4104, 20.6.2.4106 (abatement plans); §§ 20.6.2.4108-20.6.2.4109 (public notice & agency approval).  Abatement of water pollution is not complete until "the standards and requirements set forth in Section 20.6.2.4103 NMAC are met."  NMAC § 20.6.2.4112

---

[36] **20.6.2.3104 DISCHARGE PERMIT REQUIRED:** Unless otherwise provided by this Part, no person shall cause or allow effluent or leachate to discharge so that it may move directly of indirectly into ground water unless he is discharging pursuant to a discharge permit issued by the secretary. When a permit has been issued, discharges must be consistent with the terms and conditions of the permit. In the event of a transfer of the ownership, control, or possession of a facility for which a discharge permit is in effect, the transferee shall have authority to discharge under such permit, provided that the transferee has complied with Section 20.6.2.3111 NMAC, regarding transfers.

(completion).[37]  NMAC §§ 20.6.2.4101 *et seq.* governs administrative abatement plans and proceedings conducted by the New Mexico Environment Department (NMED), again with the goal of protecting present and future use of the water for domestic and agricultural purposes by cleaning up serious contamination problems where they exist. NMAC § 20.6.2.4101(A), (B);[38] *see* NMAC § 20.6.2.4103 (abatement standards).

Both of these NMWQCC regulations prove wholly consistent with the power and duty of the NMWQCC under the New Mexico Water Quality Act to "adopt, promulgate and publish regulations *to prevent or abate water pollution* in the state or in any specific geographic area, aquifer, watershed of the state," and to "adopt water quality standards for surface and ground waters of the state" that "shall include . . . the designated uses of the waters and the water quality criteria necessary *to protect* such uses."  N.M. Stat. Ann.

---

[37]Plaintiffs' counsel acknowledges this: "The Water Quality Control Commission regulations regulate people who contaminate water, and it sets the levels to which that water must be cleaned up to protect public health."  (Transcript of Hearing, dated February 5, 2003, at 1873:25-1874:4 (Mr. Garber).)  "That's the situation we have here, and that's why these standards are the best measure."  (*Id.* at 1874:4-5.)

[38]    **20.6.2.4101  PURPOSE:**

**A.**  The *purposes of Sections 20.6.2.4000 through 20.6.2.4115 NMAC are to:*

*(1) Abate pollution of subsurface water* so that all ground water of the State of New Mexico which has a background concentration of 10,000 mg/L or less TDS, is either *remediated or protected for use as domestic and agricultural water supply*, and to remediate or protect those segments of surface waters which are gaining because of subsurface-water inflow, for uses designated in the Water Quality Standards for Interstate and Intrastate Streams in New Mexico (20.6.4 NMAC);

\* \* \*

**B.**  If the background concentration of any water contaminant exceeds the standard or requirement of Subsections A, B and C of Section 20.6.2.4103 NMAC, pollution *shall be abated by the responsible person* to the background concentration.  [Emphasis added.]

§ 74-6-4(C), (D) (Supp. 2002) (emphasis added).

But do either of these NMWQCC regulatory schemes limit the actual *use* of contaminated groundwater?

### b.  The NMWQCC Regulations and Use of Groundwater

NMAC § 20.6.2.3101(C) expressly states: "The standards are not intended as maximum ranges and concentrations for use, and nothing herein contained shall be construed as limiting the use of waters containing higher ranges and concentrations." Likewise, NMAC § 20.6.2.4101(C) expressly states: "The standards and requirements set forth in Section 20.6.2.4103 NMAC are not intended as maximum ranges and concentrations for use, and nothing herein contained shall be construed as limiting the use of waters containing higher ranges and concentrations."  The language of NMAC §§ 20.6.2.3101(C) and 20.6.2.4101(C) clearly expresses the intent that these regulations *not* be construed "as limiting the use of waters containing higher ranges and concentrations" of contaminants than the water quality standards set forth in those regulations.  Based upon their plain meaning, these regulations do *not* govern whether a given volume of groundwater may actually be appropriated and *used* as drinking water.

Generally, in the New Mexico courts, the "plain language of a statute is the primary indicator of legislative intent." *General Motors Acceptance Corp. v. Anaya*, 103 N.M. 72, 76, 703 P.2d 169, 173 (1985).  The courts "'will not read into a statute or ordinance language which is not there, particularly if it makes sense as written.'"  *Smith v.*

*Board of County Com'rs*, ___ N.M. ___, 82 P.3d 547, 551 (Ct. App. 2003) (quoting

*Burroughs v. Bd. of County Comm'rs*, 88 N.M. 303, 306, 540 P.2d 233, 236 (1975)) ;

*Amoco Production Co. v. New Mexico Taxation and Revenue Dept.*,134 N.M. 162, 74

P.3d 96, (Ct. App. 2003) ("The courts are to 'give the words used in the statute their

ordinary meaning unless the legislature indicates a different intent.' *State ex rel. Klineline*

*v. Blackhurst*, 106 N.M. 732, 735, 749 P.2d 1111, 1114 (1988).") These rules of

construction inform this court's reading of the New Mexico regulations at issue.  *See,*

*e.g.*, *Johnson v. N.M. Oil Conservation Comm'n*, 127 N.M. 120, 978 P.2d 327 (1999)

(holding that canons of construction that apply to statutes also apply to interpretation of

agency rules and regulations).

Plaintiffs' counsel, on the other hand, insists that these regulations set drinking

water standards and that "use" in NMAC §§ 20.6.2.3101(C) and 20.6.2.4101(C) must

refer to uses *other than* as drinking water.  (*See* Transcript of Hearing, dated January 8,

2004, at 4142:17-4143:12 (Mr. Lewis).)

Nothing in the text of these regulations supports such a limiting construction of

"use."[39] Counsel cites no New Mexico case law on point, and has not proffered any

long-standing administrative construction of these provisions by the agency charged with

administering them that supports Plaintiffs' reading.  (*See also* Transcript of Hearing,

---

[39]Given the plain meaning of these provisions, it is not surprising that neither the discharge permit regulations nor the abatement regulations establish any administrative mechanism or compliance procedure dealing with the actual use of water for drinking water purposes, or impose any affirmative restriction of that use because of contamination by toxic pollutants.

dated February 5, 2003, at 1800:4-1808:8, 1872:15-1873:12 (Mr. Garber).)[40]

### c. New Mexico Drinking Water Regulations

The Defendants respond that regulations setting standards for the *use* of New Mexico's water for its "highest and best use"—as drinking water—are found elsewhere, and reflect the State's adoption of federal drinking water standards, at least as to water supplied through public water systems. *See* NMAC § 20.7.10.100. These New Mexico Environmental Improvement Board (EIB) regulations were promulgated pursuant to provisions of New Mexico's Environment Improvement Act, N.M. Stat. Ann. §§ 74-1-8 and 74-1-13.1 (Repl. 2000 & Supp. 2002),[41] and expressly adopt and incorporate by reference the safe drinking water standards promulgated by the Environmental Protection Agency (EPA) in 40 C.F.R. Part 141 (2002) (National Primary Drinking Water Regulations), including the EPA's Maximum Contaminant Level (MCL) standards.[42]

---

[40]To the contrary, counsel proffered that "[t]he State Engineer is a member of the Water Quality Control Commission, and wanted to ensure that the adoption of these regulations did not impair in any way with the engineer's ability to allocate the use of water." (Transcript of Hearing, dated February 5, 2003, at 1873:8-12 (Mr. Garber).) The State's ability to make available and allocate the use of water through the State Engineer is precisely the legal interest that is at issue in this case.

[41]According to *New Mexico Statutes Ann.* § 74-1-8(A): "The board is responsible for environmental management and consumer protection. In that respect, the board shall promulgate rules and standards in the following areas: . . . (2) *water supply*, including . . . rules authorizing imposition of administrative penalties for enforcement; . . ." (Emphasis added.)

[42]The New Mexico drinking water regulations also adopt and incorporate by reference the EPA's National Secondary Drinking Water Regulations, codified at 40 C.F.R. Part 143 (2002). NMAC § 20.7.10.101. These regulations "control contaminants in drinking water that primarily affect the aesthetic qualities relating to the public acceptance of drinking water," largely consisting of inorganic mineral contaminants. 40 C.F.R. § 143.1 (2002).

### d.  Reconciling the EIB & NMWQCC Regulations

Plaintiffs' counsel attempts to read the NMAC §§ 20.6.2.3103 and 20.6.2.4103 standards into these drinking water regulations, pointing to language providing that "[c]ompliance with this Part does not relieve a person from the obligation to comply with other applicable state and federal regulations."  NMAC § 20.7.10.703.[43]

Of course, no one would suggest that a public water system would be permitted to discharge contaminants into groundwater in excess of the standards set by NMAC § 20.6.2.3103, or would be exempt as a responsible person from abatement proceedings under NMAC § 20.6.2.4101 *et seq.*[44]  But the obligation of a public water system to comply with NMAC § 20.6.2.3101 *et seq.* as to *discharges* or NMAC § 20.6.2.4101 *et seq.* as to *abatement* does not transmute those regulations into standards governing the supply of water through public water systems for *use* as drinking water.

NMAC § 20.7.10.300(A) declares that "[n]o public water system shall supply drinking water to the public unless the system is operated and maintained in compliance

---

[43]Counsel argues, "In other words, the very state drinking water standard upon which this Court predicated its ruling also recognizes the applicability of other State regulations such as the NMWQCC regulations.  The reference is obvious.  The applicability is obvious." (Plaintiff's Reply to the Court's Ruling on "Injury" and Request for Reconsideration or Certification of the Question to the New Mexico Supreme Court, filed January 5, 2004 (dkt. no. 1049), at 3.)

[44]Concerning the ongoing EPA remediation, Plaintiffs submit that "the federal government, the State of New Mexico, the City of Albuquerque, all regulatory agencies, and all responsible parties and their environmental consultants had agreed that the standard to be achieved in restoring the contaminated South Valley water to drinking water quality was the more stringent NMWQCC drinking water regulations" (Proposed Joint Pre-Trial Order, received July 29, 2003, at 19)—thus acknowledging the application of the NMWQCC abatement standard to the ongoing *abatement* of the contamination at South Valley through the EPA remediation.

with this Part," not with  NMAC §§ 20.6.2.3103 and 20.6.2.4103.  NMAC §

20.7.10.300(B)(2) empowers the Secretary of the New Mexico Environment Department

(NMED) to require treatment of drinking water to meet the EPA's MCL standards, not

the NMAC §§ 20.6.2.3103 and 20.6.2.4103 standards.[45]   In contrast to its adoption of the

EPA standards, Title 20, Chapter 7, Part 10, NMAC does not explicitly adopt or

incorporate the NMAC §§ 20.6.2.3103 and 20.6.2.4103 standards as compliance

standards governing *use*, or indeed, make any reference to them at all.

If in fact the State of New Mexico intended the NMAC §§ 20.6.2.3103 and

20.6.2.4103 standards to govern the "highest and best use" of groundwater as drinking

water, it would seem logical that the State would say so *somewhere* in the *New Mexico

Administrative Code*, but to date it has not.  This reflects the legislature's deliberate

division of power and authority over water quality issues between different state agencies.

The New Mexico Environmental Improvement Act, N.M. Stat. Ann. §§ 74-1-1

(Repl. 2000) creates the New Mexico Environmental Improvement Board (EIB), making

it "responsible for environmental management and consumer protection" and empowering

it to "promulgate rules and standards in the following areas: (1) food protection; (2) *water

supply*, including . . . rules authorizing imposition of administrative penalties for

---

[45]        (2)     If the secretary determines that treatment of water is necessary for a
public water system to meet the maximum contaminant levels set forth at 40
CFR sections 141.11-141.16 and 141.61-141.66, such treatment shall be
continuously maintained until the public water system can demonstrate to the
secretary that such treatment is no longer necessary.

enforcement; . . ." N.M. Stat. Ann. § 74-1-8(A)(1), (2) (Repl. 2000) (emphasis added).

The New Mexico Water Quality Act, N.M. Stat. Ann. §§ 74-6-1 *et seq.* (Repl. 2000), on the other hand, created the New Mexico Water Quality Control Commission (NMWQCC), empowering it to "adopt water quality standards for surface and ground waters of the state subject to the Water Quality Act," and to "adopt, promulgate and publish regulations to *prevent or abate* water pollution in the state . . . ." N.M. Stat. Ann. § 74-6-4(C), (D) (Cum. Supp. 2002) (emphasis added). NMWQCC thus has been delegated the responsibility to address water pollution problems through its detailed system of discharge permits and through administrative abatement of existing pollution hazards, while the EIB remains vested with responsibility for day-to-day consumer protection and water supply and use issues.[46]

------

[46]Nothing in the Water Quality Act or the NMWQCC regulations empowers any agency to act to prevent the use of polluted water for drinking water purposes, or creates a mechanism to regulate or safeguard use. The EIB regulations, in contrast, expressly address use and, *inter alia*, empower the Secretary of the New Mexico Environment Department to

>  take any action necessary to protect the health of persons who are or may be served by a public water system, including but not limited to issuing orders, assessing penalties or commencing a civil action for appropriate relief:
>      (a)   if the public water system fails to meet any requirement of this Part;
>      (b)   upon receiving information that a contaminant, whether or not listed in 40 CFR sections 141.11-141.16 and 141.61-141.66, is present in or likely to enter the public water system, that the presence of such contaminant may present an imminent and substantial endangerment to the health of persons served by the system, and that appropriate local authorities have not acted to protect the health of such persons; or
>      (c)   in response to a civil emergency involving public drinking water.

NMAC § 20.7.10.300(B). The EIB drinking water regulations—not the NMWQCC regulations—require notice by the water supplier or by NMED to the public concerning contamination problems involving "water used for drinking or culinary purposes." *See* NMAC § 20.7.10.600.

### e.  NMAC § 20.7.10.1 & Loss of Drinking Water Services

The plain language of NMAC §§ 20.7.10.1 *et seq.* states that public water systems may lawfully supply drinking water that meets the EPA's MCL standards as expressly adopted by the State of New Mexico.  It follows that groundwater that meets those same standards has not been lost to use as drinking water.  Water in which the contaminant level exceeds New Mexico's MCL standards, on the other hand, cannot be supplied as drinking water in compliance with NMAC §§ 20.7.10.1 *et seq.*, with a resulting loss of drinking water services as to that water.

Remembering that the San Jose well field supplied South Valley groundwater to a public water system serving the City of Albuquerque, it is this New Mexico drinking water standard, NMAC §§ 20.7.10.100, that the court earlier concluded should be applied to determine whether there has been a loss of drinking water services involving the groundwater underlying the South Valley Site.

### 2.  Plaintiffs' Theory of Injury Revisited

According to Plaintiffs' counsel, "the State of New Mexico adamantly believes that this Court is in error in defining 'injury' in such a limited and arbitrary fashion." (Plaintiff's Further Response to General Electric Company's Supplemental Brief in Support of its Motion for Summary Judgment on Plaintiff's Damage Claims," filed December 29, 2003 (dkt. no. 1043), at 10.)  Yet the "injury" alleged in this case—as defined by *Plaintiffs*—is the loss of drinking water services due to chemical

contamination.  How else should that injury be measured?

Arguing that a common law claim for damages "is not hand-cuffed to only one standard," Plaintiffs contend that "standards promulgated by an administrative agency do not dictate, *as a matter of law*, whether a cause of action exists or the nature and extent of the injury."  (Plaintiff's Reply to the Court's Ruling on "Injury" and Request for Reconsideration or Certification of the Question to the New Mexico Supreme Court, filed January 5, 2004 (dkt. no. 1049), at 6, 9 (emphasis in original).)  Instead, Plaintiffs now assert,  the groundwater "must still be considered 'injured' unless and until it is restored to its pre-polluted condition and fully complies with **ALL** human health standards which are applicable to water intended for public consumption."  (*Id.* at 4 (emphasis in original).)

In effect, then, Plaintiffs now argue *two* different theories of injury: (1) that "[t]he standard for drinking water quality for the groundwater involved in this lawsuit is the more stringent NMWQCC health-based toxic pollutant standard";[47] and (2) that "the groundwater and aquifer will remain injured unless and until it is restored to its pre-contaminated condition."[48]  These two assertions, often made together,[49] are not wholly

---

[47](Proposed Joint Pre-Trial Order, received July 29, 2003, at 17.)

[48](*Id.* at 26; *see id.* at 24 ("'Injury' also includes any alteration, change in the characteristics, properties, and uses of . . . groundwater and the aquifer, and the injury continues until the groundwater and aquifer are restored, if possible, to their pre-contaminated condition.").)

[49]*E.g.,* according to Plaintiffs, "the EPA and the State of New Mexico agreed that the groundwater would continue to be injured and damaged until it was restored . . . to its baseline uncontaminated condition and

(continued...)

congruent.

In this case, it may well be that the State of New Mexico has suffered an *injury* to its interest in the groundwater underlying the South Valley Site, notwithstanding the fact that much of the groundwater meets the New Mexico drinking water standards, but it may be that the injury is *not* the total and permanent loss of drinking water services that Plaintiffs now assert.

To date, however, Plaintiffs have proffered no significant probative evidence of any *diminution in value* of the groundwater, measured by the difference between its current condition and its formerly pristine state, apart from the alleged loss of drinking water services.  No expert witness has testified as to the economic value of water that may prove to be drinkable, but still not pristine.

Plaintiffs may be hoping to argue to a jury that *any* diminishment of groundwater quality has resulted in the permanent and total loss of the value of the affected volume of groundwater.[50]  Indeed, Plaintiffs' experts have formulated opinions on damages based upon the assumption that South Valley groundwater has been permanently lost to *all*

---

[49](...continued)
remediated to nothing less than the State of New Mexico's health-based groundwater regulations and standards." (*Id.* at 18.)

[50]Plaintiffs also appear to rely on a subjective fear-driven measure of "injury," one turning on "whether the ultimate prospective consumer would wish to consume it, given the higher risks of serious disease and cancer asssociated with the consumption or use of that water." (*Id.* at 27-28.)

beneficial uses, including use as drinking water.[51]

Under New Mexico law, however, water need not be pristine to be drinkable, and use for drinking water purposes depends upon whether applicable water quality standards are met, not whether the water yet remains in its primordial state, untouched by any of the chemical remnants of the modern age.

As this court explained a year ago, Plaintiffs' own characterization of their alleged injury selects the legal standard to be applied to measure the existence and extent of that injury. Drinkability does not equate with pristine purity under New Mexico law,[52] and the court remains convinced that a loss of drinking water services must be measured by applying New Mexico drinking water standards.

## V.    THE PLAINTIFFS' THEORY OF DAMAGES

Plaintiffs assert that the State has been deprived of the opportunity to make contaminant-free water available to others, to offer the opportunity for others to appropriate water in pristine condition, and to put it to its "highest and best use" as drinking water. They allege that an identifiable, quantifiable volume of groundwater has

---

[51]Yet Plaintiffs' counsel read the pertinent language of NMAC §§ 20.6.2.3101(C) and 20.6.2.4101(C) as "clearly saying here that we're not going to shackle you because, if you want to use the water for something other than drinking water purposes, there's nothing contained in these regs that would prohibit you from doing so or permitting higher concentrations." (Transcript of Hearing, dated January 8, 2004, at 4142:17-22 (Mr. Lewis).) Plaintiffs thus concede that groundwater exceeding their preferred NMAC §§ 20.6.2.3103 and 20.6.2.4103 standards may nonetheless be diverted to non-culinary beneficial uses.

[52]Even accepting Plaintiffs' assertion that the NMWQCC abatement regulations set drinking water "use" standards, the NMAC §§ 20.6.2.3103 and 20.6.2.4103 standards do not require abatement of toxic contamination to pristine purity, or precontamination levels. Plaintiffs thus cannot premise their claimed "loss of use" upon the fact that water remediated even to NMWQCC standards would still be less than pristine.

been lost to use as drinking water, and therefore has been permanently lost to any beneficial use.  They claim that the State has lost both the economic value that the affected water would have were it otherwise to be extracted from the ground and put to beneficial use, and the *in situ* value of that water as it yet remains in the ground.[53]  They insist that the State should be compensated in money damages for the total value of the volume of water in question, measured by its replacement cost based upon purchase or lease of existing water rights at market value, and the value of the "loss of the aquifer apart from market value of the quantity of water," *State of Utah v. Kennecott Corp.*, 801 F. Supp. 553, 566-67 (D. Utah 1992), ostensibly measured by the cost of replacing it through construction and maintenance of a large surface reservoir.

Plaintiffs' groundwater damages theory depends upon three critical assumptions: (1) that the volume of water affected by the contamination could otherwise be made available for appropriation from the Middle Rio Grande Basin aquifer, but for the contamination; (2) that the volume of water has been lost to all beneficial uses; and (3) that the loss of use is permanent.

In responding to the Defendants' motions for summary judgment, and in proffers of proof made during the course of our extended Pretrial Conference and Rule 702

---

[53]As summarized by Plaintiffs' counsel in the Proposed Joint Pre-Trial Order, "The measure of damages for the State's claims is quite simple: it is the diminution in value of the State's *in situ* groundwater damaged by defendants' pollution, plus the value of lost extractive services as a result of defendants' pollution, plus the value of that portion of the aquifer . . . destroyed as a result of defendants' pollution."  (Proposed Joint Pre-Trial Order, received July 29, 2003, at LI-41.)

evidentiary hearing, the Plaintiffs have failed to come forward with significant probative evidence validating these assumptions, or showing that they raise a genuine issue of material fact requiring a trial.  *See* Fed. R. Civ. P. 56(e).

A.      **Loss of "Extractive Services" & Loss of Value of *in situ* Groundwater**

1.    **Alleged Loss of "Extractive Services"**

Plaintiffs' counsel argue that it is undisputed that "a volume of groundwater was taken out of service in 1980" and "has remained out of service up to the present date, and will continue to remain out of service for the foreseeable future."[54]  They point to a loss of services that "'began in the fall of 1980 with the shut-down of San Jose 6,'" and, at times, equate the San Jose well field's "loss of capacity to provide a volume of water to the public on and after the closure of municipal well SJ-6" with the continuing loss of groundwater services they now assert.[55]

Defendants respond that the loss of pumping capacity at the San Jose 6 Well does not equate with a loss of extractive groundwater services, unless the Plaintiffs can show that the total volume of groundwater that may safely be extracted from the Middle Rio Grande Basin aquifer without depletion, violation of the Rio Grande Compact, or other adverse effects—the aquifer's "safe yield"—has actually been reduced.[56]  The State of

---

[54](Plaintiff's Further Response to General Electric Company's Supplemental Brief in Support of its Motion for Summary Judgment on Plaintiff's Damage Claims," filed December 29, 2003 (dkt. no. 1043), at 5.)

[55](*Id.* at 6.)

[56]Plaintiffs assert an expected hydrological "safe yield" from South Valley groundwater of

(continued...)

New Mexico has lost nothing in terms of *use*, Defendants maintain, if the State may make the same total quantity of groundwater available from the same aquifer for use by appropriators, regardless of whether a particular volume of water underlying South Valley may now be extracted or not.  A  change in the point of diversion, by itself, is not a loss of use.

The Defendants' assertion that the Middle Rio Grande Basin aquifer was and is already fully appropriated, leaving the State unable to make additional water available for appropriation, appears to be correct, as confirmed by the following colloquy:

> THE COURT: Have all of the water resources in the South Valley been fully appropriated?

> MR. LEWIS: I believe they are fully appropriated, yes . . . .

(Transcript of Hearing, dated January 17, 2003, at 1544:12-15.)

Moreover, as noted above, in the *Silvery Minnow* litigation,[57] the Plaintiffs apparently have taken the position that "'the waters of the Rio Grande basin have been

---

[56](...continued)
approximately 3,320 acre-feet each year.  (*See* Transcript of Hearing, dated December 10, 2003 (a.m.), at 2737:4-6 (testimony of Stephen B. Johnson).)  Plaintiffs define the "safe yield" as "the amount of water that can be extracted from an aquifer on an annual basis without depleting the size of the aquifer in the ground.  It is an aquifer-specific number that depends on a myriad of factors, including the recharge zones, annual precipitation of the area, hydrogeology of the aquifer, etc."  (State of New Mexico's Response and Memorandum in Opposition to Phillips Pipe Line Co., et al.'s Motion and Memorandum for Partial Summary Judgement Seeking Dismissal of Plaintiffs' Alleged Lost Services Claims Under CERCLA and Lost Use Claims at Common Law, filed September 16, 2002 (dkt. no. 769), at 4 n.3.)

[57]*Rio Grande Silvery Minnow v. Martinez*, Civil No. 99-1320-JP (D.N.M.), *prelim. ruling aff'd on interlocutory appeal sub nom. Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109 (10th Cir. 2003), *panel opinion vacated and appeal dismissed as moot*, 355 F.3d 1215 (10th Cir. 2004).

fully appropriated and no additional water is available for any purpose.'"  (Proposed Joint

Pre-Trial Order, received July 29, 2003, at LI-23 (quoting Response of State of New

Mexico to Plaintiff's Motion for Preliminary Injunction at 10, *Rio Grande Silvery*

*Minnow v. Martinez*, Civil No. 99-1320-JP (D.N.M. filed July 7, 2000)).)

Plaintiffs do not assert that the State of New Mexico has lost the use of water to

which it holds a water right.  Nor have Plaintiffs shown that any other water rights holder

has lost the use of a specific volume of water from the Middle Rio Grande Basin aquifer

to which he or she would otherwise be entitled.[58]  Nor, for that matter, have Plaintiffs

shown that applications for extraction of any significant volume of South Valley

groundwater have actually been made and denied *because of the contamination issue*[59]

---

[58]Plaintiffs point to a loss of *production capacity* from the City of Albuquerque's SJ-6 well of
approximately 2,000 acre-feet per year after 1979, (*see* Transcript of Hearing, dated January 8, 2004, at 4117:18-
4118:25 (Mr. Lewis)), which counsel equates with a loss of resource use. (*Id.* at 4124:14-19 (Mr. Lewis).)  But
Plaintiffs have not shown a net reduction by the City in the exercise of its total water rights in the Middle Rio
Grande Basin aquifer during that period, presumably up to the installation of the Burton #4 Well in April of
1987.  (*See id.* at 4134:8-12 (Ms. Azorsky) ("We know what happened.  For some period of time, the City
spread the pumping among its wells.").)

It appears that Plaintiffs' experts have not examined whether the contamination at South Valley resulted
in a net reduction in groundwater extraction from the Middle Rio Grande Basin after 1979.

[59]The Plaintiffs often point to a December 19, 1988 press release by the State Engineer announcing
interim restrictions on drilling of new wells in the "San Jose area," *i.e.*, the South Valley:

On December 19, 1988, S.E. Reynolds, State Engineer, announced a decision to restrict access
within the shallow groundwater aquifer which lies below the San Jose area of Albuquerque,
Bernalillo County, New Mexico (see attached map).  The State Engineer will require that
certain well construction and completion procedures be adopted fo all new wells in order to
protect the public from appropriation of contaminated water and to prevent further groundwater
degradation.  The State Engineer will impose certain conditions on permits for all new wells
requiring that the bottom of the casing or top of well screen or perforated interval be placed at a
certain minimum depth.  In addition the annulus around the casing to the top of the well screen
or perforated interval will be required to be sealed in a manner acceptable to the State Engineer
to prevent the movement of contaminated water between the casing and the borehole wall; a

(continued...)

-48-

—or that any such applications are currently pending.  To this extent, at least, Plaintiffs'

loss of "extractive services" claim may simply be premature, or even speculative.[60]

The Defendants submit that any current restrictions imposed by the State Engineer

on further appropriations from the Middle Rio Grande Basin are driven by other

considerations involving the State's obligations under the Rio Grande Compact and the

corresponding need to maintain stream flows in the Rio Grande River, and that those

---

[59](...continued)
sanitary seal will also be required for protection at the surface.

The decision of the State Engineer follows a recent recommendation from the U.S.
Environmental Protection Agency (EPA).  In a letter to the New Mexico State Engineer dated
December 1, 1988, EPA representative, Kathleen O'Reilly, states that the presence of organic
contaminants, locally in excess of drinking water standards, makes the restrictions necessary to
protect the public health and prevent further groundwater contamination.  Minimum
completion depths recommended by the EPA and adopted by the State Engineer are specific for
local portions of the affected area and are detailed as follows: * * * *

(Exhibit 57 to State of New Mexico's Response and Memorandum in Opposition to Phillips Pipe Line Co., et
al.'s Motion and Memorandum for Partial Summary Judgement Seeking Dismissal of Plaintiffs' Alleged Lost
Services Claims Under CERCLA and Lost Use Claims at Common Law, filed September 16, 2002 (dkt. no.
769).)  Plaintiffs state that this press release "restricted access to portions of the groundwater in the San Jose area
of the South Valley."  (*Id.* at 18 ¶26.)

This oft-cited press release says not a word about restricting the *appropriation* of any *volume* of
groundwater because of the contamination; it speaks to the proper *method* for future well construction—what
Plaintiffs may mean by "access."  The State Engineer did not create a "no-pump zone" through this release, and
it does not demonstrate that any volume of water otherwise available for appropriation was "taken out of
service" in December 1988, or otherwise.

[60]
THE COURT: Is there a moratorium on new applications or the approval of new
applications for appropriation?

MR. LEWIS: They're looking at them very carefully.  The State Engineer has allowed
a couple [of] shallow wells to be completed in this zone since 1988, but he also testified . . .
that the State Engineer's Office is prepared to further restrict access to groundwater in the
South Valley based on the additional information and uncertainties affecting the site,
particularly the new material that's coming out with respect to some of the depths [of] the
contaminants that have been found.

(Transcript of Hearing, dated January 17, 2003, at 1543:23-1544:11.)

restrictions effectively limit extractive services to appropriation under existing water rights.[61]   Plaintiffs respond that "[t]he State Engineer's Office does not have responsibility for environmental compliance or the expertise to evaluate health and safety issues relating to remediation at the Site," but that the Office "is prepared to further restrict access to groundwater in South Valley based on the additional information and uncertainties affecting the Site."[62]

If because of the contamination at South Valley, the State Engineer has in fact restricted further *appropriation* from the Middle Rio Grande Basin aquifer (a restriction on *quantity* rather than the depth and design of new wells), nothing that Plaintiffs point to in this record has yet made that restriction explicit.

Absent significant probative evidence of an actual loss of extractive services involving a volume of unappropriated groundwater that the State could otherwise have made available for appropriation from the aquifer's safe yield,[63] Plaintiffs claim for

---

[61](*See, e.g.*, Motion and Memorandum for Partial Summary Judgment Seeking Dismissal of Plaintiffs' Alleged Lost Services Claims Under CERCLA and Lost Use Claims at Common Law, filed July 10, 2002 (dkt. no. 612), at 3-6 ¶¶ 1-5.)

[62](State of New Mexico's Response and Memorandum in Opposition to Phillips Pipe Line Co., et al.'s Motion and Memorandum for Partial Summary Judgement Seeking Dismissal of Plaintiffs' Alleged Lost Services Claims Under CERCLA and Lost Use Claims at Common Law, filed September 16, 2002 (dkt. no. 769), at 18 ¶26.)

[63]If, for example, the exercise of the City of Albuquerque's water rights was  impaired by the shutdown of the SJ-6 Well, that claim would belong to the City, not the State as public trustee.  In *Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464, 1470 (10th Cir. 1993), the court of appeals explained that the water users' "loss of water quality or quantity" due to groundwater contamination involves "injuries to purely private interests, which the State cannot raise" in its trustee/*parens patriae* capacity, at least under CERCLA.  The State's interest in making unappropriated public water available for appropriation does not entitle Plaintiffs to receive compensation for an impairment of the City's established water rights.

damages resulting from such a loss must fail.

### 2.  Alleged Loss of Value of *in situ* Groundwater

Plaintiffs insist that the State has also lost the *in situ* value of the groundwater beneath South Valley as "stock," or "drought reserve," even if the water is not currently available for extraction by appropriators for reasons other than the contamination: "In order to fully compensate the State of New Mexico for the groundwater lost due to the Defendants' operations, it is appropriate to analyze that loss in terms of the loss of annual safe yield and the loss of the 'stock' of groundwater as a drought reserve." (Proposed Joint Pre-Trial Order, received July 29, 2003, at LI-45; *see id.* at LI-28 ("'As distinct from the annual flow of sustained yield, the highest value of the remaining stock of groundwater is as insurance against potential future extended drought conditions, i.e., its in situ services.'" (quoting Dr. Ted Tomasi)).)

Defendants respond that the ongoing remediation activities are eliminating the chemical contamination problem, and that even if the State or its water users needed to draw upon additional groundwater in times of severe drought, they could do so at South Valley by applying wellhead treatment using the same technology that has proven successful in performing the ongoing remediation work at the South Valley Site.[64]

---

[64]The EPA has recognized packed tower aeration (PTA) and granular activated carbon (GAC) filtration as the "best available technologies" for treating water contaminated with specific volatile organic compounds in order to comply with established MCL levels.  *See, e.g.*, 40 C.F.R. § 142.62 (2003).

### 3. Different Labels, Same Injury

The "diminution of value" of *in situ* groundwater claimed by the Plaintiffs is not a discrete injury, different in kind from the claimed loss of "extractive services." To the contrary, it reflects *the same loss of drinking water services involving the same water* projected into the future, but without any limitation by the concept of the aquifer's "safe yield."[65] Use of South Valley groundwater as "drought reserve" necessarily anticipates that at some point, the State would allow the aquifer to be "mined," that is, the State in times of dire need would afford water users the benefit of "extractive services" beyond the limits of "safe yield" by allowing pumping that may far exceed the capacity of the aquifer to recharge itself.[66]

The Plaintiffs' claimed loss of value of *in situ* groundwater simply projects into the future the claimed loss of use of "a volume of groundwater [that] was taken out of service in 1980 . . . has remained out of service . . . and will continue to remain out of service for

---

[65]According to Plaintiffs' own reference, "stock" values "are the value of an asset which yields *flows of value over time*." (Proposed Joint Pre-Trial Order, received July 29, 2003, at LI-45 (quoting National Research Council, *Valuing Groundwater: Economic Concepts and Approaches* 20 (1997)) (emphasis added).) "Extractive values occur as a result of the *actual or potential extraction* of the groundwater and are related to consumptive use. *In situ* values occur as a consequence of leaving the water in the aquifer for *current and/or potentially future use.*" (*Id.* at LI-27 (emphasis added).)

Plaintiffs claim *no* loss of other *in situ* groundwater services at South Valley, such as "preventing subsidence, supporting recreational activities, facilitating habitat, and ecological diversity." (Transcript of Hearing, dated January 16, 2003, at 1469:22-1470:3 (Mr. Lewis).)

[66]Counsel's assertion that "there is much, much, much more water there that can be appropriated in the future" from South Valley because "new thinking is going into ways to free up unappropriated water for use where it is needed," appears to suggest pumping from the groundwater "drought reserve" in volumes greater than the natural recharge rate of the aquifer. (Transcript of Hearing, dated January 17, 2003, at 1544:16-18, 1545:5-6 (Mr. Lewis).)

the foreseeable future."[67]  Damages for the "diminution in value" of the State's *in situ*

groundwater and damages for the value of lost "extractive services" are simply two slices

of the same pie.[68]  Where, as here, the "diminution in value" is measured *by* the "loss of

extractive services," *viz.*, the loss of use of groundwater as drinking water in the past,

present and as a "drought reserve" for the future, the two become indistinguishable, and

whether extracted groundwater is characterized "as a depletable stock or renewable

flow"[69] becomes a question of when and "how much."

Distilled to its very essence, Plaintiffs' damages theory seeks an award of damages

measured by *loss of use* of a volume of *in situ* South Valley groundwater as drinking

water, past present and future, treated as a total and permanent loss of the resource—

regardless of the limits of the aquifer's safe yield, or other limitations on further

appropriation from the Middle Rio Grande Basin having nothing to do with

contamination at South Valley.

---

[67](Plaintiff's Further Response to General Electric Company's Supplemental Brief in Support of its Motion for Summary Judgment on Plaintiff's Damage Claims," filed December 29, 2003 (dkt. no. 1043), at 5.)

[68]Taking counsel's assertions at face value, the loss of "extractive services" and "in *situ* stock" are actually the *same* slice of the same pie:

THE COURT: I'm interested in knowing what, if any volume of water would have been made available for appropriation but for the contamination in South Valley.

MR. LEWIS: That's the amount that Mr. Johnson testified to, that Dr. Williams testified to, that's their *stock*.

(Transcript of Hearing, dated January 8, 2004, at 4089:1-13 (emphasis added).)

[69](Proposed Joint Pre-Trial Order, received July 29, 2003, at LI-27.)

**B.      Loss of Drinking Water Services vs. Total Loss of All Beneficial Uses**

Plaintiffs assume that if the volume of groundwater affected by contamination at South Valley cannot be extracted and used "as is" for drinking water purposes, it likewise cannot be extracted and put to any beneficial use and cannot be stored as a "drought reserve."  Recalling that the most pressing concern arising out of the closure of the San Jose 6 Well was the loss of pumping and storage capacity to serve *fire protection* purposes at South Valley, the Plaintiffs' singular focus on drinking water services alone may miss the mark.  Plaintiffs have failed to come forward with significant probative evidence that furnishes a factual footing for their sweeping assertion that regardless of the effect of the ongoing remediation activities and the availability of wellhead treatment technology, the groundwater beneath South Valley cannot be put to *any* beneficial use, agricultural, industrial, fire protection, or otherwise, either now or in the future.

Plaintiffs' damages experts have likewise *assumed* the loss of South Valley groundwater for all beneficial uses in applying loss of use/market value replacement cost analyses, apparently without examining the factual footing for that proposition in any detail.

Damages analysis based on "market value" replacement cost necessarily assumes that there is a complete loss of the resource that has been injured, *see State of Utah v. Kennecott Corp.*, 801 F. Supp. at 566, and proves to be irrelevant to the measure of damages where some resource uses remain available, where the resource continues to

provide value or economic benefit,[70] or where a valuable resource use may be restored

through remediation.  *Id.*

C.    **"Temporary" vs. "Permanent" Injury**

Plaintiffs' "market theory" of damages also presupposes that the total loss of

beneficial use of South Valley groundwater is *permanent*.  Plaintiffs seek damages for the

toxic contamination that they insist will remain in place beneath South Valley long after

the ongoing remediation process is completed, years from now:

> [T]he Rule 702 evidentiary hearing has further confirmed the undisputed
> fact that contaminant plumes, whose concentrations are well in excess of
> MCL drinking water standards, are present in the deeper portions of the
> volume of groundwater that has been taken out of service since 1980–*and
> those deeper contaminant plumes will never be remediated under any
> currently-designed remediation system*.

(Plaintiff's Further Response to General Electric Company's Supplemental Brief in

Support of its Motion for Summary Judgment on Plaintiff's Damage Claims," filed

December 29, 2003 (dkt. no. 1043), at 5-6 (emphasis in original).)

_____

[70]If, for example, the State of New Mexico as public trustee was to make the public policy decision to
burden New Mexico's future generations by merely leaving the toxic contamination in place at South Valley,
untreated and undisturbed, then the State enjoys the economic *benefit* of "wellhead protection" that results from
maintaining the much larger buffer zone volume (200,000+ acre-feet) as a containment barrier against further
migration of the contaminants.  In fact, this *in situ* value represents the key factor weighing in favor of
maintaining a buffer zone comprised of potable water.  Plaintiffs' damages theory implicitly deems the water's
in situ "containment" value to *outweigh* the same water's *in situ* value as "stock" or "drought reserve"; the only
reason the buffer zone water would not be available as drought reserve would be the economic benefit flowing
from its *greater* value as a containment barrier.  (*Cf.* Transcript of Hearing, dated January 16, 2003, at 1470:2-3
("there are a number of other things that the in situ groundwater provides that is very beneficial to man." (Mr.
Lewis).)

Oddly, it appears that Plaintiffs' damages theory attributes no *in situ* economic value to the buffer zone
volume for providing containment services, even though a containment "remedy" saves the State as public
trustee the cost of restoration and remediation—an amount Plaintiffs know to be significant.

According to the Plaintiffs, then, the claimed injury is "permanent" because the existing remedial actions are not going to be effective to abate it.  (*See* Joint Proposed Pre-Trial Order, received July 29, 2003, at 25-26, LI-44.)  Indeed, Plaintiffs insist that the existing remediation programs will fail to clean up the water sufficiently to permit *any* future appropriation of the water underlying South Valley, particularly for use as drinking water.

Defendants respond that the pumping capacity lost due to the closure of SJ-6 has been fully replaced by the Burton #4 Well,[71] that no volume of groundwater has actually been lost to appropriation from the Middle Rio Grande Basin aquifer today, and that any injury to groundwater at South Valley due to contamination by organic chemicals is temporary, will be substantially eliminated by the ongoing remedial actions, and even now is completely remediable through wellhead treatment of the affected water prior to use.

In responding to summary judgment motions challenging their proof of injury, the Plaintiffs assert that "[t]he State will produce evidence at trial that a portion of the Basin aquifer has been rendered useless for all time due to the presence of contaminants introduced into the environment by Defendants," and that "[t]he *in situ* groundwater in

---

[71]Plaintiffs reply that "[t]he fact that the City of Albuquerque was able to obtain an alternate source of groundwater for its citizens is likewise a rabbit trail and is not a proper defense to the State's claim for the volume of groundwater taken out of service, . . ." (Plaintiff's Further Response to General Electric Company's Supplemental Brief in Support of its Motion for Summary Judgment on Plaintiff's Damage Claims," filed December 29, 2003 (dkt. no. 1043), at 6.)  Yet if the "extractive services" lost at SJ-6 were restored by changing the point of diversion to the Burton #4 Well, what damages would the City of Albuquerque thereafter be entitled to under a "loss of use" theory?

the plume of mixed toxic pollutants underlying and emanating from the Site is precluded

from use now, and will remain so, for the foreseeable future (i.e., hundreds of years),"

citing to declarations by two of Plaintiffs' experts, Drs. Dennis E. Williams and Daniel

Teitelbaum.  (State of New Mexico's Response and Memorandum in Opposition to

Phillips Pipe Line Co., et al.'s Motion and Memorandum for Partial Summary Judgement

Seeking Dismissal of Plaintiffs' Alleged Lost Services Claims Under CERCLA and Lost

Use Claims at Common Law, filed September 16, 2002 (dkt. no. 769), at 2, 3 ¶¶ 1, 4 &

Exhs. 1, 30.)  "From an economic perspective," Plaintiffs continue, "the uses or services

provided by this volume of contaminated groundwater and its associated yield is lost in

perpetuity—every day of every year."  (*Id.* at 3 ¶4.)

  To avoid summary judgment, the party opposing summary judgment "may not rest

upon the mere allegations" found in the pleadings, but "must set forth specific facts

showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  To meet this

evidentiary burden, the non-moving party must rely upon "facts specifically averred," to

be shown through "affidavits or other evidence [which] 'set forth specific facts . . . .'"

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990).  As to each specific fact

relied upon by the  nonmovant, *Lujan* demands "at least one sworn averment of that fact

before [summary judgment is denied and] the lengthy process of litigation continues."  *Id.*

at 888-89.  The party opposing summary judgment "must present sufficient evidence *in*

*specific, factual form* for a jury to return a verdict in that party's favor."  *Bacchus*

*Industries, Inc. v. Arvin Industries, Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (Aldon J. Anderson, J.) (emphasis added).

In attempting to meet their burden under Rule 56(e), Plaintiffs point first to the Declaration of Dr. Dennis E. Williams, dated August 30, 2002.  (*Id.* at Exh. 1.)  In the portion of his Declaration cited by the Plaintiffs, Dr. Williams observes that based upon his groundwater flow and transport modeling of the contaminant plumes, "the GE pump and treat system does not remediate contaminants outside the capture radius of its extraction wells, which leaves a significant amount of the total contaminant plume unremediated."  (*Id.* Exh. 1 at 7 ¶ 20.)  "Consequently," Dr. Williams continues, "the contaminants will persist in the groundwater for at least two hundred years, or even longer, after the remediation efforts have ceased in year 2020."  (*Id.*)

Of course, Dr. Williams' conclusion *assumes* that nothing will be done about the contamination at South Valley beyond the existing EPA-ordered remediation in the Plant 83/General Electric Operating Units.  Nothing in Dr. Williams' Declaration demonstrates that the predicted contamination "outside the capture radius of its extraction wells" could not be reduced or eliminated through expanded or additional remediation and treatment. Dr. Williams avers that his projected plume volumes are not currently being treated (in part at least), *not* that the existing or projected contaminant plumes mapped by his models *cannot* be treated or minimized using the available technology and economic resources.[72]

---

[72]The $1.2 *billion* in damages currently sought by Plaintiffs in this action likely would pay the cost of

(continued...)

Likewise, Dr. Williams' testimony offered at the Rule 702 evidentiary hearing reiterated and elaborated upon his plume modeling, all of which assumes that no additional remedial action will occur at the Site during the lifetime of the existing Plant 83/General Electric system.

However well-suited Dr. Williams' analysis might be to an evaluation or critique of the merits of EPA's ongoing remediation in the Plant 83/General Electric Operable Units, his work and his proffered opinions simply do not address the question whether the larger contaminant plumes that he projects are *permanent*—irremediable—or whether expanded or additional remedial action would reduce or minimize the contamination problem he attempts to describe through his models and maps.

The Declaration of Dr. Daniel Teitelbaum, dated August 14, 2002, addresses groundwater contamination in terms of toxicology, risk management and public policy considerations—particularly those bearing upon the EPA's MCL and MCLG standard-setting processes involving levels of trichloroethylene (TCE) in drinking water.  The excerpt relied upon by Plaintiffs—the only portion of the document that speaks of South Valley groundwater— applauds the State of New Mexico and the City of Albuquerque for having "acted appropriately and in accord with the precautionary principle in its decision to abandon the San Jose wash water supply."  (*Id.*, Exh. 30, at 15 ¶ 14.)  Dr. Teitelbaum opines that because there is insufficient information concerning the risks associated with

---

[72](...continued)
another Plant 83/General Electric-style remediation system many times over.

TCE exposure, "it is appropriate for the State of New Mexico to use the [Maximum Contaminant Level Goal]  of zero for TCE in its calculation" of risk, and given that assumption, "*the most prudent choice is* use the MCLG as the guiding value and *to abandon the contaminated water resource and find new potable water.*  (*Id.*, Exh. 30, at 16 ¶ 15 (emphasis added).)

One parses the Teitelbaum Declaration in vain, searching for specific facts supporting Plaintiffs' sweeping and oft-repeated assertion that the groundwater contamination at South Valley is permanent, or that this resource has been "rendered useless for all time."[73]  Dr. Teitelbaum insists that there are risks inherent in exposure to TCE, but nothing in this extended dissertation on "the philosophical basis for public health policy and its scientific basis," (*id.*, Exh. 30, at 7 ¶1), addresses the efficacy of existing remediation technology in minimizing or eliminating risk of exposure to TCE or other chemicals found in drinking water.  Dr. Teitelbaum opines that his precautionary principle "required action like that taken by the State of New Mexico and the City of Albuquerque to seek out new water supplies and to abandon those contaminated water supplies in order to protect the public health," (*id.*, Exh. 30, at 14 ¶13), but does not expressly aver that *abandonment* was and is the only risk-averse remedial option available

_____

[73]Instead, Dr. Teitelbaum's Declaration offers a detailed exposition of  "both the specific and general scientific basis which underlie [his] position on these [public health policy] issues as a toxicologist and specialist in preventive medicine," and in particular, the soundness of his "precautionary principle" and linear analysis of the risks associated with toxic exposures.  (*Id.*, Exh. 30, at 31 ¶ 42.)  To exclude his opinions from consideration in this case, he submits, "would be to render science a heartless golem with the ineffable name of science on his forehead."  (*Id.*)

at the South Valley Site.

Indeed, recalling the history of the South Valley Site, *the State of New Mexico did not abandon the groundwater resource at South Valley.* To the contrary, as recounted above, the State of New Mexico sought the assistance of the EPA in initiating cleanup actions within two years of CERCLA's enactment into law; the State conducted its own site investigation and entered into the Hydrocarbon Remediation Agreements with Chevron, Texaco and other petroleum distributors—agreements that required affirmative remediation of the groundwater contamination through extraction, treatment and reinjection systems similar to the EPA remedy; the State also participated in the formulation of similar remedial action involving contamination traceable to the nearby Univar Edmunds Street facility.

Only in this proceeding have the Plaintiffs taken the position that the State's remediation efforts at South Valley over the preceding quarter-century are of no moment, and that in effect, the State of New Mexico should be permitted to abandon the groundwater beneath the South Valley Site in favor of a lucrative damages award to be extracted from the defendants—all of whom, the Court notes, continue to conduct remediation activities at South Valley that have been expressly approved or required by the State of New Mexico.

Whether an injury is "permanent" or "temporary" is necessarily a fact-driven determination, context-dependent, and inescapably empirical, based upon the nature and

circumstances of the particular injury itself.  Plaintiffs cannot render a natural resource injury *permanent* merely by electing to do nothing about it.

As Dr. Teitelbaum suggests, abandonment of a resource is a policy *choice*, but it is not an inevitable outcome.[74]  His "precautionary principle" appears to counsel as strongly in favor of effective remediation as it does abandonment: "The precautionary principle . . . requires that in the light of scientific uncertainty, when credible evidence is put forth that a risk exists, *action should be taken to minimize that risk or eliminate it* even though absolute proof has not been obtained which quantifies the risk."  (*Id.*, Exh. 30, at 14 ¶ 13 (emphasis added).)

If, as the Defendants assert, the contamination of South Valley groundwater is *temporary, i.e.,* susceptible to effective and efficient remediation, it simply makes no sense to treat the resource as though it is permanently lost and in need of total replacement.  In *State of Utah v. Kennecott Corp.*, Judge Greene noted one expert's observation that "analysis of the natural resources damage claim was "'inextricably tied to the remediation issue'" and rejected the parties' proposed consent decree because "the State . . . failed to demonstrate . . . that restoration and plume remediation is not feasible in justification of the State's determination not to require such," thus failing to show "that the remedial purposes CERCLA was intended to achieve cannot be achieved."  801 F.

---

[74]Abandonment is one response to a natural resource injury, but it may not be the best response, or the only response available.  It certainly runs contrary to the express purposes of CERCLA and the New Mexico environmental protection statutes, all of which encourage the cleanup and abatement of toxic environmental hazards and the restoration of injured water resources to beneficial use.

Supp. at 568, 569.   Where use of the injured resource may be restored, the cost of restoration proves to be the most logically compelling measure of damages resulting from the injury, at least where that cost bears some reasonable relationship to the economic value of the restored resource use.

To date, however, Plaintiffs' counsel and their damages experts have resisted the measurement of the State's damages by the cost of restoration of the resource, preferring instead to press their "market value" replacement cost theory as the proper measure of damages.[75]  Yet where—as here—the Plaintiffs have not demonstrated through a proffer of significant probative evidence that the claimed loss of beneficial use is permanent and use cannot be restored through cost-effective remediation, the "market value" replacement cost approach may grossly overstate the value of the injury to the State's interest.

### D.    Summary

Plaintiffs have failed to meet their burden under Fed. R. Civ. P. 56(e) to "set forth specific facts showing that there is a genuine issue for trial" concerning their claim that the volume of groundwater beneath the South Valley Site contaminated in excess of drinking water standards could otherwise be extracted and made available for appropriation from the Middle Rio Grande Basin aquifer, but for the contamination.

---

[75](*See, e.g.*, Plaintiff's Further Response to General Electric Company's Supplemental Brief in Support of its Motion for Summary Judgment on Plaintiff's Damage Claims," filed December 29, 2003 (dkt. no. 1043); The State of New Mexico's Notice of Filing of Supplemental Exhibits, & Etc., filed February 4, 2003 (dkt. no. 972), and exhibits annexed thereto.)

Treating the groundwater beneath South Valley as part of the Middle Rio Grande Basin aquifer, Plaintiffs have thus shown no quantified loss of "extractive services" at South Valley resulting from the contamination.

What remains, then, is Plaintiffs' claim of injury to the *in situ* value of South Valley groundwater as "stock" or "drought reserve." Plaintiffs likewise have failed to raise a triable issue concerning whether the volume of water they contend has been impacted by the contamination (toxic plumes plus the much larger "buffer zone") has been lost to *all* beneficial uses, or whether the alleged loss of use of that water is *permanent*, and incapable of further remediation.

The questions remaining for trial in this case bear upon the nature, location and extent of the contamination that does exist, the volume of *in situ* groundwater, if any, that has been rendered unavailable for use as drinking water (*e.g.,* as drought reserve) because of that chemical contamination, and the extent of the appropriate judicial remedy for actual injury to the State's legally protected interests.

## VI.  THE SCOPE AND LIMITS OF PLAINTIFFS' STATE LAW CLAIMS

At this point, Plaintiffs have dismissed all of their claims pursuant to CERCLA, and are pursuing only their remaining state law causes of action: (1) common-law trespass; (2) common-law public nuisance; (3) statutory public nuisance, N.M. Stat. Ann. § 30-8-2 (Repl. 1994) (pollution of drinking water);[76] and (4) common-law negligence.

---

[76]N.M. Stat. Ann. § 30-8-2 (Repl. 1994) reads:

(continued...)

(*See* Consolidated Complaint at 98-106, 108-110, ¶¶ 299-332, 342-47.)[77]

The relief available to Plaintiffs on these claims proves to be delimited by several important constraints: (1) the nature of the State's affected interests; (2) the terms in which those claims are currently pleaded; (3) extrinsic limits, including the relationship between those claims and the ongoing remediation activities under CERCLA and the State's own Hydrocarbon Remediation Agreements (HRAs), the doctrines of avoidable consequences, *res judicata*, release, etc.; (4) limitations intrinsic to the pleaded causes of action themselves; and (5) the New Mexico law governing the measure of damages

.

---

[76](...continued)
**30-8-2. Polluting Water.**

Polluting water consists of knowingly and unlawfully introducing any object or substance into any body of public water causing it to be offensive or dangerous for human or animal consumption or use.  Polluting water constitutes a public nuisance.

For the purpose of this section, "body of water" means any public river or its tributary, stream, lake, pond, reservoir, acequia, canal, ditch, spring, well, or declared or known ground waters.

Whoever commits polluting water for which the act or penalty is not otherwise prescribed by law is guilty of a misdemeanor.

Though this section is found in the State's criminal code, another section in the same chapter provides for civil actions to abate public nuisances.  *See* N.M. Stat. Ann. § 30-8-8 (Repl. 1994).

[77]Plaintiffs' "unjust enrichment" claim (Consolidated Complaint at 106-110 ¶¶ 333-347) was dismissed by the court with the acquiescence of counsel early on in the Pretrial Conference.  (*See* Minute Entry, dated September 30-October 4, 2002 (dkt. no. 900), at 4.)

MR. LEWIS: . . . I'm not too excited about the unjust enrichment.

THE COURT: I'm not either.  Let's dismiss that.

MR. LEWIS: Okay.  Let's go.

(Transcript of Hearing, dated October 1, 2002, at 165:5-9.)

A.    **The State's Affected Interests**

As described in some detail above, Plaintiffs allege injury to the State's unique trust interest in the public waters of New Mexico as established by the New Mexico Consitution and statutes.  Plaintiffs are not here as water rights holders, or as water users, or as landowners,[78] or on behalf of any persons who claim to have suffered any injury caused by the chemical contamination of groundwater at South Valley.  Whatever remedy Plaintiffs may be entitled to must be tailored to redress specific injury to the State's unique interest, *viz.*, its opportunity to make water available for appropriation by others.

B.    **Plaintiffs' Current Pleadings**

As set forth in their Consolidated Complaint, Plaintiffs' state law claims are pleaded at the periphery of their CERCLA claims, now dismissed: Plaintiffs seek to "recover **monetary damages** for injuries incurred by the STATE OF NEW MEXICO" to "the extent that the damages alleged herein are either not available under Section 9607(f) of the CERCLA and/or to the extent that CERCLA does not provide adequate remedies to fully compensate the STATE OF NEW MEXICO for Defendants' pollution and contamination" at the South Valley Site.  (Consolidated Complaint at 3 ¶¶ 4, 5 (emphasis in original).)

_____

[78]As explained above, Plaintiffs' claims based upon physical injury to the aquifer underlying the South Valley Site depend upon proof of State ownership of a possessory interest in land at the Site.  Absent some *possessory* ownership interest, the public has no common right to or legal interest in the land at South Valley, including the subsurface geological materials comprising the aquifer.

To date, no such proof has been forthcoming.  For that reason, the court has addressed Plaintiffs' public nuisance and negligence claims solely in terms of the State's acknowledged legal interest in the public's groundwater at South Valley.

-66-

In other words, the Complaint also seeks to recover damages to the extent that damages suffered by the STATE OF NEW MEXICO are not provided for and/or are otherwise not recoverable pursuant to CERCLA, such as those damages resulting from releases that have occurred wholly before December 11, 1980, those damages resulting from releases of substances exempted under the CERCLA petroleum exclusion, and those damages incurred in excess of the damage limitation as provided by 42 U.S.C. § 9607(c).

(*Id.* at ¶ 4.)  That Plaintiffs seek only monetary damages is spelled out in plain terms: "this Complaint is not intended to and does not seek to impose any remediation or clean up requirements directed by any state or federal environmental agency, nor does this Complaint seek to collaterally attack any ongoing or past regulatory compliance activities."  (*Id.* at ¶ 5.)

It may be that Plaintiffs pleaded their state law claims in this fashion so as to avoid any double recovery of damages prohibited by CERCLA.  Section 114(b) of CERCLA, 42 U.S.C. § 9614(b) (2000), prohibits the double recovery of compensation "for the same removal costs or damages or claims" under both CERCLA and other federal or state law theories.  Any recovery under CERCLA must be set off against any recovery on claims under other federal or state law theories, and any CERCLA recovery must likewise be reduced by amounts received through award or settlement of other federal or state law claims.  As pleaded, Plaintiffs' state law claims are framed to avoid such a double recovery.

Plaintiffs have since dismissed their CERCLA claims in their entirety.

Plaintiffs may be assuming that their remaining state law claims have

automatically expanded in scope to fill the space left in the Consolidated Complaint by the dismissal of the CERCLA claims. Plaintiffs' expert testimony, briefing and argument concerning damages has not explicitly addressed damages in terms of relief not otherwise available to the State under CERCLA. Nevertheless, the Consolidated Complaint remains the definitive statement of Plaintiffs' claims in this action, as borne out most recently by the parties' stipulation that with the reinsertion of Chevron U.S.A. as a defendant, "the Consolidated Complaint is the current operative complaint." (Stipulation and Order Re: Chevron U.S.A., Inc., filed March 16, 2004 (dkt. no. 1065).)[79]

The Consolidated Complaint says what it says, and the relief sought in that pleading encompasses only those pecuniary damages that could be awarded to the State of New Mexico apart from the natural resource damages and response costs that would have been recoverable under CERCLA,[80] including injuries such as contamination by petroleum hydrocarbons that CERCLA expressly cannot reach. *See* 42 U.S.C. § 9601(14) (2000).

---

[79]As noted above, Plaintiffs requested leave to file a further amended complaint that, *inter alia*, would have pleaded the remaining state law claims in more expansive terms, but that request was denied for other reasons. *See* note 16, *supra*, and accompanying text.

[80]Plaintiffs acknowledge this limitation in their summary judgment memoranda. (*See, e.g.*, Plaintiffs' Response to the Petroleum Pipeline Defendants' Motion for Summary Judgment on Public Nuisance Claims, filed September 3, 2002 (dkt. no. 735), at 10 ("In this case, the State is seeking to recover monetary compensation for elements of damage which are separate from recoverable 'natural resources' damage under CERCLA.").)

C.      **Extrinsic Limitations on the Available Remedies**

**1. CERCLA & Plaintiffs' State Law Claims**

Congress enacted CERCLA to provide a mechanism for the prompt
and efficient cleanup of hazardous waste sites. . . .  The Act authorizes the
EPA to issue orders requiring potentially responsible parties to clean up
hazardous waste sites. . . .  Section 9621 of CERCLA establishes the
cleanup standards that must be met, including all applicable or relevant and
appropriate requirements of federal and state environmental laws.

*United States v. City and County of Denver*, 100 F.3d 1509, 1511 (10th Cir. 1996)

(citations omitted).  However, CERCLA does not and was not intended to completely pre-

empt the field of compensation and recovery for injury to natural resources resulting from

pollution by hazardous substances.  To the contrary, the language of CERCLA explicitly

acknowledges the continuing existence of state law remedies for such injuries and does

not supercede them by occupying the field.

**a.  The CERCLA Savings Clauses**

Section 114(a) of CERCLA, 42 U.S.C. § 9614(a) (2000), provides that "[n]othing

in this chapter shall be construed or interpreted as preempting any State from imposing

any additional liability or requirements with respect to the release of hazardous substances

within such State."  Section 302 of CERCLA, 42 U.S.C. § 9652(d) (2000), further

provides that "[n]othing in this chapter shall affect or modify in any way the obligations

or liabilities of any person under other Federal or State law, including common law, with

respect to the releases of hazardous substances or other pollutants or contaminants."

CERCLA expressly preserves a variety of claims, including claims for

-69-

contribution, indemnity, and subrogation.[81]  As the court of appeals has observed,

"Congress clearly expressed its intent that CERCLA should work in conjunction with

other federal and state hazardous waste laws in order to solve this country's hazardous

waste cleanup problem."  *United States v. State of Colorado*, 990 F.2d at 1575.

Under CERCLA, federal and state hazardous waste remediation efforts may

proceed side by side.  In the *State of Colorado* case, for example, the Tenth Circuit held

that where "a state has RCRA authority over a hazardous waste site, §§ 9614(a) and

9652(d) expressly preserve the state's exercise of that authority regardless of whether a

CERCLA response action is underway."  990 F.2d at 1581 (footnote omitted).

### b.  Conflict Preemption

Notwithstanding its savings clauses, CERCLA does preempt the application of

state or local law to hazardous waste contamination where the state or local law is in

actual conflict with CERCLA or with a remedial order issued by the EPA.  In *United*

*States v. City and County of Denver*, the Tenth Circuit held that a municipal zoning

ordinance prohibiting maintenance of hazardous waste in an area zoned for industrial use

conflicted with an EPA remedial order that required a permanent on-site remedy, *viz.*, the

on-site solidification of radioactive soil.  As the court of appeals explained:

> The Supremacy Clause of the Constitution, art. VI, cl. 2, invalidates
> state laws that "interfere with, or are contrary to the laws of [C]ongress,

---

[81]Plaintiffs cite to § 107(e)(2) of CERCLA, 42 U.S.C. § 9607(e)(2) (2000), in pleading their Complaint in the Consolidated Case, (*see id.* at 3 ¶ 5), but CERCLA's contribution, indemnity and subrogation clauses have no apparent bearing upon the claims Plaintiffs now assert.

made in pursuance of the [C]onstitution." *Wisconsin Pub. Intervenor v. Mortier*, 501 U.S. 597, 604 . . . (1991) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 211, 6. L.Ed. 23 (1824)). . . . "Conflict preemption" occurs where it is impossible to comply with both the federal and state laws, or the state law stands as an obstacle to the accomplishment of Congress's objectives. . . .

This is a case of conflict preemption. Denver concedes that it is impossible for Shattuck to comply with both Denver's zoning ordinance and the EPA's remedial order. The zoning ordinance also stands as an obstacle to the objectives of CERCLA, whose purpose is to effect the expeditious and permanent cleanup of hazardous waste sites, and to allow the EPA the flexibility needed to address site-specific problems. CERCLA § 9621(b)(1) (expressing a preference for on-site, permanent remedies); . . .

100 F.3d at 1512 (some citations omitted).

For some time now, the Defendants have maintained that Plaintiffs' damages claims based upon New Mexico tort theories "stand as an obstacle to the accomplishment of the full purposes and objectives of Congress" in enacting CERCLA because they allow the Plaintiffs to recover natural resource damages that may be used for purposes other than the restoration of the injured resource—as CERCLA would otherwise require;[82] they run roughshod over CERCLA's complex assessment and restoration scheme involving the EPA and the state natural resources trustee, and they discourage prompt settlement of claims.[83] *See also Coastline Terminals of Connecticut v. USX Corp.*, 156 F. Supp.2d 203,

---

[82]*See* 42 U.S.C. § 9607(f)(1) (2000).

[83](*See, e.g.*, ACF Industries, Inc.'s Motion to Dismiss Plaintiffs' First Amended Complaint, filed July 21, 2000 (dkt. no. 153); ACF Industries, Inc.'s Renewed Motion to Dismiss Plaintiffs' State Law Claims as Contained in the Complaint in the Consolidated Case, filed August 9, 2001 (dkt. no. 373); General Electric Company's Motion and Supporting Memorandum for Summary Judgment on Plaintiffs' State Law Claims, filed January 8, 2002 (dkt. no. 432).)

208-09 (D. Conn. 2001) ("state law actions . . . disrupt[ing] CERCLA's settlement incentive scheme by providing a potential avenue for recovery against a potentially responsible party that has settled a CERCLA action . . . are preempted.").  Defendants argue that state tort damages hinder CERCLA's operation by extracting large sums of money from potentially responsible parties, generating a windfall for the State's general fund that may never be applied to clean up the hazardous waste and restore the groundwater resource to use.  The injury persists and the compensation for the injury is spent elsewhere, defeating the primary objective of CERCLA—the prompt and efficient cleanup of hazardous waste sites.[84]  To avoid this result, the Defendants submit, Plaintiffs' state tort claims must be "preempted to the extent they are based on any injury for which CERCLA provides a remedy."  (General Electric Company's Motion and Supporting Memorandum for Summary Judgment on Plaintiffs' State Law Claims, filed January 8, 2002 (dkt. no. 432), at 14.)

To the extent that Plaintiffs contend that the on-going remedial action ordered and overseen by the EPA at South Valley is insufficient to clean up the existing chemical contamination, Plaintiffs' claims also assail "the methods by which the federal statute was designed to reach this goal," *International Paper Co. v. Oullette*, 479 U.S. 481, 494 (1987),  and would likewise be barred under conflict preemption principles.

Plaintiffs respond that their state law claims are complementary to CERCLA

---

[84]*Cf. Alaska Sport Fishing Ass'n v. Exxon Corp.*, 34 F.3d 769, 772 (9th Cir. 1994) (dismissing private state law tort claims in favor of recovery of CERCLA lost use damages by the state natural resources trustee).

remedies and are preserved by CERCLA's savings clauses.  They assert that they are

entitled to the greatest amount recoverable under any single pleaded theory that is

supported by the evidence, and may seek relief under all of the state statutory and

common law claims, whether relief may be available under CERCLA or not.

If the Plaintiffs now seek damages *only* for those *injuries* to State interests at South

Valley beyond the reach of CERCLA, *e.g.*, pollution by release of petroleum products

alone,[85] or for injuries beyond the intended scope of EPA's prescribed remedial action,[86]

then there need be no conflict between the state remedies and the purposes and objectives

of CERCLA, even in the context of ongoing CERCLA remediation at South Valley.  If,

on the other hand, Plaintiffs now seek to use state tort claims to recover natural resource

damages for the permanent loss of use of the groundwater at South Valley regardless of

the ongoing remediation, or to recover additional damages from parties complying with

an EPA order on the theory that the EPA's chosen remedy is somehow inadequate, a

collision in this case between state tort damages remedies and the CERCLA statutory and

---

[85]*See, e.g., Coastline Terminals of Connecticut v. USX Corp.*, 156 F. Supp.2d 203, 209 (D. Conn. 2001) ("state law claims related to allegations of petroleum releases are not preempted by CERCLA"); *cf. Tosco Corp. Koch Industries*, 216 F.3d 886, 893-94 (10th Cir. 2000) (petroleum products commingled with hazardous waste remediable under CERCLA).  The Defendants acknowledge that "plaintiffs may pursue state law claims based on any injury caused solely by a release of petroleum."  (General Electric Company's Motion and Supporting Memorandum for Summary Judgment on Plaintiffs' State Law Claims, filed January 8, 2002 (dkt. no. 432), at 14.)

[86]An injury beyond the intended scope of the EPA remedial action likewise would fall outside the scope of any responsible party's "settlement" in that action and would thus not be preempted under *Coastline Terminals of Connecticut v. USX Corp.*, 156 F. Supp.2d 203, 208 (D. Conn. 2001), preempting  "state law actions . . . providing a potential avenue for recovery against a potentially responsible party that has settled a CERCLA action."

regulatory scheme appears inevitable:

> Regardless of the type of tort suit brought by plaintiffs, the defendant is required by federal law . . . to comply with the methodology provided in the ROD.  Allowance of the suit for monetary damages [for EPA's inadequate remedy selection] would mean that the PRP could then be held liable for failing to use methods that it was prevented by law from using.  Imposing a damage claim on the defendant would be a direct usurpation of the EPA's statutory authority to determine which remedies are adequate to protect human health and would conflict with a judicially enforceable order.  Simply put, "common-law damages actions are preempted to the same extent as common-law injunctive suits."

Gregory M. Romano, Note, *"Shovels First and Lawyers Later": A Collision Course for CERCLA Cleanups and Environmental Tort Claims*, 21 WM. & MARY ENVTL. L. & POL'Y REV. 421, 444-445 (1997) (footnotes omitted) (quoting *Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1416 (4th Cir. 1994) (Murnaghan, J., concurring).  Imposing onerous damages liability upon General Electric and ACF because the remedy ordered by the EPA for the Plant 83/General Electric Operable Units will somehow prove inadequate would punish the defendants for the *EPA*'s selection of remedy, and likely would "stand as an obstacle to the objectives of CERCLA, whose purpose is to effect the expeditious and permanent cleanup of hazardous waste sites, and to allow the EPA the flexibility needed to address site-specific problems." *United States v. City and County of Denver*, 100 F.3d at 1512 (local zoning ordinance waste removal requirement preempted as inconsistent with on-site remedial action ordered by the EPA).

## 2.  The Hydrocarbon Remediation Agreements

As outlined above, the State of New Mexico in 1994 and 1995 entered into several
Hydrocarbon Remediation Agreements (HRAs) with Chevron, Texaco, and other
petroleum handlers and distributors located on or near the South Valley Site, requiring
those parties to perform specified work to clean up groundwater contamination resulting
from discharges of petroleum products into the soil and groundwater beneath the South
Valley Site.

Taking the Chevron HRA as an example, in consideration for Chevron's assent to
the HRAs, the New Mexico Environment Department (NMED) agreed not to pursue any
civil or administrative action against Chevron arising out of releases of the listed
"Petroleum Product Constituents" at the South Valley Site, with several specific
exceptions (enforcement of the HRA, future violations of law, emergency response
actions), and a general limitation:

> NMED's release is made only for those actions that might be brought by
> NMED, and does not release Chevron from or otherwise limit the authority
> of any other state agency; including the Office of the Natural Resources
> Trustee.

(Chevron HRA at ¶54.)[87]

The Chevron HRA did not require Chevron to "treat, remove, remediate, arrange

---

[87]In addition, ¶ 16 of the Chevron HRA provides that:

Nothing in this Agreement shall be construed as addressing or releasing any claims the state
may have for natural resources damages under state or federal law, including the cost of
preparing a damage assessment.

for the disposal of or otherwise handle 'hazardous substances' as that term is defined in"
CERCLA § 9601(14).  (HRA ¶ 17.)  Rather, the "work" to be performed by Chevron
involved "Petroleum-Product Constituents," defined by the HRA's attached "Statement of
Work" as: benzene, toluene, ethylbenzene, xylenes, "polynuclear aromatic hydrocarbons,"
1,2-dibromoethane (EDB), 1,2-dicloroethane (EDC), methyl tertiary-butyl ether (MTBE),
and lead.  (Chevron HRA, App. A ("Statement of Work") at ¶ 1.4.)[88]  "For Petroleum-
Product Constituents with a health based standard," Chevron is required to "remediate
ground water to the more stringent of" (1) standards set forth in the NMWQCC water
quality regulations, (2) MCLs established by the EPA, or (3) "to a level representing an
increased lifetime cancer risk of 1 in 100,000 ($10^{-5}$) for any Petroleum-Product
Constituent or combination of Petroleum Product Constituents."  (*Id.* at ¶ 1.5.2(1).)
Chevron must "remove any Petroleum-Product Constituents or equivalent Toxic
Pollutants listed in Section 1-101.ZZ of N.M. WQCC Regulations," as well as "any phase
separated hydrocarbons from the subsurface."  (*Id.* at ¶ 1.5.2(3), (4).)

Upon Chevron's completion of the agreed work, NMED must issue a notice of
completion which shall "constitute a release of liability whereby NMED shall thereafter
be forever barred from pursuing any judicial, administrative or other action against
Chevron arising out of or relating in any way to the subject matter of this Agreement."

---

[88]The Chevron HRA Statement of Work also requires remediation of some other chemicals, *viz.*,
"halogenated solvents" and "Toxic Pollutants" listed in NMWQCC water quality regulations in concentrations
exceeding the standards set forth in those regulations. (*Id.* at ¶ 1.5.2.)

(Chevron HRA at ¶ 59.)

The Texaco HRA makes substantially the same provisions for remediation and liability release, with similar exceptions.[89]

Chevron, Texaco and other defendants have raised the question of the scope of NMED's HRA release language in prior motions, arguing that the subject matter of the HRAs and Plaintiffs' state law claims is essentially the same, that NMED's releases and covenants not to sue embrace the entirety of Plaintiffs' remaining state law claims against them, and that Plaintiffs may obtain no additional tort compensation from them in this proceeding.[90]  Plaintiffs respond that to the contrary, NMED's release language was tailored to allow lawsuits such as this one—brought by the Attorney General, not NMED—to proceed unhindered by the HRAs.[91]

The intended scope of the NMED release language *vis-a-vis* the Attorney General's state tort damages claims remains in genuine dispute, and if necessary, will be resolved at trial.

_____

[89](*See* Texaco HRA, ¶¶ 14, 15, 49, annexed as Exhibit B to Motion and Memorandum of Chevron and Texaco in Support of Partial Summary Judgment on Plaintiffs' State Common Law Claims and Common Law and Statutory Public Nuisance Claims Based on the Hydrocarbon Remediation Agreement, filed July 10, 2002 (dkt. no. 596); Plaintiff's Response to Chevron's and Texaco's Motion for Partial Summary Judgment  on Plaintiffs' State Common Law Claims and Common Law and Statutory Public Nuisance Claims Based on the Hydrocarbon Remediation Agreement, filed August 30, 2002 (dkt. no. 723), at Exh. 3.)

[90](*See* Motion and Memorandum of Chevron and Texaco in Support of Partial Summary Judgment on Plaintiffs' State Common Law Claims and Common Law and Statutory Public Nuisance Claims Based on the Hydrocarbon Remediation Agreement, filed July 10, 2002 (dkt. no. 596), at 8-24.)

[91](*See* Plaintiff's Response to Chevron's and Texaco's Motion for Partial Summary Judgment  on Plaintiffs' State Common Law Claims and Common Law and Statutory Public Nuisance Claims Based on the Hydrocarbon Remediation Agreement, filed August 30, 2002 (dkt. no. 723), at 5-10.)

Even as construed by the Attorney General, however, the NMED release language may directly limit the relief obtainable by the Plaintiffs in this action against Chevron/Texaco.  If the remedy available to Plaintiffs under their common-law and statutory public nuisance claims is *abatement*, the abatement of groundwater pollution is clearly among those "actions that might be brought by NMED" in a "civil or administrative action against" Chevron/Texaco, (Chevron HRA at ¶ 54), and thus may come squarely within the terms of the NMED release language.  *Cf. State ex rel. Norvell v. Arizona Public Service Co.*, 85 N.M. 165, 510 P.2d 98 (1973), discussed *infra*.  NMED expressly invoked its jurisdiction pursuant to, *inter alia*, the New Mexico law of statutory and common-law public nuisance in making the HRAs themselves.  (*See* Chevron HRA at ¶ 8; Texaco HRA at ¶ 7 (citing N.M. Stat. Ann. §§ 30-8-1, 30-8-2, 30-8-8).)

Under the terms of the HRAs, then, equitable relief seeking abatement of groundwater contamination within the scope of the HRAs may not be available to Plaintiffs in this action at least as against Chevron/Texaco, and the same may be true of damages measured in terms of the cost of abatement or restoration, at least within the scope of the existing HRA remedial actions.[92]

### 3. *Schwartzman*, Settlement and Release of the State's Claims

Defendants ACF Industries, Chevron and Texaco contend that they were already

---

[92]Even if they are available under New Mexico law, interim loss of use and diminishment of value damages may likewise be unavailable to the extent they depend upon the jurisdiction over public nuisances already invoked by NMED in the HRAs.

sued in the name of the State of New Mexico pursuant to the New Mexico public

nuisance statute for injuries to public rights resulting from the contamination of

groundwater at South Valley, as well as theories of trespass and negligence.[93]  That action

was settled on June 9, 1994, pursuant to which, Defendants contend, the State's statutory

public nuisance claims at South Valley were forever released.

 Plaintiffs respond that "[t]he principles of *res judicata* have no application here.

There has been no previous natural resources damage litigation under either state law or

CERCLA resulting from defendants' conduct in this case."  (Plaintiffs' Response to the

Petroleum Pipeline Defendants' Motion for Summary Judgment on Public Nuisance

Claims, filed September 3, 2002 (dkt. no. 735), at 10; Plaintiffs' Response to ACF

Industries' Motion for Summary Judgment on Public Nuisance Claims, filed August 30,

2002 (dkt. no. 721), at 3-4 (same).)[94]

 The impact of the prior public nuisance settlement may be a question of the effect

of privity between the State and a "private attorney general" relator in a statutory public

---

[93](*See* First Amended Complaint for Trespass, Nuisance, Negligence and Related Claims,
*Schwartzman, Inc. and the State of New Mexico ex rel. Schwartzman, Inc. v. General Electric Company, et al.*,
Civil No. CIV-93-0027M (D.N.M., filed February 26, 1993), annexed as Exhibit 1 to Defendant ACF Industries,
Inc.'s Motion for Summary Judgment on Plaintiffs' Nuisance Claims and Brief in Support of the Motion, filed
July 10, 2002 (dkt. no. 606); Joint Motion for Dismissal with Prejudice, *Schwartzman, Inc. and the State of New
Mexico ex rel. Schwartzman, Inc. v. General Electric Company, et al.*, Civil No. CIV-93-0027M (D.N.M.), *id.* at
Exh. 2; Order of Dismissal with Prejudice, *Schwartzman, Inc. and the State of New Mexico ex rel. Schwartzman,
Inc. v. General Electric Company, et al.*, Civil No. CIV-93-0027M (D.N.M.), *id.* at Exh. 3.  *Accord,*
[Chevron/Texaco] Motion and Memorandum of Points and Authorities in Support of Motion for Summary
Judgment on Public Nuisance Claims, filed July 10, 2002 (dkt. no. 646), at 4-5, 10-11 & Exhs. B, C, D & E.)

[94]The pertinent summary judgment motions were heard on October 4, 2002, and the matter was taken
under advisement.  (*See* Minute Entry, dated September 30-October 4, 2002 (dkt. no. 900), at 9.)

nuisance action, and may raise *res judicata* principles at least to that extent.  If the State is bound by the terms of its relator's settlement agreements with tortfeasors, then the impact of prior settlements on the State's presently asserted nuisance claims depends upon the substantive scope of the injuries and conduct encompassed by the prior settlements, which is largely a fact-driven question.

### 4.  Avoidable Consequences & Plaintiffs' Duty to Mitigate Damages

Another fundamental principle of New Mexico law that may limit the damages recoverable by Plaintiffs and indeed, may counsel in favor of measuring the Plaintiffs' damages by the cost of restoration is the Plaintiffs' legal duty to mitigate tort damages. "Under the doctrine of 'avoidable consequences' the injured person has the duty to use reasonable diligence to mitigate damages incurred either from tort or breach of contract." *Acme Cigarette Services, Inc. v. Gallegos*, 91 N.M. 577, 583, 577 P.2d 885, 891 (Ct. App. 1978) (Hernandez, J, specially concurring) (citing *Mitchell v. James*, 47 N.M. 169, 138 P.2d 522 (1943) ("It is well settled that a party must use reasonable diligence to mitigate the damages about to be suffered either from tort or breach of contract."), and *Rutledge v. Johnson*, 81 N.M. 217, 220, 465 P.2d 274, 277 (1970) ("Under the doctrine of avoidable consequences a person injured by the tort of another is not entitled to damages for harm which he could have avoided by the use of due care after the commission of the tort.")); *see also Ledbetter v. Webb*,103 N.M. 597, 605, 711 P.2d 874, 882 (1985) ("the principle of avoidable consequences or mitigation of damages is applicable to torts both negligent

and intentional."); *Selgado v. Commercial Warehouse Co.*, 88 N.M. 579, 581, 544 P.2d 719, 721 (Ct. App.1975) ("plaintiff cannot recover damages for injuries . . . if plaintiff could reasonably have avoided these consequences. This is called the doctrine of 'avoidable consequences'.")

The Plaintiffs' current posture in this litigation suggests that the State intends to do nothing further to abate, mitigate or remediate the hazardous waste contamination problem at South Valley, beyond seeking the recovery of significant monetary damages to be paid into the State's general fund.  The Plaintiffs' approach presupposes that the injury to the groundwater resource beneath the South Valley Site is total and permanent, and that a large volume of groundwater has been forever lost to beneficial use by the people of New Mexico.  Plaintiffs seek an award of the cash replacement value of the affected water and the aquifer in which the water is stored.[95]

If the Plaintiffs' premise proves to be demonstrably *wrong*, and some, most or all

---

[95]As of January 2004, the Plaintiffs demand over $1.2 billion dollars in cash compensation, including $609,000,000 as the cost of water rights to nearly a quarter-million acre-feet of potable water that likely will never be purchased, and up to $609,000,000 million for the construction of a 289,500 acre-foot "replacement" surface storage reservoir that likely will never be built:

Summary of Total Value of Damages

| | |
|---|---|
| Replacement of Lost Groundwater Supply Storage | $77.8 to 609.0 million |
| Replacement of Groundwater Storage Reservoir (Aquifer) | $609.4 million |
| Replacement of Lost Aquifer Yield | $62.8 million |
| Total | $749.7 million to $1.28 billion |

(*See* Transcript of Hearing, dated December 10, 2003 (a.m.), at 2769:17-2770:19 (testimony of Stephen B. Johnson).)

of the affected South Valley groundwater may actually be used, or may be restored to use

as drinking water or put to other beneficial use, then the State of New Mexico—like any

state tort plaintiff—may *not* recover monetary damages for present and future value of the

use of groundwater that in fact has not been or need not be lost.[96]

### D.      Intrinsic Limitations on the Available Remedies

### 1. Common Law Trespass

#### a. *Schwartzman* and Physical Invasion of a Possessory Interest

As Chief Judge Burciaga of this court explained in *Schwartzman, Inc. v. Atchison,*

*Topeka & Santa Fe R. Co.*, 857 F. Supp. 838 (D.N.M. 1994), "Trespass is defined as a

direct infringement of another's right of possession."  857 F. Supp. at 844 (citing *Pacheco*

*v. Martinez*, 97 N.M. 37, 41, 636 P.2d 308 (Ct. App. 1981)).[97]  "A trespass may be

committed on or beneath the surface of the earth," *id.* (citing *Restatement (Second) of*

*Torts* § 159 (1977)), and "contemplates actual physical entry or invasion."  *Id.*   For

"groundwater contamination to be actionable under trespass, the contamination must have

reached Plaintiff's property and damaged it."  *Id.* (citing *Padilla v. Lawrence*, 101 N.M.

---

[96]Moreover, the prospect of the State channeling hundreds of millions of dollars into the general fund at the conclusion of this litigation—ostensibly as a legal "remedy" for hazardous waste contamination of the public's groundwater—while undertaking *no* clean-up of the complained-of contamination only lends further credence to the Defendants' assertion that allowing the recovery of natural resource damages without requiring remediation frustrates the express purposes of CERCLA to achieve the clean-up of hazardous waste sites and the restoration of damaged natural resources to use, thus inviting conflict preemption of the state damages remedy altogether.  (*See* General Electric Company's Motion and Supporting Memorandum for Summary Judgment on Plaintiffs' State Law Claims, filed January 8, 2002 (dkt. no. 432), at 6-9.)

[97]As *Schwartzman* involved trespass claims arising from groundwater contamination in Albuquerque's South Valley, it seems to be an excellent starting point.

556, 563, 685 P.2d 964 (Ct. App. 1984)).

*Schwartzman* thus instructs that "actual physical invasion of the contamination is a requisite element" of Plaintiffs' trespass claim. *Id.* at 845. "To survive summary judgment, Plaintiff[s] must identify *specific facts*, Fed.R.Civ.P. 56(e), which show physical invasion of contaminants." *Id.* (emphasis in original).

In this case, Defendants argue that the Plaintiffs cannot recover damages for trespass because they cannot show harm to any property within the State's *exclusive possession*.[98]

> Historically, the requirements for recovery for trespass to land under the common law action of trespass were an invasion (a) which interferes with the right of exclusive possession of the land, and (b) which was a direct result of some act committed by the defendant. In the bundle of rights, privileges, powers, and immunities that are enjoyed by an owner of property, perhaps the most important is the right to exclusive "use" of the realty. An interference with this exclusive possessory interest brought about in a direct way from an act committed by the defendant was regarded legally as actionable.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 13, at 67 (5th ed. 1984) (footnote omitted).

Plaintiffs respond that the State has "proprietary interests" in its natural resources; that the State is the proper party "in its role as public trustee"; and "has a sovereign

---

[98](*See* Motion and Memorandum in Support of Motion for Summary Judgment on Claim for Trespass, filed July 10, 2002 (dkt. 629), at 5-8; *see also* Motion to Dismiss and Motion for Judgment on the Pleadings on State Law Claims for Trespass, Nuisance and Unjust Enrichment, filed August 24, 2001 (dkt. no. 385)); *see also In re Burbank Environmental Litigation*, 42 F. Supp. 2d 976, 983-84 (C.D. Cal. 1998) ("A trespass is 'an invasion of the interest in the exclusive possession of land, as by entry upon it.' . . . Trespass requires a physical invasion of plaintiffs' land. . . . [T]respass may be based on the presence of contamination on property. . . ." (citations omitted)).

interest in in its water resources" making it "the proper party to pursue the claims of its citizens in its role as *parens patriae*" in bringing a trespass action for actual damage to the public's water supply, (Proposed Joint Pre-Trial Order, received July 29, 2003, at 13), relying on *State ex rel. Erickson v. McLean*, 62 N.M. 264, 308 P.2d 983 (1957), among other cases cited in their memorandum.[99]

### b. Common-Law Trespass & the State's Interests in Public Water

In *State ex rel. Erickson v. McLean*, the New Mexico State Engineer brought a *statutory public nuisance action* seeking injunctive relief against a water user who had wasted artesian well water by "permitting it to run uncontrolled for twenty four hours a day over grazing lands without an irrigation system, or through pipes to water troughs fitted with float feeds or other means of control to prevent waste," resulting in the diversion of a volume of water "many times that which is actually consumed for a useful or beneficial use."  62 N.M. at 270, 380 P.2d at 987.

> Water is too valuable to be wasted, either through an extravagant application for the purpose appropriated or by waste by misapplication which can be avoided by the exercise of a reasonable degree of care to prevent loss, or loss of a volume which is greatly disproportionate to that actually consumed.

*Id.*, 62 N.M. at 270-71, 380 P.2d at 987.  When an appropriator diverts more water than

---

[99](The State of New Mexico's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment on Claim for Trespass, filed August 30, 2002 (dkt. no 720), at 6-12.)  Plaintiffs also cite *State ex rel. New Mexico Water Quality Control Comm'n v. Molybdenum Corp. of America*, 89 N.M. 552, 554, 555 P.2d 375, 377 (Ct. App. 1976), for the proposition that "[a]s the water belongs to the State, the State is the proper party to bring a cause of action for trespass . . . ."  However, no claim of trespass was made in *Molybdenum Corp.*; instead the State was seeking enforcement of penalties for violations of New Mexico Water Quality Control Commission regulations.

necessary for a specific beneficial use, "he is appropriating to himself *that which belongs to others who are entitled to a like use*, and to that extent is obstructing the necessary use of water so as to interfere with its beneficial use, and which [by statute] . . . is declared to be *a public nuisance*." *Id.*, 62 N.M. at 273, 380 P.2d at 988-89 (emphasis added).

> Whatever right one has, even in his own, is subject to that established principle that his use shall not be injurious to the rights of others, or of the general public. No surface owner possesses the right to extract the subterranean water in excess of the quantity necessary to supply the beneficial uses to which it has been appropriated by him.  Any additional extraction is not in the exercise of a right, if by such exercise the rights of others and the public are injuriously affected.

*Id.*, 62 N.M. at 273, 380 P.2d at 989.  Mr. Erickson, the State Engineer, made no common-law trespass claim in addition to his well-grounded statutory public nuisance claim, and the *Erickson* court makes no reference to trespass at all.[100]

Another case cited by Plaintiffs, *In re Burbank Environmental Litigation*, 42 F. Supp. 2d 976, 983-84 (C.D. Cal. 1998), did involve trespass claims for contamination of groundwater, but the plaintiffs were private landowners, not the State of California.

Were Plaintiffs alleging a physical intrusion by hazardous substances onto lands or into groundwater located directly beneath lands owned by the State,[101] *Schwartzman*

_____

[100]It appears that the Plaintiffs cite the *Erickson* case for a single proposition: "All water within the state, whether above or beneath the surface of the ground belongs to the state, which authorizes its use, and there is no ownership in the corpus of the water but the use thereof may be acquired and the basis of such acquisition is beneficial use." *Id.*, 62 N.M. at 271, 380 P.2d at 987 (citations omitted).

[101]In their opposition memorandum, Plaintiffs remark that "State ownership of property in the vicinity of the South Valley Superfund Site ("Site") is readily apparent."

(continued...)

-85-

clearly indicates that a cause of action for trespass could be maintained to redress such an invasion of the State's exclusive possessory interest as a landowner.  *Accord, Hartman v. Texaco, Inc.*, 123 N.M. 220, 224, 937 P.2d 979, 983 (Ct. App. 1997) ("We recognize that in New Mexico an action for common law trespass does provide relief for trespass beneath the surface of the land.  *See Schwartzman Inc. v. Atchison, Topeka & S.F. Ry.*, 857 F.Supp. 838, 844 (D.N.M.1994) (trespass for pollution of groundwater); . . ."); *Snyder Ranches, Inc. v. Oil Conservation Comm'n*, 110 N.M. 637, 640, 798 P.2d 587, 590 (1990) (a landowner whose property may be damaged by injected salt water used in oil and gas operations may bring a claim for damages caused by the trespass).[102]

Similarly, if Plaintiffs were here claiming injury to the State's possessory interest

---

[101](...continued)

There can be no legitimate dispute that natural resources, real property and other interests owned by, managed by, and/or held in trust by the State exist within and in geographic proximity to the Site.  These interests are a matter of public record and include highways, air space and land easements, surface waters, groundwater, and beds and banks of navigable water bodies (*i.e.* the Rio Grande River).

(The State of New Mexico's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment on Claim for Trespass, filed August 30, 2002 (dkt. no 720), at 4-5.)  This lone assertion, unsupported by even a single citation to the record in this case, cannot suffice to meet Plaintiffs' burden in opposing summary judgment; it lacks specific facts supported by reference to Rule 56(c) materials.  *See* Fed. R. Civ. P. 56(c), (e); *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002) ("'Conclusory allegations made by a non-movant will not suffice.  Instead, sufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein.'" (quoting *United States v. Simmons*, 129 F.3d 1386, 1388 (10th Cir. 1997)).

[102]*See also Lincoln-Lucky & Lee Min. Co. v. Hendry*, 9 N.M. 149, 50 P. 330, 332 (N.M. Terr. 1897) ("there can be no distinction between an ouster upon the surface and an ouster beneath the surface, except in cases arising under the mining laws . . . .").  This notion may reflect the common law doctrine that ownership of land extends to the periphery of the universe.  *Pueblo of Sandia ex rel. Chaves v. Smith*, 497 F.2d 1043, 1045 (10th Cir. 1974).

as a water rights holder,[103] the right to compensatory damages for common-law trespass appears to be long-established under New Mexico law. *See Mogollon Gold & Copper Co. v. Stout*, 14 N.M. 245, 91 P.724 (N.M. Terr. 1907) (prior appropriator's claim against copper company for loss of trees and vineyards caused by water pollution "a good declaration in trespass on the case" under the common-law rules).[104]

Here, however, Plaintiffs assert neither species of possessory interest with reference to the contaminated groundwater directly beneath the South Valley Site.[105]  As detailed above, Plaintiffs assert the State's broader sovereign and public trust/*parens patriae* interests in protecting the public's right to the use of all of the waters of New

---

[103]Under New Mexico law, "A water right is property and in fact it is held to be real property by most authorities. 'It is generally conceded by all of the authorities that a water right, or an interest in water, is real property, and it is so treated under all the rules of law appertaining to such property.' 2 Kinney on Irrigation and Water Rights (2d Ed.) p. 1328." *New Mexico Prods. Co. v. New Mexico Power Co.*, 42 N.M. 311, 77 P.2d 634, 641 (1937); *Elephant Butte Irr. Dist. v. Regents of New Mexico State University*, 115 N.M. 229, 233, 849 P.2d 372, 376 (Ct. App. 1993) ("Water rights are real property rights that are generally tied to specific land." (citing *New Mexico Prods. Co.*, 42 N.M. at 321, 77 P.2d at 641)); *KRM, Inc. v. Caviness*, 122 N.M. 389, 390, 925 P.2d 9, 10 (Ct. App. 1996) ("A vested right to use water is a protected property right that can be sold, leased, or transferred"); see *also State ex rel. Reynolds v. Holguin*, 95 N.M. 15, 618 P.2d 359 (1980) (all water rights are appurtenant to specific acreage); *Posey v. Dove*, 57 N.M. 200, 257 P.2d 541 (1953); (water rights are real property rights).

[104]If the State's "proprietary interests" in the public's water resources equated with the possessory interest represented by water rights, it would be pointless to require the State to obtain water rights through the same process as everyone else.  Yet, as noted above, that is precisely what New Mexico law requires.  *See* N.M. Stat. Ann. § 72-5-1 (Repl. 1997).

[105]The Consolidated Complaint alleges an invasion of "the STATE OF NEW MEXICO's interests in the exclusive possession of the valuable natural resources of the STATE OF NEW MEXICO," (*id.* at 98 ¶ 303), impairment of the State's "use of its historic water rights," (*id.* at 99 ¶ 305), and a loss of tax revenues, (*id.* at 99 ¶ 306).  However, Plaintiffs have failed to articulate a factual footing that would establish any interest beyond the State's "ability to provide drinking water in its pre-pollution condition" for appropriation and use by others. (*Id.* at 99 ¶ 305.)

Mexico, including groundwater, "the stewardship of which is entrusted to the State."[106]
These interests fall outside of the scope of the law's protection traditionally afforded to
private landowners' right of exclusive possession by the law of trespass.

### c.  Trespass, Public Nuisance & Injury to Public Rights

The distinction between private possessory rights and public trust interests[107]
parallels the distinction between the trespass and public nuisance causes of action: the law
of trespass redresses injuries to an owner's right to actual and exclusive possession of the
affected property[108] caused by "an actual physical invasion";[109] in contrast, as reflected in
*Erickson* and as further explained *infra*, the law of *public nuisance* redresses injuries to
common rights belonging to the public as well as providing a remedy against threats to
the public's health, safety and welfare.

Absent the pleading of an exclusive possessory legal interest pertaining to the
groundwater in question, this court concludes that Plaintiffs cannot maintain a common-
law cause of action for *trespass* as against those who have allegedly contaminated the
public's groundwater by releasing hazardous substances at South Valley.  Instead, as

---

[106](Surreply to Defendants' Reply Memorandum in Support of Defendants' Motion to Dismiss and for Judgment on the Pleadings on the State Law Claims for Trespass, Nuisance and Unjust Enrichment, filed November 26, 2001 (dkt. no. 422), at 4.)

[107]*See, e.g., State v. Superior Court of Riverside County*, 78 Cal.App.4th 1019, 93 Cal. Rptr.2d 276 (2000) (state's public trust interest in unappropriated public water not a possessory property right).

[108]*See, e.g., Pueblo of Sandia ex rel. Chaves v. Smith*, 497 F.2d 1043, 1045 (10th Cir. 1974) (to recover trespass damages for aircraft overflights, "a landowner must allege and prove that low level flights are within the immediate reaches of, and interfere with the actual use of, his land").

[109](Transcript of Hearing, dated October 4, 2002, at 800:1-2 (Mr. Brian Branch).)

explained *infra*, they may pursue claims of common-law and statutory public nuisance to remedy the alleged injury to the public's groundwater and to vindicate the State's interest in making that groundwater available for public use.

### d.  Plaintiffs' Claims re: Injury to the Aquifer

As to Plaintiffs' claimed injury to the aquifer beneath the South Valley Site, trespass likewise becomes a tract book issue, and Plaintiffs must demonstrate contamination "directly underneath Plaintiff[s]' property," *Schwartzman*, 857 F. Supp. at 845, that is, contamination of geologic constituents of the aquifer either owned by or found directly beneath land owned by the State of New Mexico, to recover damages for a common-law trespass.

### 2.  Common Law Public Nuisance

Defendants submit that the State of New Mexico follows the *Restatement (Second) of Torts* in defining the tort cause of action for public nuisance.  *See, e.g.*, *State of New Mexico ex rel. Smith v. Riley*, 123 N.M. 453, 454, 942 P.2d 721, 722 (Ct. App. 1997);[110] Restatement (Second) of Torts §§ 821B-821C (1979).[111]  Generally, public nuisance

---

[110]According to *Riley*, 123 N.M. at 454, 942 P.2d at 722:

Public nuisance has its roots in English common law.  It came to mean "an act or omission 'which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all Her Majesty's subjects.'" W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 90, at 643 (5th ed.1984) (citation omitted).  It was a crime.  *Id.* at 645. Currently, New Mexico and all other states have criminal statutes barring public nuisance.  *Id.* at 645-46.  These statutes are commonly construed to  encompass the common law prohibitions. *Id.* at 646.

[111]Restatement (Second) of Torts § 821B (1979) reads:

(continued...)

claims are brought to abate an activity which adversely affects the public health, safety or

welfare, or "an unreasonable interference with a right common to the general public."

*State of New Mexico ex rel. Village of Los Ranchos de Albuquerque v. City of*

*Albuquerque*, 119 N.M. 150, 163, 889 P.2d 185, 198 (1994) (quoting *Restatement*

*(Second of Torts* § 821B(1)).

> This public right is one common to--belonging to–"all members of the
> general public." *Id.* § 821B cmt. g. "It is not, however,  necessary that the
> entire community be affected by a public nuisance, so long as the nuisance
> will interfere with those who come in contact with it in the exercise of a
> public right or it otherwise affects the interests of the community at large."
> *Id.*

*Id.*, 119 N.M. at 163, 889 P.2d at 198.

Analysis begins with the questions of interest and injury because nuisance "has

reference to the interests invaded, to the damage or harm inflicted, and not to any

particular kind of act or omission which has led to the invasion."  William L. Prosser,

*Handbook of the Law of Torts* § 87, at 573 (4th ed. 1971).

> Common law public nuisance covered a wide range of conduct
> which interfered with the interests of the community at large: "interests that

---

[111](...continued)
(1) A public nuisance is an unreasonable interference with a right common to the general
public.

(2) Circumstances that may sustain a holding that an interference with a public right is
unreasonable include the following:
(a) Whether the conduct involves a significant interference with the public health, the public
safety, the public peace, the public comfort or the public convenience, or
(b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or
(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting
effect, and, as the actor knows or has reason to know, has a significant effect upon the public
right.

were recognized as rights of the general public entitled to protection." Restatement (Second) of Torts § 821B cmt. b (1979). A public nuisance included "interference with the public health, ... with the public safety, ... with the public morals, ... with the public peace, ... with the public comfort, ... with the public convenience, ... and with a wide variety of other miscellaneous public rights of a similar kind." *Id.* This common law concept is carried into New Mexico law. See § 30-8-1; *State ex rel. Village of Los Ranchos de Albuquerque v. City of Albuquerque*, 119 N.M. 150, 163, 889 P.2d 185,198 (1994) (A "public right is one common to--belonging to-- 'all members of the general public.'" (quoting Restatement, supra, § 821B cmt. g)). A public nuisance affects "a considerable number of people or an entire community or neighborhood." *Padilla v. Lawrence*, 101 N.M. 556, 562, 685 P.2d 964, 970 (Ct. App.1984).

*Riley*, 123 N.M. at 454, 942 P.2d at 722. The *Riley* court elaborated on the required

breadth of the interest affected by a true "public nuisance," quoting the *Restatement*:

> Conduct does not become a public nuisance merely because it interferes with the use and enjoyment of land by a large number of persons. There must be some interference with a public right. A public right is one common to all members of the general public. . . . Thus the pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason alone become a public nuisance. If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public nuisance.

*Id.*, 123 N.M. at 455, 942 P.2d at 723 (quoting *Restatement (Second) of Torts* § 821B cmt.

g, at 92).

### a. Remedies for Common Law Public Nuisance

Defendants submit that the remedy for common-law public nuisance is abatement

through injunctive relief, *e.g.*, *Town of Clayton v. Mayfield*, 82 N.M. 596, 485 P.2d 352 (1971) (auto junkyard a public nuisance justifying injunctive relief),[112] and that compensatory damages are not available to public nuisance plaintiffs under New Mexico law.  While conceding that the New Mexico appellate courts have yet to affirm such an award, Plaintiffs insist that in actions brought by the State, compensatory as well as punitive damages are available for common-law public nuisance,[113] citing *Espinosa v. Roswell Tower, Inc.*, 121 N.M. 306, 910 P.2d 940 (Ct. App. 1995):

> Nuisance law in our state has largely evolved in the context of injunctive relief. *See, e.g.*, *State ex rel. N.M. Water Quality Control Comm'n v. City of Hobbs*, 86 N.M. 444, 446, 525 P.2d 371, 373 (1974) (negligent operation of sewer plant as public nuisance); *Town of Clayton v. Mayfield*, 82 N.M. 596, 485 P.2d 352 (1971); *Koeber v. Apex-Albuq Phoenix Exp.*, 72 N.M. 4, 380 P.2d 14 (1963).
>
> Other jurisdictions have (1) determined that the state's interest in its air, land, and water supports a nuisance claim for monetary damages, *see Selma Pressure Treating Co. v. Osmose Wood Preserving Co. of Am.*, 221 Cal.App.3d 1601, 271 Cal.Rptr. 596, 605-06 (1990) (list of cases from around the country allowing such recovery), and (2) recognized the state's right to seek punitive damages for common-law public nuisance based on the need for deterrence and the inadequacy of actual or nominal damages. *See National Audubon Soc'y v. Department of Water*, 869 F.2d 1196, 1204 (9th Cir.1988) (state common-law nuisance particularly appropriate to air pollution); *State ex rel. Dresser Indus., Inc. v. Ruddy*, 592 S.W.2d 789, 793 (Mo.1980) (en banc) (where neither party could cite precedent to deny public authority's right to recover punitive damages for common-law public nuisance, and where public policy furthered by recovery in cases of

---

[112]"None can question the power of a court of equity to enjoin permanently a nuisance that adversely affects the public health, welfare or safety."  *Mahone v. Autry*, 55 N.M. 111, 114, 227 P.2d 623, 624 (1971) (citations omitted).

[113](*See, e.g.*, Transcript of Hearing, dated October 4, 2002, at 791:13-793:10 (Mr. Brian Branch).)

environmental degradation, award is at discretion of trial court); . . .

121 N.M. at 310, 910 P.2d at 944 (some citations omitted).  *Espinosa* affirmed the award

to NMED of punitive damages in addition to statutory penalties against an air polluter

who failed to comply with regulations governing removal and disposal of asbestos.  *Id.*,

121 N.M. at 310-312, 314, 910 P.2d at 945-46, 948.  NMED sought such damages under

a common-law public nuisance theory, in contrast to a statutory public nuisance claim.

*Id.*

*Espinosa* pointed to *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.*

*of Am.*, 221 Cal.App.3d 1601, 271 Cal.Rptr. 596, 605-06 (1990), in suggesting that

compensatory as well as punitive damages may be available in an action for common-law

public nuisance under New Mexico law.  In *Selma Pressure Treating*, a California

intermediate court of appeals ruled that at the pleadings stage, at least, the State could

maintain a statutory public nuisance action for damages and equitable relief resulting

from releases of hazardous waste that had contaminated groundwater held by the State in

trust for the public.  Under the California statute, "when the state in its representative

capacity prosecutes a cause of action for a public nuisance, it is confined to seeking an

abatement of the public nuisance; money damages are not available to the state."  *Id.*, 221

Cal.App.3d at 1613, 271 Cal.Rptr. at 602-03.  The lower court had dismissed cross-claims

for indemnity among the respondents on the ground that indemnity claims would not arise

where the respondents could neither be held liable in damages nor required to abate the

nuisance.[114]  The court of appeals reversed the district court's dismissal, ruling that the

statute limits the State "only when it acts in its representative capacity protecting the

public interest generally.  Where the State has a property interest which has been

injuriously affected by a nuisance, the State can, like any property owner, seek damages."

*Id.*, 221 Cal.App.3d at 1614, 271 Cal.Rptr. at 603.  Given its property interest in the

polluted groundwater, the State was a "person whose property is injuriously affected" by

the public nuisance, thereby entitling it to bring a statutory public nuisance action for

damages:

> Whether we term the State's interest here a direct usufructory
> interest, a mere legal interest held for the benefit of the People or an interest
> supported by its *parens patriae* role, the State does have a legally
> cognizable interest in the ground waters affected here which would suffice
> to support a claim for damages under [the statute].

*Id.*, 221 Cal. App. 3d at 1618, 271 Cal. Rptr. at 606.  In its pleadings, the State had prayed

for "damages to the natural resources of the state of California, as determined at trial,"

together with "reimbursement . . . for the costs of sampling, investigations, and other

actions taken to determine the nature and extent of contamination in and around the site,

and for the costs of actions that may be taken . . . to abate the existing contamination and

prevent future contamination."  *Id.*, 221 Cal. App.3d at 1618-19, 271 Cal. Rptr. at 606.[115]

---

[114]The respondents had "no control over the polluted land, [and] they could not be made to abate the
nuisance."  *Id.*, 221 Cal.App.3d at 1614, 271 Cal.Rptr. at 603.

[115]In effect, the state in *Selma Pressure Treating* was seeking statutory public nuisance damages
measured by existing and future response and remediation costs.

Plaintiffs argue that "[t]here is no New Mexico authority supporting the notion that monetary damages are unavailable as a remedy for public nuisance," and urge that the *Espinosa* court's reliance on *Selma Pressure Treating*'s view that "the state's interest in its . . . water supports a nuisance claim for monetary damages" suggests that such damages may be recovered under New Mexico common-law public nuisance as well. (Proposed Joint Pre-Trial Order, received July 29, 2003, at LI-55.)

### b.  Nuisance Damages & the "Special Injury" Requirement

Turning once again to the *Restatement*, the Defendants respond that Plaintiffs cannot establish the "special injury"—different in kind from the injury suffered by the general public—that is a prerequisite for recovery of compensatory damages on a claim of common-law public nuisance under New Mexico law.  *See* Restatement (Second) of Torts § 821C (1979).  Section 821C of the *Restatement* reads in part:

> § 821C.        Who Can Recover for Public Nuisance
>
> (1)      In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.

As the official comments explain, the historical roots of the "special injury" requirement run deep:

> The original remedies for a public nuisance were a prosecution for a criminal offense or a suit to abate or enjoin the nuisance brought by or on behalf of the state or an appropriate subdivision by the proper public authority.  The first recorded case permitting a private action in tort was decided in 1536.  Anonymous, Y.B. Mich., 27 Hen. 8, f. 26, pl. 10.  This

-95-

> case held that a tort action could be maintained by a person who could show
> that he had suffered particular harm, over and above that caused to the
> public at large or to other members of the public exercising the same public
> right.

Restatement (Second) of Torts § 821C cmt. a. (1979).  *Accord*, William L. Prosser,
*Handbook of the Law of Torts* § 86, at 572 (4th ed. 1971) ("The remedy [for public
nuisance] remained exclusively a criminal one until the sixteenth century, when it was
recognized that a private individual who had suffered special damage might have a civil
action in tort for the invasion of the public right." (footnote omitted) (citing 8 William S.
Holdsworth, *History of English Law* 424-25 (2d ed. 1937), and English cases)).

According to the *Restatement*, special injury includes physical harm to a plaintiff's
land, *id.* § 821C cmt. d, and may include pecuniary loss: "Pecuniary loss to the plaintiff
resulting from the public nuisance is normally a different kind of harm from that suffered
by the general public."  *Id.* § 821C cmt. h.  Such pecuniary loss may result from the
pollution of public waters:

> 11.  A pollutes public waters, killing all the fish.  B, who has been
> operating a commercial fishery in these waters, suffers pecuniary loss as a
> result.  B can recover for the public nuisance.

*Id.* § 821C cmt. h, illus. 11.  *Cf. Pruitt v. Allied Chemical Corp.*, 523 F. Supp. 975, 980
(E.D. Va. 1981) (negligence liability for direct fishery-dependent economic losses
resulting from pollution of James River and Chesapeake Bay).

In *Selma Pressure Treating*, the California appellate court attempted to satisfy the
special injury requirement by ruling that the state's property interest in the public waters

was sufficient to support a damages claim, in contrast to cases where the state acts solely

"in its representative capacity protecting the public interest generally."  221 Cal. App.3d

at 1615, 271 Cal. Rptr. at 603.  The State, "like any property owner, [may] seek damages"

for injury to its own property interests.  *Id.*

In characterizing the state's interest in public waters as a property interest, the

court in *Selma Pressure Treating* relied on an earlier statement in *Aerojet-General Corp.*

*v. Superior Court*, 211 Cal. App.3d 216, 229, 257 Cal. Rptr. 621 (1989), that

> [i]n this state, all ownership of water is usufructuary; water rights decisions
> "do not speak of the ownership of water, but only of the right to its use." . . .
> The state's property interest in groundwater . . . is no less usufructuary than
> that of private ownership, and public waters may be duly used, regulated
> and controlled in the public interest. . . .
>
> Pollution of the ground and river waters is damage to public property, as
> well as a direct injury to public welfare. . . [Citations omitted.]

Under New Mexico law, however, if the State wishes to exercise "usufructuary"

rights to the public waters, *i.e.*, diverting water for a beneficial use,[116] the State must make

application to the State Engineer just as any private appropriator is required to do.  *See*

Part IV.A, *supra*.  The State's interest in New Mexico's unappropriated public waters is

not "usufructuary" in and of itself,[117] and remains indistinguishable from the public's

---

[116]"Usufructuary" refers to "the nature of a usufruct," that is, "[a] right to use another's property for a time without damaging or diminishing it, although the property might naturally deteriorate over time." Black's Law Dictionary 1542, 1543 (Bryan A. Garner ed., 7th ed. 1999)  As explained *supra*, "Beneficial use is the basis, the measure and the limit to the right to the use of the waters" owned by the State, including its groundwater.  N.M. Stat. Ann. § 72-1-2 (Repl. 1997)

[117]Viewed in terms of usufructuary rights, the State's interest in public waters seems more akin to that

(continued...)

interest in those waters: "The unappropriated water of every natural stream, perennial or torrential, within the state of New Mexico, *is hereby declared to belong to the public* and to be subject to appropriation for beneficial use, in accordance with the laws of the state." New Mexico Const., Art. XVI, § 2 (emphasis added).

To satisfy the "special injury" requirement in this case and establish any entitlement to compensatory damages on their common-law public nuisance claim, the Plaintiffs must show that the State has suffered some discrete physical harm or pecuniary loss apart from the more generalized injury to the public's interest that results from the public nuisance, here the contamination of public groundwater at South Valley by hazardous substances.[118]  As *Selma Pressure Treating* suggests, pecuniary losses arising from existing and future response and remediation costs at South Valley may be recoverable as damages reflecting a "special injury" to the State's property interest in South Valley groundwater—provided, of course, that the State has actually incurred or

---

[117](...continued)
of "the owner of the thing burdened" by the usufruct, *Black's Law Dictionary* at 1542; the State "is the holder of legal title as trustee for the benefit of the people of the state, all of whom in the last analysis, are the water users of the state." *Ivanhoe Irr. Dist. v. All Parties*, 47 Cal.2d 597, 625, 306 P.2d 824 (1957), *rev'd on other grounds sub nom. Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275 (1958).

[118]As is the case with Plaintiffs' trespass claims, their damages claims arising from physical injury to the aquifer beneath South Valley may be viable to the extent that the public nuisance impacts geological materials beneath land owned by the State itself.  *See, e.g.*, *Mayor and Council v. Klockner & Klockner*, 811 F. Supp. 1039, 1056 (D.N.J. 1993) (landowner alleged interference with that portion of an aquifer beneath its property, thus claiming a special injury different from that suffered by the public in general and stating a claim for public nuisance damages, citing *Restatement (Second) of Torts* § 821C).

will incur such losses by conducting response and remediation actions at the Site.[119]  *See*

*Tosco Corp. v. Koch Industries, Inc.*, 216 F.3d 886, 895-96 (10th Cir. 2000) (subsequent

owner who had borne entire cost of environmental investigation and remediation at oil

refinery proved it suffered "special injury" sufficient to maintain cause of action for

public nuisance against contributors); *City of Portland v. Boeing Co.*, 179 F.Supp.2d

1190, 1194-96 (D. Or. 2001) (municipality may recover response and remediation costs in

public nuisance action involving groundwater contamination; "These costs are unique to

Plaintiff as an owner of property in near proximity to Defendants' Facilities and are

adequate to establish a special injury").[120]

Absent proof of some discrete "special injury" to the State's interest apart from the

injury to the public's interest in unappropriated groundwater,[121] Plaintiffs may be limited

---

[119]Interim loss of use or diminution of value, on the other hand, appear to be losses suffered in common with the general public.  It is the *public*—not the State itself—that allegedly cannot appropriate to beneficial uses that volume of water purportedly lost to use because of chemical contamination.

[120]In *City of Portland*, the plaintiff municipality alleged injury to its own water rights and as a property owner: "the existence of contamination in the groundwater prevented Plaintiffs from utilizing the Wells to capacity, forcing them to obtain alternative water supplies and impose water restrictions, and caused Plaintiff to incur substantial costs in responding to the immediate threat to Plaintiff's water supply . . . ."  179 F. Supp.2d at 1194.

[121]Plaintiffs cannot satisfy the special injury requirement by pleading special injuries resulting in losses to private parties.  In *Satsky v. Paramount Communications, Inc.*, 7 F.3d 1464, 1470 (10th Cir. 1993), the court of appeals explained that "property damage, diminution of value to real estate, loss of income and other economic losses including loss of asset value, increased operating expenses, increased costs of personal protection from contaminated domestic water or the threat of contaminated domestic water, loss of water quality or quantity, loss or enjoyment of real property, mental anguish, and emotional distress and an increased risk of harm and an increased risk of contracting fatal or otherwise serious illnesses" involve "injuries to purely private interests, which the State cannot raise" in its trustee/*parens patriae* capacity in bringing a CERCLA natural resource damages claim.  Generally, "In order to maintain [a parens patriae] action, the State must articulate an interest apart from the interests of particular private parties, *i.e.*, the State must be more than a nominal party. The State must express a quasi-sovereign interest."  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*,

(continued...)

-99-

to equitable relief seeking the abatement of the claimed nuisance. *See, e.g.*, *People of the State of Illinois v. City of Milwaukee*, 731 F.2d 403, 415 (7th Cir. 1984) (state cannot recover damages for public nuisance because it had not suffered injury resulting from dumping of raw sewage into public waters of Lake Michigan of a kind different from that suffered by the public), *cert. denied*, 469 U.S. 1196 (1985).

### 3. Statutory Public Nuisance (N.M. Stat. Ann. § 30-8-2 (Repl. 1994))

As currently pleaded, Plaintiffs seek compensatory damages for both common-law and statutory public nuisance under New Mexico law, relying upon N.M. Stat. Ann. § 30-8-2 (Repl. 1994) (polluting public water a public nuisance),[122] a section currently found in New Mexico's criminal code[123] together with its corresponding remedial provision, N.M. Stat. Ann. § 30-8-8 (Repl. 1994) (abatement of a public nuisance).[124]

---

[121](...continued)
458 U.S. 592, 607 (1982). It is clear, then, that "a state may not sue to assert the rights of private individuals," in contrast to vindicating common public rights, when litigating in its representative/*parens patriae* capacity. *Satsky*, 7 F.3d at 1469.

[122]*See* note 76, *supra* (text of N.M. Stat. Ann. § 30-8-2).

[123]Under the New Mexico statute, committing a public nuisance is a misdemeanor:

**30-8-1. Public nuisance.**

A public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either:
A. injurious to public health, safety, morals or welfare; or
B. Interferes with the exercise and enjoyment of public rights, including the right to use public property.
Whoever commits a public nuisance for which the act or penalty is not otherwise prescribed by law is guilty of a petty misdemeanor.

[124]N.M. Stat. Ann. § 30-8-8 (Repl. 1994) reads:

(continued...)

-100-

### a.  Availability of Damages for Statutory Public Nuisance

In *Schwartzman,* Chief Judge Burciaga held that N.M. Stat. Ann. § 30-8-8 "does not provide for recoverability of damages" in public nuisance actions under N.M. Stat. Ann. § 30-8-2 brought by private plaintiffs in the name of the State: "Complainants are acting for the citizenry in general, and seek to force those who maintain public nuisances to refrain from further injuring the people."  *Id.* at 851.  Schwartzman, Inc. sought damages and injunctive relief against the defendant railroad arising from chemical contamination of groundwater underlying the plaintiff's property caused by waste discharge at an adjacent wood treatment facility operated by the railroad from 1908 through 1972.

While *Schwartzman* speaks in terms of private plaintiffs, N.M. Stat. Ann. § 30-8-8 makes no substantive distinction between actions "to abate a public nuisance" brought "by any public officer or private citizen," including the Attorney General herself; in each

---

[124](...continued)

**30-8-8.  Abatement of a public nuisance.**

A.  Except as herein provided, an action for the abatement of a public nuisance shall be governed by the general rules of civil procedure.

B.  A civil action to abate a public nuisance may be brought, by verified complaint in the name of the state without cost, by any public officer or private citizen, in the district court of the county where the public nuisance exists, against any person, corporation or association of persons who shall create, perform or maintain a public nuisance.

C.  When judgment is against the defendant in an action to abate a public nuisance, he shall be adjudged to pay all court costs and a reasonable fee for the complainant's attorney, when the suit is not prosecuted exclusively by the attorney general or a district attorney.

instance, the relief available would be essentially the same.[125]   The civil remedy available

to the Plaintiffs under § 30-8-2 is abatement of the nuisance—equitable relief—rather

than an award of pecuniary damages.[126]   This scheme reflects the historical nature of the

public nuisance cause of action as summarized by the *Restatement*, quoted above.   Where

public nuisances are concerned,

> The remedies usually available are those of criminal prosecution and
> abatement by way of an injunctive decree or order.  Equity followed the law
> generally speaking in adopting a broad definition of what would constitute a
> public nuisance.  The equitable remedy of injunction to enjoin a public
> nuisance developed early in the history of the development of equity
> jurisprudence, and this remedy is available to the state or the appropriate
> governmental entity even though the conduct may not be a crime.

W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 90, at 643 (5th ed.1984)

(footnote omitted).

Plaintiffs dispute *Schwartzman*, arguing that common-law public nuisance is

---

[125]N.M. Stat. Ann. § 30-8-8(C) does create one exception: it provides for an award of attorney's fees and costs to prevailing plaintiffs "when the suit is not prosecuted exclusively by the attorney general or a district attorney."

[126]Plaintiffs' § 30-8-2 claim must also surmount another obstacle: the requirement that they prove that the defendants acted "knowingly and unlawfully" in polluting South Valley groundwater, as alleged in ¶ 319 of the Consolidated Complaint.  *See, e.g.*, *Aragon v. United States*, 146 F.3d 819, 825 (10th Cir. 1998) (Air Force held immune from liability for trichloroethylene (TCE) contamination of private water wells near Walker Air Force Base in Roswell, New Mexico; no evidence that Air Force "knowingly and unlawfully" introduced TCE into a public water body). The fact that South Valley groundwater is contaminated, and that the contamination may be traceable to various defendants' property, does not suffice to establish Plaintiffs' right to the statutory remedy.  *See also Espinosa v. Roswell Tower, Inc.*, 121 N.M. 306, 310, 910 P.2d 940, 944 (Ct. App. 1995) (statutory public nuisance requires proof of knowledge; common-law nuisance requires no element of knowledge); *City of Albuquerque v. State ex rel. Village of Los Ranchos de Albuquerque*, 111 N.M. 608, 612, 808 P.2d 58, 62 (Ct. App. 1991), *cert. denied*, 113 N.M. 524, 828 P.2d 957 (1992).

"similar" to statutory public nuisance under New Mexico law,[127] and that N.M. Stat. Ann. § 30-8-8 "does not define 'abatement' nor does it limit actions or attempt to exclude actions for damages from its terms,"[128] indicating that the New Mexico public nuisance statute "includes the right to monetary damages," citing the *Selma Pressure Treating* case.[129]

In contrast to the California statute construed in *Selma Pressure Treating*, N.M. Stat. Ann. § 30-8-8 does *not* anywhere provide that "the nuisance may be enjoined or abated *as well as damages recovered therefor*";[130] indeed, the New Mexico statute specifically provides that "[a] civil action to abate a public nuisance may be brought,"[131] rather than providing that "[a]n action may be brought by any person whose property is injuriously affected . . . by a nuisance," as does the California statute.[132]  Moreover, *Selma Pressure Treating* recognized that absent proof of some special injury, "[a] civil action may be brought in the name of the people of the State of California to abate a public

---

[127]*See, e.g., State ex rel. Village of Los Ranchos de Albuquerque v. City of Albuquerque*, 119 N.M. 150, 163-64, 889 P.2d 185, 198-99 (1994) ("The common law public nuisance is similar to the New Mexico public nuisance statute, Section 30-8-1.").

[128](Plaintiffs' Response to ACF Industries' Motion for Summary Judgment on Public Nuisance Claims, filed August 30, 2002 (dkt. no. 721), at 6, 7.)

[129](Proposed Joint Pretrial Order, received July 29, 2003, at LI-53.)

[130]Calif. Civ. Proc. Code § 731 (emphasis added).

[131]N.M. Stat. Ann. § 30-8-8(B).  Defense counsel has expressed the view that "abatement" does not include "payment of the money to abate."  (Transcript of Hearing, dated October 4, 2002, at 794:15-795:5 (Ms. Azorsky).)

[132]*Id.*

-103-

nuisance," Calif. Civ. Proc. Code § 731, and that as thus confined, "money damages are not available to the state."  221 Cal. App.3d at 1613, 271 Cal. Rptr. at 1613.[133]

### b.  Statutory Public Nuisance, NMED & the Doctrine of Primary Jurisdiction

To the extent that Plaintiffs must seek equitable relief under N.M. Stat. Ann. §§ 30-8-2 and 30-8-8 to abate the public nuisance by further remediating the groundwater contamination at South Valley, the doctrine of primary jurisdiction may require that their claim be stayed in favor of further administrative proceedings involving the EPA and the New Mexico Environment Department.  In *State ex rel. Norvell v. Arizona Public Service Co.*, 85 N.M. 165, 510 P.2d 98 (1973), the New Mexico Supreme Court concluded that a public nuisance action brought by the Attorney General and private plaintiffs to abate coal-fired power plant emissions should have been dismissed because the New Mexico Environment Department had primary jurisdiction over pollution control.  This court similarly stayed plaintiff's claims for injunctive relief in *Schwartzman* in favor of ongoing remediation action by the EPA and NMED: "The doctrine applies when the agency and the court entertaining Plaintiff's claims have concurrent jurisdiction, but the court . . . believes it is prudent to decline to exercise its jurisdiction in favor of the expertise of the

---

[133]Plaintiffs also argue that the State may seek damages by pursuing "the claims of its citizens in its role as parens patriae" without proof of special injury.  (Plaintiffs' Response to ACF Industries' Motion for Summary Judgment on Public Nuisance Claims, filed August 30, 2002 (dkt. no. 721), at 13.)  *Selma Pressure Treating* makes no distinction concerning the State's status as *parens patriae* in pursuing damages for a special injury caused by a public nuisance.  *Commonwealth of Puerto Rico v. The SS Zoe Colocotroni*, 628 F.2d 652 (1st Cir. 1980), cited by Plaintiffs, involved admiralty jurisdiction over a cause of action for natural resources damages pursuant to a Puerto Rican environmental statute, and offers no help as to the law of *parens patriae* and statutory public nuisance in New Mexico.

agency." *Schwartzman*, 857 F. Supp. at 843.

Even if the  primary jurisdiction doctrine applies to abatement remedies, however,

Plaintiffs "may yet pursue monetary damages under the theor[y] of negligence . . . which

would include any costs necessary for cleanup," *id.*,[134] assuming that Plaintiffs intend to

seek further remediation of the problem they allege.

### 4.  Common Law Negligence

As with public nuisance, analysis of Plaintiffs' negligence claim begins with the

questions of interest and injury:

> Though the elements of negligence are generally facts for the jury to
> determine, "[n]egligence is not actionable unless it involves the invasion of
> a legally protected interest, the violation of a right." *Palsgraf v. Long
> Island R.R. Co.*, 248 N.Y. 339, 162 N.E. 99, 99 (1928).  "Proof of
> negligence in the air, so to speak, will not do." *Id.* (internal quotation marks
> and citation omitted).  Thus, the ultimate question of duty is whether the
> law should give recognition and effect to an obligation from one party to
> another, . . .

*Blake v. Public Service Co. of New Mexico*, --- N.M. ----, 82 P.3d 960, 962 (2003).  *See*

*also Calkins v. Cox Estates*, 110 N.M. 59, 62, 792 P.2d 36, 39 (1990) ("[Plaintiff] must

show that a relationship existed by which defendant was legally obliged to protect the

---

[134]To the extent that NMED could pursue further administrative or judicial abatement or other public nuisance remedies arising out of chemical contamination at South Valley, *cf. Espinosa*, 121 N.M. at 310-312, 314, 910 P.2d at 945-46, 948, Plaintiffs may be precluded from seeking such relief against Chevron, Texaco or other signatories of Hydrocarbon Remediation Agreements (HRAs).

It also remains somewhat unclear whether the New Mexico Natural Resources Trustee is the real party in interest concerning the remaining claims asserted by Plaintiffs.  *See* N.M. Stat. Ann. § 75-7-2(A) (Repl. 2001) ("The natural resources trustee shall act on behalf of the public as trustee of natural resources within the state or belonging to, managed by, controlled by or appertaining to the state, including protecting and representing the state's interest under applicable federal laws regarding injury to, destruction of or loss of natural resources in the state.").

interest of plaintiff.").

### a. Essential Elements

Generally, "a negligence claim requires the existence of a duty from a defendant to a plaintiff, breach of that duty, which is typically based upon a standard of reasonable care, and the breach being a proximate cause and cause in fact of the plaintiff's damages." *Herrera v. Quality Pontiac*, 134 N.M. 43, 73 P.3d 181, 185-86 (2003); *Hull v. Feinstein*, 133 N.M. 531, 534, 65 P.3d 266, 269 (Ct. App. 2002) ("Plaintiff's negligence claim required that she prove each of the elements of negligence, including that her injuries were proximately caused by the City's negligence. *See Lopez v. Maez*, 98 N.M. 625, 630, 651 P.2d 1269,1274 (1982) (stating requirements for negligence claim: duty, breach, proximate causation, and damages).").

"In New Mexico, negligence encompasses the concepts of foreseeability of harm to the person injured and of a duty of care toward that person." *Ramirez v. Armstrong*, 100 N.M. 538, 541, 673 P.2d 822, 825 (1983), *overruled on other grounds by Folz v. State*, 110 N.M. 457, 460, 797 P.2d 246, 249 (1990); *accord Calkins v. Cox Estates*, 110 N.M. at 62, 792 P.2d at 39.

Defendants contend that the Plaintiffs cannot prevail on their negligence claims in this action because (1) they have not established that Defendants owed a duty of care to the State;[135] (2) they have not established that each Defendant breached a duty of care

---

[135]Defendants also assert that in "evaluating operations at the respective facilities, one must properly
(continued...)

allegedly owed to the State; and (3) they cannot establish that the breach of a duty of care

owed by each Defendant proximately caused the alleged injuries to the State's interests in

the groundwater and aquifer at South Valley.  (*See* Proposed Joint Pre-Trial Order,

received September 23, 2002, at 57.)

### b.  The Duty Issue

"A finding of negligence . . . is dependent upon the existence of a duty on
the part of the defendant. Whether a duty exists is a question of law for the
courts to decide." *Schear v. Bd. of County Comm'rs*, 101 N.M. 671, 672,
687 P.2d 728, 729 (1984) (citations omitted); *accord Solon v. WEK Drilling
Co.*, 113 N.M. 566, 571, 829 P.2d 645, 650 (1992) ("It is thoroughly settled
in New Mexico, of course, that whether the defendant owes a duty to the
plaintiff is a question of law."); *Calkins*, 110 N.M. at 61, 792 P.2d at 38
(stating that the question of duty "must be decided as a matter of law by the
judge, using established legal policy").

*Herrera v. Quality Pontiac*, 134 N.M. 43, 73 P.3d at 186.  The issue of the existence of a

duty of care raises questions of foreseeability of harm and considerations of public policy.

*See Blake*, 82 P.3d at 963-68 (public utility under contract with a city owes no duty of

care to a person allegedly injured as a result of failure to provide or maintain

streetlights).[136]

---

[135](...continued)
apply the appropriate standard of care in effect at the time the activity or incident being evaluated occurred.  It is
inappropriate to retroactively apply today's laws and industry practices to events that occurred decades ago."
(Proposed Joint Pre-Trial Order, received September 23, 2002, at 57.)

[136]          Determination of duty is based in part on whether the injury to the
plaintiff was foreseeable.  *See Ramirez v. Armstrong*, 100 N.M. 538, 541, 673
P.2d 822, 825 (1983) ("If it is found that a plaintiff, and injury to that
plaintiff, were foreseeable, then a duty is owed to that plaintiff by the
defendant."), *rejected on other grounds by Folz v. State*, 110 N.M. 457, 460,

(continued...)

Plaintiffs contend that the legal duty of every person in New Mexico is to exercise "ordinary care" for the safety of the person and the property of others, citing New Mexico pattern jury instructions, NMUJI 13-1604 (2002), and *Dunleavy v. Miller,* 116 N.M. 353, 357, 862 P.2d 1212, 1216 (1993).  "Ordinary care" is that care which a reasonably prudent person would use in the conduct of the person's own affairs. *Id.*; NMUJI 13-1603 (2002).  What constitutes "ordinary care," Plaintiffs continue, varies with the nature of what is being done:

> As the risk of danger that should reasonably be foreseen increases, the amount of care required also increases.  In deciding whether ordinary care has been used, the conduct in question must be considered in the light of all the surrounding circumstances.  The duty owed—the exercise of ordinary care—thus remains constant, "while the conduct necessary to fulfill it varies with the circumstances." *Id.* (citing *Bober v. New Mexico State Fair*, 111 N.M. 644, 649, 808 P.2d 614, 619 (1991)).

(Proposed Joint Pre-Trial Order, received September 23, 2002, at 58.)

---

[136](...continued)
797 P.2d 246, 249 (1990).  In New Mexico, policy also determines duty. *Torres v. State*, 119 N.M. 609, 612, 894 P.2d 386, 389 (1995).  In determining issues of policy, we look to "community moral norms and policy views, tempered and enriched by experience, and subject to the requirements of maintaining a reliable, predictable, and consistent body of law." *Sanchez v. San Juan Concrete Co.*, 1997-NMCA-068, ¶ 12, 123 N.M. 537, 943 P.2d 571.  Our determination involves an analysis of the relationship of the parties, the plaintiff's injured interests, and the defendant's conduct.  *Calkins*, 110 N.M. at 63, 792 P.2d at 40.  We look principally to legal precedent, both common law and statutory.  *Sanchez*, 1997-NMCA-068, ¶¶ 13-15, 123 N.M. 537, 943 P.2d 571.  "[T]here is a policy in our law to protect certain interests, and thus the balancing implicit in the legal determination of a duty has been established by our legal tradition."  *Calkins*, 110 N.M. at 63, 792 P.2d at 40.

*Blake*, 82 P.3d at 963.

We must also keep in mind that "New Mexico has adopted and applied for decades the majority view of *Palsgraf,* that a negligent actor only owes a duty to those whose injuries are a foreseeable result of the negligence, rather than the dissenting *Palsgraf* view, that one owes a duty to the world, even if the plaintiff is outside of the zone of danger." *Herrera v. Quality Pontiac*, 73 P.3d at 190.

> As an initial step in the establishment of a common law duty, along with the required component of policy, "a potential plaintiff must be reasonably foreseeable to the defendant because of defendant's actions." *Klopp v. Wackenhut Corp.,* 113 N.M. 153, 158, 824 P.2d 293, 298 (1992) (quoting *Calkins,* 110 N.M. at 62, 792 P.2d at 39). "If the harm was not willful, [the plaintiff] must show that the act as to [the plaintiff] had possibilities of danger so many and apparent as to entitle [the plaintiff] to be protected against the doing of it though the harm was unintended." *Palsgraf,* 162 N.E. at 101. In other words, in a negligence case, a plaintiff must demonstrate that the defendant's act created a foreseeable zone of danger of such a magnitude that the defendant owes a duty to the plaintiff to refrain from engaging in the act. *Calkins,* 110 N.M. at 61, 792 P.2d at 38.

*Id.* As an aspect of the duty issue under New Mexico law, foreseeability and the zone of danger created by defendant's conduct must be addressed under the circumstances of each case.[137]

---

[137]In *Blake*, for example, the court concluded that Public Service Company of New Mexico owed no duty of care to a pedestrian who had been struck by a car while crossing an Albuquerque intersection one evening; a streetlight originally installed in 1977 had since been removed. 82 P.3d at 962-68. In *Herrera*, the court wrestled with whether an automobile business owed a duty of care to motorists who were killed or injured by a collision with a thief who had stolen a car from the shop's lot; the keys had been left in the vehicle awaiting repairs in compliance with the business's instructions. 73 P.3d at 185. Based on a detailed analysis of public policy and the foreseeability of the specific harm suffered by plaintiffs, the court held that "Defendant's actions in directing the owner to leave the keys in the vehicle and leaving the vehicle unlocked and unattended created a duty to exercise ordinary care. Without any of these factors, the foreseeability and likelihood of theft and the risk of harm would diminish so substantially that such a claim would fail." *Id.* at 194.

In this case as well, the duty issue presents a question of law for this court to decide.

### c.  Breach of the Duty of Care

It is "'[a] fundamental tenet of common law negligence . . . that liability must be predicated upon fault.'" *State Farm Mut. Auto. Ins. Co. v. Baldonado*, 134 N.M. 197, 75 P.3d 413, 416 (quoting *Britt v. Phoenix Indem. Ins. Co.*, 120 N.M. 813, 817, 907 P.2d 994, 998 (1995)).  To be held liable for negligence, then, a defendant must be shown to have breached a duty of care to the plaintiff, and the plaintiff must prove that the defendant's breach was the cause-in-fact and proximate cause of injury to the plaintiff's legally protected interests.

> [T]he responsibility for determining whether the defendant has breached a duty owed to the plaintiff entails a determination of what a reasonably prudent person would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all the surrounding circumstances.  This is a factual determination or, perhaps, a mixed determination of law and fact, involving as it does the application of precepts of duty to the historical facts as found by the fact finder.

*Bober v. New Mexico State Fair*, 111 N.M. 644, 650, 808 P.2d 614, 620 (1991).  "The finder of fact must determine whether Defendant breached the duty of ordinary care by considering what a reasonably prudent individual would foresee, what an unreasonable risk of injury would be, and what would constitute an exercise of ordinary care in light of all surrounding circumstances of the present case, including whether Defendant acted reasonably or negligently" in engaging in the conduct in question.  *Herrera v. Quality Pontiac*, 73 P.3d at 195.

### d. Causation in Fact & Proximate Cause

"Causation of injury is an ultimate fact in every case." *Armstrong v. Industrial Elec. and Equipment Service*, 97 N.M. 272, 276, 639 P.2d 81, 85 (Ct. App. 1981). Plaintiffs submit that under New Mexico law,

> A proximate cause of an injury is that which in a natural and continuous sequence [unbroken by an independent intervening cause] produces the injury, and without which the injury would not have occurred.  It need not be the only cause, nor the last nor nearest cause.  It is sufficient if it occurs with some other cause acting at the same time, which in combination with it, causes the injury.

N.M.U.J.I. 13-305 (2002); *Bouldin v. Sategna,* 71 N.M. 329, 378 P.2d 370 (1963).

(Proposed Joint Pre-Trial Order, received September 23, 2002, at 58.)  "Thus, the finder of fact must determine whether Defendant's acts . . . were a proximate cause of Plaintiffs' injuries." *Herrera v. Quality Pontiac*, 73 P.3d at 195.

Underlying the issue of proximate cause, of course, is the question of causation in fact, that is, the *factual connection* between a defendant's conduct and the plaintiff's injury.  In every situation, there are a multitude of facts and events that may be seen to lead to an event or occurrence that results in an injury.  This "chain of causation" may often involve more than one act or omission on the part of more than one person.[138]

---

[138]In *Herrera*, the chain of causation involved several different actors and events:

On May 27, 1996, an individual took his car to Defendant for repairs.  At Defendant's direction, the owner left the keys in the car and the doors unlocked.  The lot was fenced, and

(continued...)

"To establish liability, there must be a chain of causation initiated by some negligent act or omission of the defendant, which in legal terms is the cause in fact or the 'but for' cause of plaintiff's injury." *Chamberland v. Roswell Osteopathic Clinic, Inc.*, 130 N.M. 532, 536, 27 P.3d 1019, 1023 (Ct. App. 2001); *see* NMUJI 13-305 (encompassing cause in fact within the instruction on proximate cause, defining it as "that . . . without which the injury would not have occurred").[139]  "The law requires the parties to separate the limitless events which lead to an occurrence and establish the legal significance of a defendant's acts by showing that defendant was the proximate or direct cause of plaintiff's injuries." *Martinez v. First Nat. Bank of Santa Fe*, 107 N.M. 268, 269, 755 P.2d 606, 607 (Ct. App. 1987) (citing W.P. Keeton, *Prosser and Keeton on the*

---

[138](...continued)

the gate was unlocked.  After 9:00 p.m., Billy Garcia entered the lot, apparently looking inside the cars for something to steal.  Garcia stole the vehicle in question.  The following day, at approximately 11:00 a.m., a Bernalillo County deputy sheriff observed Garcia driving quickly through a school zone and pursued him, engaging his emergency lights and sirens.  Garcia drove at a speed of up to ninety miles per hour and collided head on with Plaintiffs' car, which had pulled over onto the shoulder after hearing the sirens.  One occupant was killed and the other seriously injured.

73 P.2d at 185.  Would the *Herrera* plaintiffs have been killed or injured if any one of the acts or events in this sequence had not happened?

[139]     The general term 'proximate cause' encompasses both causation in fact and proximate causation as a limitation placed on the tort-feasor's responsibility. Prosser on Torts, § 41 (4th Ed. 1971).  The latter type of causation occurs when the consequences '". . . were or should have been contemplated or might have been foreseen." . . .' *Valdez v. Gonzales*, 50 N.M. 281, 176 P.2d 173 (1946)."

*Terrel v. Duke City Lumber Co.*, 86 N.M. 405, 423, 524 P.2d 1021, 1039 (Ct. App.1974), *modified*, 88 N.M. 299, 540 P.2d 229 (1975).

*Law of Torts* § 41 (5th ed. 1984)).

> Proximate cause superimposes considerations of foreseeability on causation in fact. *See Torres v. El Paso Elec. Co.*, 1999- NMSC-029, ¶ 14, 127 N.M. 729, 987 P.2d 386 (noting the necessity of limiting "potentially limitless liability arising from mere cause in fact"). New Mexico follows the rule that "'[a]ny harm which is in itself foreseeable, as to which the actor has created or increased the recognizable risk, is always "proximate," no matter how it is brought about.'" *Id.*, ¶ 23 (quoting Restatement (Second) of Torts § 442B cmt. b (1965)).

*Andrews v. Saylor*, 134 N.M. 545, 80 P.3d 482, 489 (Ct. App. 2003). "The proximate cause of an injury must be an act which actually aids in bringing about an injury; it need not be the last or nearest act, nor need it be the sole cause of the injury." *Id.*, 107 N.M. at 270, 755 P.2d at 608 (citing *LeBlanc v. Northern Colfax County Hosp.*, 100 N.M. 494, 672 P.2d 667 (Ct. App.1983)).

As outlined above, Defendants contend that their actions did not proximately cause Plaintiffs' alleged injuries. Indeed, they assert that much of the contamination at South Valley may be traceable to releases of hazardous materials by non-parties, *e.g.*, the Univar Edmunds Street facility. Plaintiffs respond that they "need only show proximate cause which is an issue of fact for the jury." (Proposed Joint Pre-Trial Order, received September 23, 2002, at 58 (citing *New Mexico Elec. Serv. Co. v. Montanez,* 89 N.M. 278, 551 P.2d 634 (1976)[140]).)

---

[140]Other than the statement that "[w]hether the defendant . . . breached his duty of reasonable care or proximately caused the injuries in question remain for the jury to decide," 89 N.M. at 281, 551 P.2d at 637, the support that *Montanez* lends to Plaintiffs' assertion remains unclear.

-113-

### e.  Injury in Fact & Damages

Of the four essential elements of Plaintiffs' negligence claim, only the element of *injury in fact* would be addressed in the first phase of the trial of this action concerning interest, injury and damages.  Under New Mexico law, the existence of a duty of care and the question whether a defendant breached that duty are of no legal consequence if a plaintiff did not suffer a legally cognizable injury to a legally protected interest as a proximate consequence of a defendant's breach of duty.  Proof that the State has suffered such an injury-in-fact under the circumstances alleged in this action is required before the trier of fact need decide the issues of breach of duty and causation, and is essential to the court's legal determination of the duty issue, *viz.*, whether the defendants owed a duty of care to the State to avoid conduct creating a risk of this particular harm to the State's legally protected interests.[141]

*Damages* reflect the consequences of an established injury-in-fact.  Under New Mexico law, the damages sought must bear some reasonable relationship to the injury suffered.

Plaintiffs' recovery of damages may be limited by the hypothetical or speculative nature of the damages sought.  Under New Mexico law, "Damages based on surmise,

---

[141]It may be that the injury suffered is in the nature of a public nuisance.  *See* William L. Prosser, *Handbook of the Law of Torts* § 87, at 573-74 (4th ed. 1971) ("The attempt frequently made to distinguish between nuisance and negligence . . . is based upon an entirely mistaken emphasis upon what the defendant has done rather than the result which has followed, and forgets completely the well established fact that *negligence is merely one type of conduct which may give rise to a nuisance.*" (emphasis added & footnotes omitted)).

conjecture or speculation cannot be sustained.  Damages must be proved with reasonable

certainty." *Mascarenas v. Jaramillo*,111 N.M. 410, 415, 806 P.2d 59, 64 (1991); *Central*

*Sec. and Alarm Co., Inc. v. Mehler*, 121 N.M. 840, 848, 918 P.2d 1340, 1348 (Ct. App.

1996) ("Although proof of the amount of damages need not be made with mathematical

certainty, it cannot be based upon surmise, conjecture, or speculation." (citing *First Nat'l*

*Bank in Albuquerque v. Sanchez*, 112 N.M. 317, 323-24, 815 P.2d 613, 619-20 (1991),

and *Camino Real Mobile Home Park Partnership v. Wolfe*, 119 N.M. 436, 447, 891 P.2d

1190, 1201 (1995) (surmise, conjecture, speculation not sufficient to prove amount of

damages))); *cf. Buckingham v. Health South Rehabilitation Hosp.*, 124 N.M. 419, 423,

952 P.2d 20, 24 (Ct. App. 1997) ("Courts commonly use the term 'speculative' to mean

'unlikely' or 'arrived at  merely by guesswork,' as when courts refuse to permit recovery

for 'speculative' damages. *See Camino Sin Pasada Neighborhood Ass'n v. Rockstroh*,

119 N.M. 212, 216, 889 P.2d 247, 251 (Ct. App. 1994).").

     If Plaintiffs have actually suffered no discernable actual injury to a legally

protected interest, there need be no further consideration of the question of fault.  If

Plaintiffs can establish an injury-in-fact, but fail to prove the economic value of that

injury, the compensatory damages awarded would be nominal at best. *Herzog*

*Contracting Corp. v. A & S Const. Co.*,107 N.M. 6, 8-9, 751 P.2d 690, 692-93 (1988)

("'To authorize a recovery of more than nominal damages, facts must exist and be shown

by the evidence which afford a reasonable basis for measuring the plaintiff's loss.  The

damages must be susceptible of ascertainment in some manner other than by mere

speculation, conjecture, or surmise and by reference to some fairly definite standard * *

*.'  22 Am.Jur.2d *Damages* § 25 (1965).").

Plaintiffs' damages recovery as against these Defendants may also be diminished

to the extent that Plaintiffs' injury may be attributed to the fault of non-parties.  New

Mexico applies principles of comparative fault in apportioning liability for negligence

among multiple defendants or other actors. *See Scott v. Rizzo*, 96 N.M. 682, 634 P.2d

1234 (1981) (adopting pure comparative negligence).  "Under comparative negligence,

fault may be allocated between defendant and a tortfeasor not joined as a party to the

action, so long as evidence is presented to establish that the absent party was negligent

and fault can be fairly distributed in proportion to the injury caused by the act of each

joint tortfeasor. *Martinez v. First Nat'l Bank of Santa Fe*, 107 N.M. 268, 270, 755 P.2d

606, 608 (Ct. App. 1987).

As explained above, Plaintiffs' recovery of damages may also be limited so as not

to compensate for avoidable consequences, that is, Plaintiffs' failure to mitigate damages.

*See, e.g.*, *Martinez on Behalf of Martinez v. Vigil*, 105 N.M. 741, 745, 737 P.2d 100, 104

(Ct. App. 1987) ( ("Under the doctrine of avoidable consequences, a person injured by the

tort of another is not entitled to recover for losses that he or she could have avoided by the

use of due care.")

### 5. Summary re: Instrinsic Limitations

Each of the state law causes of action now pleaded in this action imposes its own intrinsic limitations and constraints upon the remedy available to the Plaintiffs, in particular the monetary damages they now seek: (1) absent proof of physical invasion of an exclusive possessory interest in property owned by the State, Plaintiffs are entitled to *no* judicial remedy for common-law trespass; (2) absent proof of a "special injury" to the State's interests different in kind from that suffered by the public at large, Plaintiffs may not be entitled to relief in compensatory damages for common-law public nuisance, and the special injury requirement may limit Plaintiffs' damages to its pecuniary losses reflecting costs already incurred or likely to be incurred in response to and in the abatement and remediation of the alleged public nuisance; (3) this court's precedent correctly instructs that compensatory damages are not available to the Plaintiffs for statutory public nuisance under N.M. Stat. Ann. §§ 30-8-1, 30-8-2 & 30-8-8, as abatement of the nuisance is the prescribed remedy; and (4) recovery of damages under Plaintiffs' negligence claim is limited to reasonable compensation for the actual and unavoidable consequences of an injury-in-fact to the State's interests, further limited by the degree of fault, if any, properly attributable to the wrongful conduct of each Defendant or other non-party actor.

E.      The Measure of Damages Under New Mexico Law

Plaintiffs contend that under New Mexico law, "the State of New Mexico is entitled to be made whole - with the ultimate purpose being to fully compensate the State for all of its losses," pointing to *Ruiz v. Varan*, 110 N.M. 478, 797 P.2d 267 (1990). (Proposed Joint Pre-Trial Order, received July 29, 2003, at LI-44.)

1.  Diminution of Value & Loss of Use

In *Ruiz v. Varan*, the New Mexico Supreme Court explained,

> The measure of damages for a real property tort can be found in our Uniform Jury Instructions, SCRA 1986, 13-1802 and 13-1819. The first of these instructions, on the general measure of damages, is intended to provide for an "amount of money which will reasonably and fairly compensate" for an injury as established by evidence. Ordinarily this is accomplished by instructing the jury to determine "what was the value of the property immediately before the occurrence and immediately after the occurrence. The difference between these two figures is the legal measure of damages to real property." SCRA 1986, 13-1819. *See also Duke City Lumber Co. Inc. v. Terrel*, 88 N.M. 299, 540 P.2d 229 (1975) (difference between "before and after" fair market values measures damage to business).

*Id.*, 110 N.M. at 481, 797 P.2d at 270. "But nothing in our case law," the court continues, "precludes substituting a 'lost use' measure for the standard 'before and after' measure set out in UJI 13-1819 where such a measure represents fair and reasonable compensation." *Id.* (citing *Shaeffer v. Kelton*, 95 N.M.182, 619 P.2d 1226 (1980) (damages awarded for inability to discharge loan due to breach of contract, interest payments made while attempting to locate buyer for property, and lost use value of investment capital)). "In sum, 'before and after' diminution in value, compensation for

-118-

lost use, and even nominal damages of the kind associated with a trespass may be awarded, depending on the proof offered to establish and quantify the harm." *Id.*

In *Ruiz v. Varan*, the court affirmed the trial court's refusal to award damages for loss of use of development property where partnership held property for no specific use and presented no evidence of actual lost use. It is thus read to stand for the proposition that "a landowner may not recover lost-use damages for uses that are speculative." *Chenega Corp. v. Exxon Corp.*, 991 P.2d 769, 793 & n.97 (Alaska 1999) (citing *Ruiz v. Varan* and other cases).

## 2. Cost of Restoration as a Measure of Damages

The cost of repairing, restoring or replacing damaged property is often an appropriate measure of damages where the injury is "temporary," that is, where restoration or replacement can actually be accomplished. *See, e.g., Harvey v. Bokum*, 70 N.M. 444, 447, 374 P.2d 500, 502 (1962) (affirming damages award of "'$1923.64 for the restoration of said well to a condition where it furnished water,'" as "'the  measure is the cost of repairing or restoring the same.'" (citation omitted)). Cost of repair or restoration as a measure of damages for injury to property has been acknowledged by the New Mexico courts for a long time. *See, e.g., Mogollon Gold & Copper Co. v. Stout*, 14 N.M. 245, 261-62, 91 P. 724, 729 (1907) (suggesting that damages for destruction of property may be proved either by cost of repair or replacement, or by showing depreciation in value of real estate); *cf. Snider v. Town of Silver City*, 56 N.M. 603, 613,

247 P.2d 178, 184 (1952) ("'Where the building can be restored to substantially the condition it was in prior to the injury, * * * the measure of damages may be the cost of restoration, together, in a proper case, with the loss of rental, * * *'" (quoting 25 C.J.S. *Damages* § 85, at 609)); *Springer Ditch Co. v. Wright*, 31 N.M. 457,  247 P. 270, 274 (1925) (noting that "[f]or temporary injuries to real estate it is claimed that the true measure of damages is the cost of restoration, . . .")

"Because neither the diminished value nor the repair measure is appropriate for all cases, courts choose the measure deemed most adapted to the case at hand."  1 Dan B. Dobbs, *Law of Remedies* § 5.2(2), at 716 (2d ed. 1993).

> One rule sometimes adopted by courts for selecting the appropriate measure is that if the harm is "permanent," then the diminution measure rather than the repair cost measure is to be used.  This automatically makes the diminished value a ceiling on recovery for any harms that are permanent, since it forecloses use of the repair-cost measure altogether.  Use of the diminished value measure in turn eliminates any risk of economic waste or windfall.

*Id.* (footnotes omitted).

Under New Mexico law, "The measure of damages under a negligence theory of liability for permanent damage to real property is the difference between the fair market value of the land prior to the injury and the fair market value of the land after the full extent of the injury has been determined."  *Amoco Production Co. v. Carter Farms Co.,*103 N.M. 117, 121, 703 P.2d 894, 898 (N.M. 1985) (citation omitted).  "Where temporary damage results to the surface estate, but it can be repaired, then the damages

-120-

are the cost of repair or restoration if the cost of restoration does not exceed the value of

the property." *Id.* (citation omitted).[142]

New Mexico law appears to harmonize with the *Restatement* view:

§ 929. Harm to Land from Past Invasions

(1) If one entitled to a judgment for harm to land resulting from a past
invasion and not amounting to a total destruction of value, the damages
include compensation for

(a) the difference between the value of the land before the harm and
the value after the harm, or at his election in an appropriate case, the cost of
restoration that has been or may be reasonably incurred,

(b) the loss of use of the land, and

(c) discomfort and annoyance to him as an occupant.

(2) If a thing attached to the land but severable from it is damaged,
he may at his election recover the loss in value to the thing instead of the
damage to the land as a whole.

Restatement (Second) of Torts § 929 (1979).  Concerning the restoration cost measure,

the *Restatement* observes:

[T]he reasonable cost of replacing the land in its original position is
ordinarily allowable as the measure of recovery. . . . If, however, the cost of
replacing the land in its original condition is disproportionate to the
diminution in the value of the land . . . damages are measured only by the
difference between the value of the land before and after the harm. . . .

*Id.* § 929 cmt. b.

_____

[142]The court in *Amoco Production Co.* rejected the cost of restoration measure where, *inter alia*, the
cost of restoration exceeded the fair market value of the affected property.

### 3.  Plaintiffs' "Loss of Use" Damages Theory

Plaintiffs in this case seek damages that ostensibly they would measure in at least

two different ways: "The measure of damages for the State's claims is . . . the diminution

in value of the State's *in situ* groundwater damaged by defendants' pollution, plus the

value of lost extractive services as a result of defendants' pollution, plus the value of that

portion of the aquifer . . . destroyed as a result of defendants' pollution."  (Proposed Joint

Pre-Trial Order, received July 29, 2003, at LI-41.)

As noted above, however, these two measures address essentially the same injury,

and Plaintiffs' experts evaluate both the "diminution in value" of the *in situ* groundwater

and the "lost use" of extracted groundwater in essentially the same way: according to the

*"market value" replacement cost* of existing water rights representing equivalent volumes

of water, as well as the estimated construction cost of a large "replacement" surface

storage reservoir.

### a.  Loss of Use Damages & Replacement Cost

According to *Ruiz v. Varan*, ordinarily the "diminution in value" of property is

measured by asking "what was the value of the property immediately before the

occurrence and immediately after the occurrence," and not by asking "what is the 'market

value' replacement cost" of the injured property as evidenced by the purchase price of

some "equivalent" property supposedly to be obtained elsewhere.

Evaluating "before-after" diminution of value in terms of *replacement cost* makes

sense only if the evidence shows that the diminution of value of Plaintiffs' interests is both *permanent* and *total*. The same is true where, as here, damages are sought to be measured in terms of a total and permanent loss of use.  Natural resource damages analysis based on "market value" replacement cost necessarily assumes that there is a complete loss of the resource that has been injured, *see State of Utah v. Kennecott Corp.*, 801 F. Supp. at 566, and may be premature, particularly where sufficient facts have not been developed to justify the conclusion that the contaminant plumes could not be remediated.  *Id.*[143]

Plaintiffs have proffered no significant probative evidence or expert opinion as to "before-after" diminution of the value of its affected interests, short of the total replacement cost estimates based on the assumption that the affected water and aquifer are totally and permanently lost to use.[144]  As noted above, no expert witness has yet testified as to the relative economic value of groundwater that may be found to be

---

[143]On that score, Defendants insist that the ongoing remediation activities at the South Valley Site will effectively eliminate the contamination problem, leaving the public's groundwater in a usable, even potable condition, and rendering Plaintiffs' "permanent and total loss" of use illusory.  Plaintiffs reply that their interests will remain "injured" unless and until the groundwater and aquifer are restored to their pristine condition, and that the ongoing remediation actions will not restore the groundwater resource to pristine, pre-contamination levels.

If both predictions prove to be correct, and the existing remediation systems restore the groundwater beneath South Valley to a usable but not pristine condition, what then?

[144]

MR. LEWIS: . . . Dr. Brookshire also addressed the diminishment aspect of it in the sense that the water in its contaminated state is zero; the water but for the contamination would have been worth X.

(Transcript of Hearing, dated January 8, 2004, at 4093:22-4094:2 (Mr. Lewis).)

drinkable, but still not pristine.

### b.  Proof of "Loss of Use"/Replacement Cost Damages

Plaintiffs' "lost use" damages turn on the total and permanent loss of drinking water services that Plaintiffs insist has occurred at South Valley as a result of the contamination problem.  As *Ruiz v. Varan* indicates, to recover damages for this injury, Plaintiffs must show that "such a measure represents fair and reasonable compensation," depending "on the proof offered to establish and quantify the harm."  110 N.M. at 481, 797 P.2d at 270.  If their damages are to be measured by loss of use, Plaintiffs would be required to come forward with substantial evidence quantifying the additional volume of *in situ* groundwater in the Middle Rio Grande Basin aquifer that would otherwise be made available for appropriation at some point in the future, but for the contamination problem at South Valley.  As was the case in *Ruiz*, Plaintiffs may not recover lost-use damages for uses that are merely speculative or conjectural.

Plaintiffs dispute this, arguing vehemently that if they are unable to recover replacement cost damages for past, present and future loss of use of the volume of water "taken out of service" by defendants' contaminants, then the defendants will not be held accountable and in effect be granted "a license to pollute" where the groundwater is already fully appropriated.[145] Yet when framed in terms of *loss of use*, the State's interest

---

[145](*See, e.g.*, Plaintiff's Further Response to General Electric Company's Supplemental Brief in Support of its Motion for Summary Judgment on Plaintiff's Damage Claims," filed December 29, 2003 (dkt. no. 1043), at 5-9.)

in making public waters available for appropriation is injured only to the extent that the

*amount* of water which could otherwise be made available is reduced, *i.e.*, injured by an

*actual* loss of use.

### c. Alternative Measures & the "License to Pollute"

Were Plaintiffs seeking damages measured by the traditional "before-after"

*diminishment of value* of the *in situ* groundwater,[146] damages could be measured by the

degradation in *quality* of contaminated water compared to water of pristine purity, and the

responsible parties could be held liable for the value of that diminishment in an amount

that "'will reasonably and fairly compensate' for an injury as established by evidence,"

*Ruiz v. Varan*, 110 N.M. at 481, 797 P.2d at 270, without requiring proof of the impacted

water's availability for appropriation.  A defendant may still be held liable for causing a

diminishment of water quality as a matter of property value; actual loss of use would be

one of several factors bearing upon the question of value.[147]

As explained above, as an alternative to the diminution or lost use measures, a

defendant may also be held liable for the cost of restoration of a resource, where

restoration has been accomplished, is in the works, or at least appears feasible.

---

[146]"Ordinarily this is accomplished by instructing the jury to determine 'what was the value of the property immediately before the occurrence and immediately after the occurrence.'" *Ruiz v. Varan*, 110 N.M. at 481, 797 P.2d at 270.

[147]Because "use" would not be determinative of the fact of injury, the New Mexico drinking water standards would *not* define the extent of an injury to be compensated under the traditional diminution of value measure; the drinking water standards govern where the claimed injury to be compensated is the *loss of use or availability for use as drinking water.  See* Part IV.B.1, *supra*.

The New Mexico law of damages thus grants no "license to pollute."

In this case, however, Plaintiffs have steadfastly insisted upon substituting their loss of use/replacement cost theory for the traditional diminution measure, and have proffered *no* evidence concerning diminution of value other than as measured by a total loss of use ("extractive services," "drinking water services," "drought reserve," etc.). This continues to be so even when Plaintiffs have adopted diminution-of-quality language in pressing their claims.  (*See, e.g.*, Plaintiff's Reply to the Court's Ruling on "Injury" and Request for Reconsideration or Certification of the ["Injury"] Question to the New Mexico Supreme Court, filed January 5, 2004 (dkt. no. 1049), at 4 ("Potable groundwater, 'injured' by contamination, must still be considered 'injured' unless and until it is restored to its pre-polluted condition . . . .").)[148]

### 4. Cost of Restoration vs. Replacement Cost

Several times during the course of the Pretrial Conference, this court has raised

---

[148]Counsel's shrill cry that under the law of this case,

> polluters who do business in New Mexico have a license to pollute the groundwater and to use the State's groundwater as a disposal facility for its hazardous waste and toxic pollutants - *no matter how toxic and no matter how high the health risk* - as long as they can keep the concentrations slightly below the MCL standards,

(*id.* at 4-5 (emphasis in original)), blatantly ignores both the New Mexico law of tort damages outlined above and the New Mexico Water Quality Control Commission pollutant discharge regulations upon which Plaintiffs' counsel insist they rely.  *See* NMAC § 20.6.2.3101 *et seq.* (rules and standards governing discharge of pollutants into New Mexico water); *and* Fed. R. Civ. P. 11 ("By presenting to the court . . . a pleading, written motion, or other paper, an attorney . . . is certifying that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, . . . (2) the . . . legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law; . . .").

questions concerning the possible need for further remediation of the contamination at

South Valley, and the potential cost of restoration of the groundwater that Plaintiffs insist

will remain affected by the existing contamination.  The inquiry has been prompted by the

need to decide upon a measure of damages "'which will reasonably and fairly

compensate' for an injury as established by evidence," as New Mexico law requires.  *Ruiz*

*v. Varan*, 110 N.M. at 481, 797 P.2d at 270.

Besides the fact that the reasonable costs of restoration are "ordinarily allowable as

the measure of recovery" for injuries to property interests in private tort litigation,

*Restatement (Second) of Torts* § 929 cmt. b, the nature of the injury and interests asserted

in this case, when viewed against the background of public policy concerning  natural

resource protection, demands that restoration costs be taken into consideration in

determining the nature of the remedy that may ultimately be available to the Plaintiffs.

Indeed, as *State of Utah v. Kennecott Corp.* suggests, assessment of market value

replacement cost damages for the total loss of use of a resource may be premature where

restoration of use of the resource through remediation has not yet been fully examined.

801 F. Supp. at 566.

## 5.  Injury and Remedy in Hazardous Waste Cases

When dealing with contamination of land and water by hazardous substances, the

traditional legal damages remedy measured by diminution in value, or even loss of use,

may not fully redress the injury inflicted or mitigate its accompanying risks.

In some cases damage to the plaintiff's land also causes harm to others or to the public. Injunctive remedies may furnish the best relief in such cases. For example, a defendant might deposit toxic wastes on the plaintiff's land. As long as the wastes remain, they may be a source of secondary pollution that affects a neighbor's well or public waters. In such a case, the diminution in the value of the plaintiff's land does not represent all of the damage done. Instead, some of costs are externalized or placed upon other victims. Although the costs are real, many of them would be difficult to measure, even if appropriate plaintiffs could be identified. So injunctions will often be appropriate and desirable in such cases because the injunction can stop conduct that causes harms to the public at the same time it stops conduct that causes harm to the plaintiff.

1 Dan B. Dobbs, *Law of Remedies* § 5.2(5), at 724-25 (footnote omitted).

It is no accident, then, that the New Mexico law of common-law and statutory public nuisance "has largely evolved in the context of injunctive relief." *Espinosa v. Roswell Tower, Inc.*, 121 N.M. at 310, 910 P.2d at 944. Abatement of a public nuisance involving risks of public exposure to hazardous waste brings an end to the nuisance and to the risks, thus minimizing the externalized costs of the nuisance before many of those costs have been incurred.

Where hazardous releases have already ceased, "toxic substances may be left behind that continue to cause threats" and unless the defendant can "remove the hazards, . . . the question will be one of damages." 1 Dan B. Dobbs, *Law of Remedies* § 5.2(5), at 725. "Because the costs of the pollution affect others, or the public at large, the diminished value of the plaintiff's land is no guide to the actual costs imposed by the pollution. Costs of repair or cleanup are thus appropriate, even if they exceed the

-128-

diminished value of the land." *Id.*[149]  Indeed, measuring damages by the costs of

restoration "is supported by analogy to environmental laws, even if those laws do not

apply to the particular case."  *Id.  See generally State of Ohio v. United States Dept. of

Interior*, 880 F.2d 432, 456-57 (D.C. Cir. 1989); *State of Utah v. Kennecott Corp.*, 801 F.

Supp. at 571  (under CERCLA, "If . . . restoration is feasible, the State would be

obligated to follow and apply the statutory preference for restoration in assessing costs

and damages, unless exceptional circumstances would warrant adoption of a different

measure of damages.")

### 6.  The State as Public Trustee/*Parens Patriae*

To this point, at least, Plaintiffs are not here asserting the interests of a landowner

or water rights holder.  As Plaintiffs' counsel has persistently exclaimed, the Plaintiffs are

here as the "'public trustee' of the public's trust in these resources," as the *parens*

*patriae*—the "parent of the country"—suing "to prevent or repair harm to its 'quasi-

sovereign' interests," *Hawaii v. Standard Oil Co. of California*, 405 U.S. 251, 258

(1972),[150] and as the *public's* Attorney General, not as a private litigant pursuing purely

---

[149]Damage analysis in terms of remediation of the entire volume of groundwater to drinking water standards presumes exclusively culinary use, and "does not take into account that much of the water is already being used for purposes that don't require that level of treatment [drinking water]."  *State of Utah v. Kennecott Corp.*, 801 F. Supp. at 565 (internal quotations omitted).  *Cf.* Transcript of Hearing, dated February 5,2003, at 1813:11-13 (Mr. Lewis) ("this case has to do squarely with whether there has been pollution, and the question is, To what level do you clean it up?").

[150](The State of New Mexico's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment on Claim for Trespass, filed August 30, 2002 (dkt. no. 720), at 7-8, 9-10 (quoting *Attorney General v. Hermes*, 127 Mich. App. 777, 339 N.W.2d 545, 550 (1983).)

private interests.

Being here as the "holder of legal title as trustee for the benefit of the people of the state, all of whom in the last analysis, are the water users of the state,"[151] the Plaintiffs allege an injury shared in common with the public.  To the extent that water has been rendered unavailable for appropriation because it is unsafe, it is the public that suffers the consequences of that loss.  Like New Jersey, where, as Plaintiffs' counsel asserts, the "'State has not only the right but also the affirmative fiduciary obligation to ensure that the rights of the public to a viable marine environment are protected,'" the State of New Mexico has the standing and duty to protect the public's supply of drinking water.[152]

Measuring Plaintiffs' damages according to the costs of restoration of the affected South Valley groundwater coalesces with the State's professed role in this litigation. Where "the health and comfort of the inhabitants of a State are threatened, the State is the proper party to represent and defend them," *Missouri v. Illinois*, 180 U.S. 208, 241 (1901), and presumably the State would seek and obtain the legal remedy that best addresses the threat of harm to the public by minimizing that threat and restoring public groundwater resources to public use.

---

[151]*Ivanhoe Irr. Dist. v. All Parties*, 47 Cal.2d 597, 625, 306 P.2d 824 (1957), *rev'd on other grounds sub nom. Ivanhoe Irr. Dist. v. McCracken*, 357 U.S. 275 (1958).

[152](The State of New Mexico's Response and Memorandum in Opposition to Defendants' Motion for Summary Judgment on Claim for Trespass, *supra*, at 8 (quoting *Department of Environmental Protection v. Jersey Central Power & Light Co.*, 133 N.J. Super. 375, 336 A.2d 750, 759 (1975), *rev'd on other grounds*, 69 N.J. 102, 351 A.2d 337 (1976).)

### 7. Cost of Restoration & the Constraints on Plaintiffs' Claims

The restoration cost measure also permits recovery of damages under a wider range of Plaintiff's liability theories.[153]  Whether the Plaintiffs can recover damages for a particular type of injury or harm may depend on the legal theory of the plaintiff's claim. *See, e.g., First Nat'l Bank v. Sanchez*, 112 N.M. at 322, 815 P.2d at 618 (for breach of contract, recovery allowed for consequential damages only if they were within contemplation of parties at time of contracting).  To recover for the *loss of use* of the "out of service" volume of groundwater affected by the chemical contamination at South Valley, Plaintiffs must rely on their negligence claim alone, as compensatory damages for the injury to the public's common interest in that water are not available to Plaintiffs under either common-law or statutory public nuisance.[154]

However, if Plaintiffs' damages are measured by the cost of restoration of use of the affected groundwater as drinking water, restoration costs represent a "special injury" permitting their recovery under the common-law nuisance theory[155] as well as a

---

[153]Chevron also argues that New Mexico's environmental statutes displace state common-law remedies in redressing pollution problems, citing *Hittson v. Chicago, R. I. & P. Ry. Co.*, 43 N.M. 122, 86 P.2d 1037 (1939), and *Munro v. City of Albuquerque*, 48 N.M. 306,150 P.2d 733 (1943).  (*See* Transcript of Hearing, dated October 4, 2002, at 782:14-785:12 (Mr. Huffaker).)  Absent a clear expression of legislative intent to supplant the traditional common-law tort causes of action, this court remains unpersuaded by this argument.  *See, e.g.*, N.M. Stat. Ann. § 74-6-13 (Repl. 2000) (nothing in the New Mexico Water Quality Act "abridges or alters rights of action or remedies in equity under the common law or statutory law, criminal or civil").

[154]The same would be true even if Plaintiffs' "lost use" damages for the volume of affected groundwater are characterized as a "diminution in value."

[155]Of course, this assumes that the State as public trustee incurs the costs of restoration by conducting the required remediation itself.  The State suffers no "special injury" where the costs of restoration are imposed

(continued...)

recognized measure of compensatory damages available under the negligence claim.

Proof of a public nuisance may be an easier burden to meet. To recover under the

negligence claim, Plaintiffs must establish a duty of care, breach of that duty by each

defendant (including comparative fault issues), factual and proximate causation, as well

as injury-in-fact. To obtain a remedy for public nuisance, Plaintiffs need only prove the

existence of the nuisance, *viz.*, an "'unreasonable interference with a right common to the

general public,'" *State ex rel. Village of Los Ranchos de Albuquerque v. City of

Albuquerque*, 119 N.M. 150, 163, 889 P.2d 185, 198 (1994) (quoting *Restatement

(Second) of Torts* § 821B(1)), and establish that the defendants caused or are maintaining

the condition constituting the nuisance.

The cost of restoration measure also deflects potential "conflict preemption" by

CERCLA by avoiding any conflict with CERCLA's remedial purposes.

### F.    The Measure of Damages in This Case

The proper measure of damages is a question of law for the court to decide. The

court may choose one of several plausible alternative measures. *See Sierra Life Ins. Co.

v. First Nat'l Life Ins. Co.*, 85 N.M. 409, 414, 512 P.2d 1245, 1250 (1973) ("This Court

will not attempt to second guess the trial court's determination of the proper measure to be

applied for damages if the trial court had several alternatives before it supported by

substantial evidence.").

---

[155](...continued)
upon the responsible parties through judicial or administrative abatement orders, or the like.

In this case, should the Plaintiffs prevail on their current damages theory, the remedy thus obtained would leave the existing contamination in place at South Valley, untreated and undisturbed; it would do nothing to minimize the risk of future injury to the public health caused by that hazard beyond tying up a much larger volume of potable groundwater to be maintained indefinitely as a "buffer zone"—thus *maximizing* rather than mitigating the "loss of use" damages flowing from the contamination.[156]

If, on the other hand, the plumes of contaminated water are remediated, the toxic plume volumes are thereby returned to public use for drinking or other beneficial uses, and the need for the much larger "buffer zone" simply evaporates.

At the January 8, 2004 Pretrial Conference, Plaintiffs' counsel framed the issue of remedy in this way: "the proper measure of injury is how do you then get that water back to where it's safe to drink."  (Transcript of Hearing, dated January 8, 2004 (P.M.), at 4144:8-10 (Mr. Lewis).)

Absent significant probative evidence establishing the *permanent and total loss* of the affected volume of  groundwater at South Valley—and there is none of any material consequence in this record—this court chooses the *cost of restoration* as the appropriate measure of compensatory damages for injury to the *in situ* groundwater beneath the South Valley Site caused by VOC and petroleum hydrocarbon contamination.  Damages thus measured would include response costs (*e.g.*, site investigation costs) and similar

---

[156]If the toxic plumes may be remediated, the loss of use of the larger buffer zone volume appears to be an "avoidable consequence" for which Plaintiffs may not recover damages under New Mexico law.

consequential damages.  Cost of restoration damages under Plaintiffs' remaining state law claims would encompass past, present and *future* remediation expenses: where toxic contamination persists in land or groundwater, a plaintiff "should be permitted to recover full restoration costs and all consequential damages that are properly established, *at least if he can give the court assurance that repair, restoration or cleanup will actually take place.*"  1 Dan B. Dobbs, *Law of Remedies* § 5.2(5), at 725 (emphasis added).[157]

By allowing recovery for *future* restoration costs, the remedy thus available under Plaintiffs' state law claims affords greater relief than would be available under CERCLA. CERCLA generally does not provide for the present recovery of future costs of restoration; instead it "provides for a declaratory judgment action to establish liability for *future* response costs.  42 U.S.C. § 9613(g)(2)." *Stanton Road Associates v. Lohrey Enterp.*, 984 F.2d 1015, 1021 (9th Cir.), *cert. granted sub nom. Key Tronic Corp.*, 510 U.S. 1023, *cert. dismissed*, 510 U.S. 1031 (1993); *Dant & Russell v. Burlington N. R.R. Co.*, 951 F.2d 246, 250 (9th Cir. 1991) (CERCLA requires plaintiffs "to actually incur response costs before they can recover them.").

According to the facts proffered in the existing record, restoration of the groundwater at South Valley may be addressed in at least two ways: (1) following

---

[157]"Such a scenario," Dobbs continues, "gives the landowner no windfall and it entails no waste."  *Id. See, e.g., Nischke v. Farmers & Merchants Bank & Trust*, 522 N.W.2d 542, 551-52 (Wis. Ct. App.) (no windfall where property owner has legal duty to take remedial measures; owner may recover future costs she must incur in restoring her property as the measure of compensatory damages even exceeding diminished value of property), *review denied*, 527 N.W.2d 335 (Wis. 1994).

CERCLA's preference for permanent solutions,[158] remediation of the toxic plume(s) over a period of time using a groundwater extraction-treatment-reinjection system to remove the volatile organic contaminants while keeping the plume volume essentially in place; and (2) restoring the plume volume to immediate use by extracting the groundwater through wells, applying wellhead treatment technology to scrub out the chemical contaminants, and then diverting the water directly to beneficial use by one or more appropriators (*e.g.*, the City of Albuquerque).[159]

The State of New Mexico has already investigated, evaluated, approved and even *required* the first method of remediation for groundwater at the South Valley Site under the terms of its existing Hydrocarbon Remediation Agreements; the same method is currently in use in the ongoing EPA–ordered remedial actions in the Plant 83/General Electric Operable Units—a remediation requested, reviewed and expressly approved by the State of New Mexico through responsible officials in the New Mexico Environment Department.

---

[158] *See* 42 U.S.C. § 9621(b) (2000) ("remedial actions in which treatment which permanently and significantly reduces the volume, toxicity, or mobility of the hazardous substances, pollutants, and contaminants is a principal element, are to be preferred over remedial actions not involving such treatment"); 40 C.F.R. § 300.430(e)(9)(iii)(C), (D) (2003) ("Long-term effectiveness and permanence" and "Reduction of toxicity, mobility, or volume through treatment" are two criteria among nine for evaluating remedial alternatives); 40 C.F.R. § 300.430(f)(i)(B) (2003) (for selection of remedy, the "five primary balancing criteria are *long term effectiveness and permanence; reduction of toxicity, mobility, or volume through treatment*; short-term effectiveness; implementability; and cost." (emphasis added)).

[159] The availability of water through adoption of the latter approach would at minimum restore the "stock" or "drought reserve" value of the *in situ* groundwater at South Valley.

Additional remedial action is available, if appropriately pursued.[160]

## VII.   SCOPE OF THE TRIAL ON INJURY AND DAMAGES

This court has often asked of counsel at pretrial, "What is left?"

This Memorandum Opinion and Order represents the court's effort to arrive at an

answer to that query.  Clearly, several triable issues of fact remain.

Given the present scope of Plaintiffs' pleadings and the constraints imposed by

CERCLA itself, this court need not and will not engage in an examination of the

adequacy or efficacy of the EPA's ordered remedy for the Plant 83/General Electric

Operable Units in restoring groundwater to use within the intended scope of that remedial

action.  Plaintiffs have carefully pleaded their remaining state law claims, marking the

periphery of the CERCLA remedy as their boundary, and thus avoiding the risk of an

impermissible double recovery as well as potential conflict preemption by CERCLA

should a state law remedy somehow frustrate CERCLA's remedial objectives.

To recover damages in this action, the Plaintiffs must prove an actual injury to the

---

[160]In pursuing a remedy for the alleged loss of drinking water services at South Valley, Plaintiffs appear to have additional options: (1) to revisit the ongoing remediation activities through the EPA, seeking to expand the scope of the  Plant 83/General Electric OU remediation to encompass the contaminant plume that Plaintiffs insist will otherwise remain after that remedial action is completed; (2) to revisit the ongoing remediations pursuant to the State's own Hydrocarbon Remediation Agreements and if necessary, amend the HRAs' statements of work to address any need for further remedial action; and/or (3) to pursue an administrative abatement remedy through the New Mexico Environment Department pursuant to NMAC §§ 20.6.2.4101 *et seq.*, outside of the intended scope of the EPA's ongoing remediation, requiring responsible parties to formulate and carry out a plan to reduce the level of toxic contamination to meet the standards set forth in the NMWQCC regulations.  *See United States v. Colorado*, 990 F.2d 1565 (10th Cir.1993) (state enforcement of state law hazardous waste cleanup requirements not preempted by CERCLA).

Each of these options may appear more or less viable or cost-effective, depending on a number of factors, and they do not appear to be mutually exclusive.  As noted above, the prospect of further remedial or abatement action at South Valley raises the question of NMED's primary jurisdiction over such action.

State's legally protected interests in the groundwater and aquifer beneath the South Valley Site—an injury beyond the intended scope of the existing CERCLA remediation, as well as prove facts supporting an award of compensatory damages.

### A.    Summary Judgment & Genuine Issues for Trial

Ordinarily, at this stage of the proceedings, based upon the proffers of proof made in summary judgment papers as well as proffers made in the context of our extended Pretrial Conference and Rule 702 evidentiary hearing, this Court would probably grant judgment dismissing the Plaintiffs' remaining claims because of Plaintiffs' failure of proof of the essential elements of injury and damage—a failure to "set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).

Rule 56(e) does not ask the court to weigh each discrete piece of evidence individually, *e.g.*, by determining the credibility of a particular party, witness or affidavit. Rather, the "genuine issue" inquiry involves weighing the *probative significance* of a particular asserted *fact*, substantially taken as true, in the context of the entire case. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial.'"  *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).[161]

As discussed above, to recover damages measured by the "market value"

---

[161] *See also* Fed. R. Civ. P. 16(c)(1) (at the pretrial conference, the court "may take appropriate action, with respect to (1) the formulation and simplification of the issues, including the elimination of frivolous claims or defenses; . . .").

replacement cost as Plaintiffs urge, they must be able to prove a complete loss of the resource that has been injured, *see State of Utah v. Kennecott Corp.*, 801 F. Supp. at 566, that is, a *total and permanent loss* of all beneficial use of the groundwater.  Yet the bare assertion that an injury is *total* because the resource's "highest and best use" may be impaired, or that an injury is *permanent* because it purportedly is not being treated by existing remedial systems,[162] cannot stand in the stead of significant probative evidence demonstrating the existence of genuine issues of material fact concerning total and permanent loss that require a trial.[163]  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (a "plaintiff could not rest on his allegations of a conspiracy to get to a jury without 'any significant probative evidence tending to support the complaint'" (quoting *First National Bank of Ariz. v. Cities Service Co.*, 391 U.S. 253, 290 (1968))).  "It is not enough that the nonmovant's evidence be 'merely colorable' or anything short of 'significantly probative.'"  *Jensen v. Redevelopment Agency of Sandy City*, 998 F.2d 1550 (10th Cir. 1993) (quoting *Anderson*, 477 U.S. at 249-50).

During the course of the Pretrial Conference, however, the Defendants have

---

[162](*See, e.g.*, Transcript of Hearing, dated October 1, 2002, at 144:10-24 (Mr. Lewis); Proposed Joint Pre-Trial Order, received July 29, 2003, at 25-26.)

[163]Moreover, "It is by now well established that Fed. R. Evid. 702 imposes on a district court a gatekeeper obligation to 'ensure that any and all scientific testimony or evidence admitted is not only *relevant*, but reliable.'" *Dodge v. Cotter Corp.*, 328 F.3d 1212, 1221 (10th Cir. 2003) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)) (emphasis added).  The Plaintiffs' failure to raise a genuine issue concerning the total and permanent loss of use of the groundwater resource renders the proffered testimony of Plaintiffs' experts concerning market value replacement cost damages essentially *irrelevant* to the trial of this action.

The Rule 702 issues concerning expert witnesses will be addressed in greater detail by further order of this court.

proffered significant probative evidence concerning the feasibility and estimated cost of restoration of contaminated groundwater at the South Valley Site, particularly with reference to the second remedial option (wellhead treatment prior to use), that is sufficient at least to raise a triable issue as to the practicality of an abatement or restoration remedy and the utility of measuring Plaintiffs' damages according to the cost of restoration.[164]

In light of this evidence in the record, this court declines to grant judgment at this time that would dismiss the Plaintiffs' remaining claims for common-law and statutory public nuisance and common-law negligence in favor of resolving the remaining factual issues at trial, with Plaintiffs' damages to be measured by the cost of restoration.

**B.    Genuine Issues Remaining for Trial**

The following issues of fact remain in genuine dispute and require determination through the first phase of the trial of this action:

1.    What is the nature, location and extent (in both volume and concentration) of the chemical contamination of the groundwater underlying the South Valley Site that exists beyond the reach of CERCLA (*e.g.*, petroleum hydrocarbons only) and/or outside the intended scope of the existing EPA remediation?

2.    What is the volume of *in situ* groundwater beneath the South Valley

---

[164](*Cf.* Consolidated Complaint at 100 ¶ 310 (the "pollution and the contamination causing the continuing public nuisance can be abated at reasonable cost").)

Site that has been injured and  rendered unavailable (*e.g.,* as drought reserve) for use as drinking water because of that chemical contamination?

       3.     What is the cost of restoration of that volume of contaminated groundwater that has been lost to use as drinking water?

       4.     What amount of damages will reasonably compensate the State of New Mexico for the injury to its interest in that volume of *in situ* groundwater, measured by the cost of restoration, response costs, etc.?

* * * *

As explained above, Plaintiffs may seek an award of damages in an amount sufficient to reimburse the State of New Mexico for site investigation and other "response costs" incurred by the State in connection with a proven injury to the State's interests at the South Valley Site, and any costs of restoration of the groundwater at South Valley already incurred by the State with respect to that injury.  Plaintiffs, on behalf of the State of New Mexico in its capacity as public trustee, may also recover damages in the amount of future costs of restoration as established by substantial evidence, said damages to be held in trust for the benefit of the public, for the express purpose of paying for the actual remediation and restoration of the affected groundwater beneath the South Valley Site.

If necessary, any damages recovered for future costs of restoration may be deposited in escrow and maintained in the Registry of this court, awaiting their disbursement upon further order of the court to pay remediation costs as they are incurred.

Such an arrangement would serve the remedial purposes of Plaintiffs' tort liability theories as well as those of Congress in enacting CERCLA,[165] and the New Mexico Legislature in enacting the New Mexico Water Quality Act, N.M. Stat. Ann. §§ 74-6-1 *et seq.* (Repl. 2000), and would ensure that the damages awarded as the cost of restoring the resource are in fact used to restore the resource for the use and benefit of the public who owns it. *See, e.g.*, James R. Cox, *Reforming the Law Applicable to the Award of Restoration Damages as a Remedy for Environmental Torts*, 20 PACE ENVTL. L. REV. 777, 798-809 (2003) (equitable or constructive "cleanup" trust as a means of ensuring that restoration cost damages are used to restore resources).

## VIII.  RULINGS ON PENDING MOTIONS

During the course of the Pretrial Conference, a number of motions have been heard, considered, granted or denied in part and/or taken under advisement.  Counsel have submitted extensive briefing, particularly with reference to the pending summary judgment motions addressing Plaintiffs' damages claims.  Having reviewed the record in this proceeding with some care during the preparation of this Memorandum Opinion and Order, including the numerous memoranda and exhibits submitted by counsel for all parties, and having considered the arguments of counsel in light of the analysis set forth in detail herein, the court now rules as follows:

---

[165] *See, e.g., Stanton Road Associates*, 984 F.2d at 1025 (Canby, J., dissenting) ("Escrow arrangements to cover cleanup costs may prove to be a useful device in effectuating Congress's purposes" under CERCLA, and may "require the kind of commitment to cleanup that might well be deemed to render the costs 'incurred.'")

(1) ACF Industries, Inc.'s Renewed Motion to Dismiss Plaintiffs' State Law Claims as Contained in the Complaint in the Consolidated Case, filed August 9, 2001 (dkt. no. 373), and General Electric Company's Motion and Supporting Memorandum for Summary Judgment on Plaintiffs' State Law Claims, filed January 8, 2002 (dkt. no. 432), dealing with conflict preemption of Plaintiffs' state law claims, are hereby DENIED AS MOOT in light of the court's foregoing rulings concerning the scope and limitations of Plaintiffs' remaining claims as pleaded in the Consolidated Complaint;

(2) The Motion to Dismiss and Motion for Judgment on the Pleadings on State Law Claims for Trespass, Nuisance and Unjust Enrichment, filed August 24, 2001 (dkt. no. 385), by General Electric, ACF Industries and Chevron Pipeline, is hereby GRANTED IN PART insofar as the court has concluded that on the existing pleadings, Plaintiffs' common-law trespass claim fails to state a claim for which relief may be granted; Chevron/Texaco's Motion and Memorandum in Support of Motion for Summary Judgment on Claim for Trespass, filed July 10, 2002 (dkt. no. 629), is GRANTED for the reasons set forth herein;

(3) Defendant ACF Industries, Inc.'s Motion for Summary Judgment on Plaintiffs' Nuisance Claims and Brief in Support of the Motion, filed July 10, 2002 (dkt. no. 606), and the [Chevron/Texaco] Motion and Memorandum of Points and Authorities in Support of Motion for Summary Judgment on Public Nuisance Claims, filed July 10, 2002 (dkt. no. 646), are hereby GRANTED IN PART to the extent that this court has ruled that

compensatory damages are not available to Plaintiffs under the New Mexico public

nuisance statute, N.M. Stat. Ann. §§ 30-8-2 & 30-8-8, and that damages recoverable by

Plaintiffs for common-law public nuisance are limited by the "special injury"

requirement;

(4)   The Motion and Memorandum for Partial Summary Judgment Seeking

Dismissal of Plaintiffs' Alleged Lost Services Claims Under CERCLA and Lost Use

Claims at Common Law, filed July 10, 2002 (dkt. no. 612), by ACF Industries, Chevron,

and Texaco is hereby GRANTED IN PART in light of this court's determination that

Plaintiffs have failed to raise a genuine issue of material fact concerning lost "extractive

services," *viz.*, any actual volume of groundwater that would be available for

appropriation but for the chemical contamination at South Valley, and because they lack

standing to recover damages for the impairment, if any, of water rights belonging to the

City of Albuquerque;

(5)  ACF Industries, Inc.'s Motion for Partial Summary Judgment Limiting

Damages to Those for Any Loss of Drinking Water Services and Brief in Support of the

Motion, filed July 10, 2002 (dkt. no. 598), and Defendant General Electric Company's

Motion and Supporting Memorandum for Summary Judgment on Plaintiffs' Damages

Claims, filed July 10, 2002 (dkt. no. 631), previously granted in part, (*see* Minute Entry,

dated February 4-6, 2003 (dkt. no. 985), at 11), are hereby further GRANTED IN PART,

to the extent that this court has determined that Plaintiffs have failed to raise a genuine

issue of material fact concerning the existence of a volume of groundwater in the Middle

Rio Grande Basin aquifer that would have been made available for appropriation to a

beneficial use but for the chemical contamination at South Valley, defeating Plaintiffs'

claim for loss of extractive drinking water services; and GRANTED IN PART to the

extent that by reason of this court's foregoing rulings, Plaintiffs' damages claims are

limited to the past, present and future loss of drinking water services, if any, measured by

the cost of restoration of the contaminated *in situ* groundwater at the South Valley Site to

potential use as drinking water (*e.g.*, as drought reserve);[166] and

(6) Upon further consideration, and pursuant to Fed. R. Civ. P. 54(b),[167] the

Motion by Defendants Chevron USA, Chevron Pipeline Co., Texaco Refining and

Texaco Inc. for Summary Judgment, filed July 10, 2002 (dkt. no. 581), previously heard

and denied by the court, *see* Order, filed November 20, 2002 (dkt. no. 901), is hereby

GRANTED AS WRITTEN, to the extent that Chevron/Texaco requested summary

---

[166]Of course, the Defendants will *not* be held liable for the contamination at South Valley resulting from the conduct of Univar/Van Waters & Rogers or others who are not parties to this action.

[167]**(b) Judgment Upon Multiple Claims or Involving Multiple Parties.**

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.  In the absence of such determination and direction, *any order or other form of decision*, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, *and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.* [Emphasis added.]

-144-

judgment that federal MCL (Maximum Contaminant Level) standards define whether the groundwater resource has been "injured" as alleged by Plaintiffs, *i.e.*, that a loss of drinking water services has occurred; in light of New Mexico's adoption of federal safe drinking water standards, including federal MCL standards, as the New Mexico standards for drinking water supplied through public systems, groundwater that meets those standards has not been lost to use as drinking water for the purposes of evaluating injury and damages for the purpose of Plaintiffs' remaining state law claims; to that extent, the Order, filed November 20, 2002 (dkt. no. 901), is hereby VACATED.

## XI.    FINAL PRETRIAL CONFERENCE

In light of the foregoing rulings, court and counsel should now proceed to finalize the Pretrial Order governing the first phase of the trial of this action, and in furtherance of that effort,

**IT IS ORDERED** that the Final Pretrial Conference will held on **Tuesday, May 11, 2004 at 9:30 a.m.** in Albuquerque, New Mexico.  The court anticipates furnishing a proposed form of Final Pretrial Order to counsel in advance of that date.  Any recently filed motions will be heard in the context of the Final Pretrial Conference.

DATED this  5th   day of April, 2004.

BY THE COURT:

/s/ Bruce S. Jenkins

BRUCE S. JENKINS
United States Senior District Judge

-145-